**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| KEVIN JOHNSON, | : | CIVIL ACTION |
|  | : | (habeas corpus) |
| Petitioner | : |  |
|  | : |  |
| v. | : | NO.  13-cv-03197 |
|  | : |  |
| JOHN KERESTES, et al. | : |  |
|  | : |  |
| Respondents | : |  |

---

**PETITIONER'S SUPPLEMENTAL BRIEF IN SUPPORT OF HABEAS RELIEF AND
THE PARTIES' COMPROMISE AND SETTLEMENT AGREEMENT**

Petitioner Kevin Johnson, through counsel, submits this Supplemental Brief in response to the issues raised  by the Court at the September 22, 2022 hearing and to provide a comprehensive statement of the factual and legal grounds that support the Petition for Writ of Habeas Corpus and the Proposed Compromise and Settlement Agreement.

**I.      The Terms and Enforceability of the Agreement**

Under the terms of the Stipulation and Proposed Order (attached as Exhibit 1, ECF No. 77-1), if the Court issues a writ of habeas corpus, Mr. Johnson has agreed to plead no contest to third-degree murder, criminal conspiracy, and possessing an instrument of crime in state court, and the Commonwealth has agreed to recommend a sentence of no more than 10-20 years.

We agree with the Court's view, as expressed at the September 22 hearing, that it has the power to issue the writ with an order to release or retry Mr. Johnson in state court within the prescribed time of 120 days (or other time frame ordered by the Court), but that it has no power

to direct a specific plea or sentence in state court. The state proceedings will be governed by state law.

In *Commonwealth v. Speight*, 249 A.3d 1075 (Pa. 2021), the Supreme Court of Pennsylvania ruled that, on a remand to a state court of a grant of the writ of habeas corpus, the Court of Common Pleas had no power to vacate the issuance of the writ, as the federal court ruling was based on federal constitutional claims.[1] Accordingly, on remand, the state court would be required to accept this Court's habeas order, but the parties agree that the Court of Common Pleas would have its usual power to accept or reject a plea based on an agreement between the parties. The only parties bound by the portion of the Stipulation and Proposed Order detailing the agreed-upon resolution of the state charges are Mr. Johnson and the District Attorney's Office.

## II.     The Factual and Legal Grounds for Issuing the Writ of Habeas Corpus

### A.      Factual Background

The factual record supporting the issuance of the writ is set forth in the Compromise and Settlement Agreement for Habeas Relief ("Agreement") (attached as Exhibit 2, ECF No. 77) and Mr. Johnson's previous filings. In summary, on October 8, 1986, two men shot Lyndon Morris, who sold drugs from a bedroom in Opal Nickson's residence in Southwest Philadelphia. *See* Agreement ¶ 6. James Smith, who worked for Morris, opened the door on the night of the shooting; one man with a shotgun and one man with a pistol forced their way into the home and demanded to be taken to Morris's room. *Id.* at ¶¶ 7-8. Once upstairs, the man with the shotgun followed James Smith to the bedroom and fired at Morris as he opened the door. *Id.* at ¶ 8.

---

[1] *Speight* was the case referenced by counsel at the September 22 hearing.

2

In the meantime, the man with the pistol went to the back bedroom, where Opal Nickson, Angelo Smith, and Elisha Bennett were getting high on cocaine and marijuana. *Id.* at ¶ 9. While at the doorway of that bedroom, that man aimed his pistol at the three occupants of the room and ordered them to the floor; almost immediately, the light in the room went out and, hearing shotgun fire, the man with the pistol ran from the back bedroom and began firing his pistol in Morris's direction, evidently hitting him once. *Id.* at ¶ 10.

Within two days, Johnson was arrested based on identifications that he was the man with the pistol. *Id.* at ¶ 22. Johnson immediately denied any involvement and told police that, at the time of the murder, he had been selling clothes in West Philadelphia with Ronald Crawford. *Id.* at ¶ 12. No physical evidence linked Johnson to the offense, and police did not recover any weapons or drugs when they arrested Johnson and searched his family home. *Id.* at ¶ 13.  Mr. Johnson has asserted his innocence throughout this case.

The police obtained eyewitness identifications from Opal Nickson, James Smith, and Elisha Bennett *after* a tentative identification by Angelo Smith, the third occupant of the back bedroom. *Id.* at ¶ 14.[2] Angelo Smith reviewed a "book of photos" at 4:30 a.m. and told police that Johnson "looks like him, I am not positive." *Id.*; *see also* ECF No. 37 at 10. At 5:50 that morning, James Smith identified Johnson as one of the two perpetrators in his second interview with police; at 9:45 am, Bennett identified Johnson, and at noon, Nickson identified him. *See* Agreement ¶ 15; *see also* ECF No. 37 at 13, 20, 24.

James Smith, Opal Nickson, and Elisha Bennett identified Johnson at trial, but in adversarial post-conviction proceedings, they have all recanted their testimony, asserting that

---

[2] As discussed below, when Angelo Smith first had the opportunity to view Mr. Johnson (at his trial), he told the investigators that Mr. Johnson was not the person who entered the house. Smith was excused from appearing, and that exculpatory information was not provided to the defense.

they were pressured and coerced into making their identifications; although Angelo Smith did

not testify at trial, he too has disavowed his tentative identification of Mr. Johnson. *See*

Agreement ¶¶ 11, 45-49.  Specifically:

- In 2001, James Smith signed an affidavit stating that he only went along with

  identifying Mr. Johnson's picture because police told him that, if he did not, he

  would go to jail for murder. *See* Agreement ¶ 46; *see also* ECF No. 37 at 28. He

  reiterated this in a 2014 affidavit in which he further stated that police added

  details to his second statement to them that he had not witnessed and that, when

  he told the prosecutor this, the prosecutor threatened him with charges if he did

  not testify in accord with his police statement. *See* Agreement n.10; *see also* ECF

  No. 37 at 33-34.

- In 2014, Angelo Smith signed an affidavit stating that he was subpoenaed to

  testify at trial but was told that his testimony was not needed when he could not

  identify Mr. Johnson as the man with the pistol. *See* Agreement ¶ 49; *see also*

  ECF No. 37 at 29-30, 35. In 2016, when interviewed by detectives during Mr.

  Johnson's state PCRA proceedings, Smith claimed to have signed the affidavit

  without reading it but "affirmed the most significant fact: that he did not testify at

  trial because he 'told the cops [he] didn't recognize the guy in the courtroom.'"

  Agreement n.12.

- In 2014, Opal Nickson signed an affidavit stating that she knew when she

  identified Mr. Johnson and testified against him that he was not the man with the

  pistol. She stated that, although Mr. Johnson "looked a little like the guy with the

  pistol," the perpetrator had darker skin. She also said police threatened her with

losing her children and home if she did not pick Mr. Johnson. *See* Agreement ¶ 47; *see also* ECF No. 37 at 31-32. In 2016, when interviewed by detectives, Nickson stated she was certain that Mr. Johnson was the man with the pistol. *See* Agreement n.12. However, in 2019, when deposed for purposes of preserving her testimony in this proceeding, Nickson, while admittedly suffering from memory issues, was adamant that Mr. Johnson was not the man with the pistol because he had lighter skin than that person. *Id.*; *see also* N.T. 6/24/2019 (attached as Exhibit 3).

- In 2014, Elisha Bennett signed an affidavit stating that police kept pointing to one picture and telling him his friends had all identified that person. Police threatened him with charges for drugs and murder if he did not pick someone. *See* Agreement ¶ 48; *see also* ECF No. 37 at 36-37.

There are further record-based facts, discussed in more detail below, that support Mr. Johnson's claims, including (1) the Commonwealth's failure to disclose exculpatory and impeaching evidence, namely the arrest photographs of Mr. Johnson, which were not produced until May 2019; (2) Angelo Smith's statement that he was told to leave the courtroom and not testify at trial because he could not identify Mr. Johnson; (3) the failure of defense counsel to secure the arrest photographs; and (4) the prosecutor's blatant misconduct in arguing that Mr. Johnson had a motive that had no evidentiary support.

B.    **The Legal Grounds for Relief**

Mr. Johnson's habeas petition, as amended, presents multiple claims for relief, as detailed in the Agreement. This Court's review as to all but one of these claims is *de novo*, as there were no state court factual or legal rulings on them, and the Commonwealth has waived defenses of

exhaustion and procedural default. *See, e.g.*, *Appel v. Horn*, 250 F.3d 203, 210 ("[W]hen,

although properly preserved by the defendant, the state court has not reached the merits of a

claim thereafter presented to a federal habeas court, the deferential standards provided by

AEDPA . . . do not apply. In such an instance, the federal habeas court must conduct a *de novo*

review over pure legal questions and mixed questions of law and fact, as a court would have

done prior to the enactment of AEDPA." (internal citations omitted)); *see also* Agreement ¶ 23

(waiver of jurisdictional bars). The only exception is Mr. Johnson's claim that his trial counsel

was ineffective for failing to consult with him before trial, as that issue was adjudicated by the

state courts. By contrast, the claim as to the failure of trial counsel to secure and use the arrest

photographs, is before the Court on *de novo* review.

      In Mr. Johnson's view, his *Brady* claim regarding the Commonwealth's to disclose the

arrest photographs is fully record-based. As argued below, that claim by itself provides a basis

for habeas relief. The other claims of constitutional violations further support his right to relief,

particularly in terms of their cumulative prejudice to Johnson's right to a fair trial.

### 1.  The Commonwealth Suppressed Material, Exculpatory Evidence of Mr. Johnson's Arrest Photos in Violation of His Constitutional Rights

      The Commonwealth violated Mr. Johnson's constitutional rights under *Brady v.*

*Maryland* and its progeny by suppressing Mr. Johnson's October 10, 1986 arrest photographs,

which show that Mr. Johnson did not match the description of the shooter. *See* Photographs

(attached as Exhibit 4; *see also* ECF No. 63-1). "[T]o establish a *Brady* violation requiring relief,

a defendant must show that (1) the government withheld evidence, either willfully or

inadvertently; (2) the evidence was favorable; and (3) the withheld evidence was material."

*Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004) (citing *Banks v. Dretke*, 540 U.S. 668

(2004)). These elements are met here.

*First*, these photographs were not provided to Mr. Johnson or his counsel before trial; indeed, they were only discovered on May 7, 2019, *over thirty years after the trial*, when the Commonwealth produced them to undersigned counsel from the Philadelphia Police Department's files as part of informal discovery in this proceeding; counsel then also discovered them in the District Attorney's Office trial file when the Commonwealth made that file available for inspection in 2020. There is no documentation in the Commonwealth's files indicating these photographs were produced to the defense at any point before that, and no indication from the trial record that defense counsel had them.

*Second*, the photographs are both exculpatory and impeachment evidence. Within hours of the shooting, both James Smith and Angelo Smith described the man with the pistol, who the Commonwealth later contended was Mr. Johnson, as having *no facial hair*:

- James Smith: "B/M 6'1", brown skin, thin build about 20-21, both men were about the same age, ***he was clean shaven***, he was wearing all black leather to [sic]." ECF No. 37 at 6 (emphasis added).

- Angelo Smith: "I don't know if I saw him before, he was a black male, dark complexion, close cut hair, ***no mustache or facial hair***, but he had a black gun, a revolver, it was as big as a .38 caliber snub nose. After I saw the gun, that is what I was looking at." *Id.* at 8-9 (emphasis added).

Mr. Johnson's arrest photographs taken just two days after the murder, by contrast, showed him to be 5'6" (not 6'1"), and, most critically, that he had ***a full mustache***. *See* Photographs; *see also* Agreement, n.9. These photographs are exculpatory as they show that Mr. Johnson did not fit James Smith's and Angelo Smith's descriptions of the perpetrator with the

pistol. They also could have been used to impeach James Smith's trial testimony in which he identified Mr. Johnson as the man with the pistol.

*Third*, the photographs are material. The "touchstone of materiality is a reasonable probability of a different result." *Dennis v. Sec'y, Pa. Dep't of Corrections*, 834 F.3d 263, 285 (3d Cir. 2016) (*en banc*) (internal quotation marks omitted). The relevant question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). There can be no confidence in the outcome of a trial in which Johnson was deprived of evidence that he could have used to affirmatively show the jury that he in fact did not meet the description of the man with the pistol that two eyewitnesses gave police very shortly after Morris's murder and could have been used to impeach James Smith, a key identification witness. This is particularly true given the prosecutor's emphasis to the jury in his opening statement and closing argument of the quality of the multiple identifications of Mr. Johnson. *See, e.g.*, N.T. 1/27/1988, 24-25; N.T. 2/3/1988, 838-39, 847-48.

The photographs could also have been used to call into question the integrity of the police investigation. *See Dennis*, 834 F.3d at 302 (holding suppressed evidence was material where "[c]ounsel also could have used the information to challenge the adequacy of the police investigation"). Detectives Nachurski and Bittenbender both testified at trial as to the reliability of the investigation and identifications and could have been questioned about why that investigation led to the arrest of someone who clearly did not meet the witnesses' descriptions.

The suppression of this evidence warrants habeas relief.

### 2.   Other Violations of Mr. Johnson's Constitutional Rights, Considered Cumulatively, Warrant Habeas Relief

The *Brady* claim discussed above is independently sufficient to support relief. However, there are additional *Brady* violations, ineffective assistance of counsel, evidence of coerced identifications, and a claim of gross prosecutorial misconduct that entitle Mr. Johnson to relief due to the cumulative prejudice of these constitutional violations. The Third Circuit has "recognize[d] that errors individually do not warrant habeas relief may do so when combined." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (citing *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2007)).

### a.   The Commonwealth violated Mr. Johnson's due process rights under *Brady* and its progeny by suppressing Angelo Smith's statement to investigators that Mr. Johnson was not the man with the pistol.

Police interviewed Angelo Smith interviewed by police shortly after the shooting and he made a qualified, tentative identification of Mr. Johnson from a book of photos, telling police the photo "looks like" the man with the pistol but "I am not positive." ECF No. 37 at 10-11. He added, "[T]hat photo that I picked out looked like the guy and if it comes down to where I might see him again, I will identify him, he threatened my life to[o]." *Id.* at 11.

In 2014, Angelo Smith signed an affidavit stating that he was subpoenaed to trial and, when he arrived, the police asked him if he saw the man with the pistol in the courtroom. *See* Agreement ¶ 49; *see also* ECF No. 37 at 29-30, 35. He was told he did not need to testify as he could not identify Mr. Johnson as a participant in the crime. *See* Agreement ¶ 49; *see also* ECF No. 37 at 29-30, 35. Angelo Smith reiterated this key fact—that he "told the cops [he] didn't recognize the guy in the courtroom"—in the course of adversarial post-conviction proceedings, to detectives who interviewed him in 2016. *See* Agreement n.12.

The Commonwealth did not disclose this affirmative evidence of Mr. Johnson's innocence to Mr. Johnson or his counsel during trial. If it had, Mr. Johnson would certainly have called Angelo Smith as a witness to provide this exculpatory evidence. Given the centrality of the identifications to the case (there was no other evidence linking Mr. Johnson to the incident), if Mr. Johnson could show the jury that the person who tentatively identified him, setting the other three identifications in motion, did not recognize him, there is a reasonable probability of a different result at trial.

> **b.    The Commonwealth violated Mr. Johnson's due process rights under *Brady* and its progeny by suppressing Opal Nickson's statements to police and the prosecutors that the man with the pistol had darker skin than Mr. Johnson**.

In 2014, Opal Nickson signed an affidavit stating that she had told both police and the prosecutor before trial that that man with the pistol had darker skin than Mr. Johnson. *See* ECF No. 37 at 31. When interviewed by detectives in 2016, she retracted that statement. *See* Agreement n.12.  She was deposed in 2019 and, although she could not remember either her 2014 affidavit or her 2016 statement to police, she was quite clear that *she could not identify Mr. Johnson as the perpetrator. Id.*  In particular, she repeatedly stated that the perpetrator had darker skin than Mr. Johnson and that she had informed police investigators and the prosecutor of that fact before the trial. *See, e.g.*, N.T. 6/24/2019, 23-24, 36-37, 44-45, 49-50.

The Commonwealth did not disclose Nickson's statements about the perpetrator's skin color to Mr. Johnson or his counsel before trial. If it had, Mr. Johnson would have been able to use this information to impeach Nickson's testimony which, again, would have been critical given the role identifications played in this case.

      **c.**      **Mr. Johnson's trial counsel was constitutionally ineffective**.

As set forth in the Agreement, trial counsel's failures permeated Mr. Johnson's trial. Counsel failed to meaningfully communicate or consult with Mr. Johnson before his capital murder trial. *See* Agreement ¶¶ 33-34. On that single claim only, the Court must give deference to the Superior Court's determination that there was not sufficient prejudice by the general lack of communication between counsel and Mr. Johnson. Nevertheless, there is a basis to find that the prejudice was significant, and, when considered as part of the cumulative impact of the various violations, it too supports habeas relief.

By contrast, no deference is appropriate regarding counsel's failure to secure the arrest photograph. On the merits of that claim, any competent defense attorney would have secured the photographs before trial, *and* upon examination immediately understand how they impeached the Commonwealth case: a witness not only had him at 6'1" when he was 5'6", but most significantly they showed Mr. Johnson with a full mustache, where witnesses described a clean-shaven assailant. *Id.* at ¶¶ 35-36. The prejudice to Mr. Johnson from these failures is manifest, alone and in its cumulative impact.

      **d.**      **The prosecutor engaged in serious misconduct in violation of Mr. Johnson's due process rights**.

At trial, the prosecutor, knowing that a conviction would be difficult to achieve without proof of a motive, repeatedly asserted that Mr. Johnson was hitman in a drug operation and that was his motive for the murder. *See, e.g.*, N.T. 1/27/1988, 17-18; *see also* Agreement ¶¶ 52-53 & n.13. However, there was not a shred of evidence to support this theory, leading the trial court to admonish prosecutor Campolongo multiple times. The presiding judge stated that the prosecutor, who has a history of similar misconduct, *see* Agreement n.15, had "violate[d] every standard of professional conduct known to [the] court," N.T. 2/3/1988, 766.

11

      **e.**      **All of these violations should be viewed in the context of the unreliable, now recanted, eyewitness identifications**.

The only evidence implicating Mr. Johnson was the identification testimony of James Smith, Opal Nickson, and Elisha Bennett, whose identifications were all set in motion by Angelo Smith's tentative (and as it turn out mis-identification). These witnesses have recanted, and while we recognize that recantations are subject to scrutiny, in this case they are highly reliable as they corroborate one another, and the witnesses independently pointed to similar police pressure tactics in securing the identifications. *See* Agreement ¶¶ 46-49.

James Smith was consistent on this point in both his 2001 and 2014 affidavits. *See id.* at ¶ 46 & n.10. In addition, the recantations of Angelo Smith and Opal Nickson were made during adversarial post-conviction processes. Angelo Smith reiterated his core statement that he was sent away from Mr. Johnson's trial because he could not identify him when questioned by detectives in 2016.  Opal Nickson reiterated, under oath at the 2019 deposition, that the perpetrator had darker skin than Mr. Johnson on direct examination by the defense and on cross-examination by the Commonwealth. In addition, the circumstances of the crime, including the lighting, duration, and weapon focus phenomenon, make it unlikely that any of these witnesses could have accurately identified the man with the pistol. *See id.* at ¶¶ 43-44 (discussing risk factors for mistaken identifications as detailed in the Third Circuit's Report on Eyewitness Identifications, 92 Temple L. Rev. 10-11 (Fall 2019)).

## III.    Conclusion

    Mr. Johnson's trial was rife with constitutional violations, the cumulative effect of which caused him significant prejudice, warranting habeas relief.[3]

---

[3] In light of recent developments, including the Attorney General's participation as *amicus*, Mr. Johnson reserves the right to further supplement his pleadings after receiving any additional filings.

Respectfully submitted,

/s/ *Claudia Flores*
CLAUDIA FLORES
Assistant Federal Public Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 540W
Philadelphia, PA 19106
215-928-1100

/s/ *Nilam A. Sanghvi*
NILAM A. SANGHVI
The Pennsylvania Innocence Project
1515 Market Street, Suite 300
Philadelphia, PA 19102
215-204-4255

/s/ *David Rudovsky*
DAVID RUDOVSKY
Kairys, Rudovsky, Messing, Feinberg & Lin LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
215-925-4400

*Counsel for Petitioner, Kevin Johnson*

DATE:        October 11, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that this supplemental brief was served on all counsel of record via the

Court's ECF system.

/s/ *Claudia Flores*
Claudia Flores
Assistant Federal Defender
*Attorney for Petitioner, Kevin Johnson*

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEVIN JOHNSON,** | : | |
| Petitioner, | : | **Civil Action** |
| | : | |
| v. | : | **NO. 13-3197** |
| | : | |
| **JOHN W. KERESTES, et al.** | : | |
| Respondents. | | |

### Stipulation and [Proposed] Order

Petitioner, Kevin Johnson, through his undersigned counsel, and Respondents, John W. Kerestes, the District Attorney of the County of Philadelphia, and the Attorney General of the State of Pennsylvania, through their undersigned counsel, stipulate as follows:

### Purpose of Stipulation

The Parties agree to the terms of this Stipulation because each believes that the terms are in their respective interests. The purpose of this Stipulation is to ensure that in exchange for the termination of these habeas corpus proceedings, Johnson will plead no contest in state court to third degree murder, criminal conspiracy and possessing an instrument of crime (PIC) and the Commonwealth will recommend that he be sentenced as follows:

> Third-degree murder, no greater than 10 to 20 years of imprisonment;
> Criminal conspiracy, no further imposition of penalty;
> PIC, no further imposition of penalty.

Johnson's cumulative sentence shall be no greater than 10 to 20 years of imprisonment. Johnson will receive credit for time served from February 4, 1988, and thus will have served the maximum prison sentence to be imposed under this agreement.[1]

Accordingly, the terms of this Stipulation shall be construed in accordance with that purpose.

---

[1] Johnson also receives credit for time served from October 10, 1986 to November 13, 1986.

1

**Terms of the Stipulation**

The following constitute the terms of the Stipulation:

I.     This Court shall conditionally grant Petitioner's Petition for Writ of Habeas Corpus based upon the Parties' agreement that the interests of justice so require;

II.    The conditional writ will order the state court to act within 120 days to retry or release Petitioner in *Commonwealth v. Kevin Johnson*, CP-51-CR-1108001-1986;

III.   Upon the issuance of the conditional writ, Johnson will plead no contest to charges of third-degree murder, criminal conspiracy, and PIC, and be sentenced to a cumulative sentence of no greater than 10 to 20 years of imprisonment in *Commonwealth v. Johnson*, CP-51-CR-1108001-1986. Johnson shall receive credit for time served from February 4, 1988 and from October 10, 1986 to November 13, 1986;

IV.   In consideration of Respondents' agreement not to further contest the Petition for Writ of Habeas Corpus, Petitioner agrees to waive any further proceedings in any court (state or federal) challenging his convictions and/or sentences in *Commonwealth v. Johnson*, CP-51-CR-1108001-1986.

V.    If for any reason the terms of this Stipulation are not met, either party may reactivate the instant action in this Court. In that event, the Parties will each return to the status quo existing on the date that the Compromise and Settlement Agreement for Habeas Relief and this Stipulation were accepted by the Court;

VI.   Once executed by the Parties and signed by this Court, this document will constitute the agreement of the Parties and the Order of the Court granting relief to Petitioner on the terms set forth above; and

2

VII.  Upon completion of the state court proceedings (set forth above), the Parties shall report

the same to this Court, at which time this matter will be closed and final.

**STIPULATED:**


*/s/ Arianna J. Freeman*
ARIANNA J. FREEMAN
Managing Attorney, Non-Capital Habeas Unit
Federal Community Defender Office
  for the Eastern District of Pennsylvania
601 Walnut St., Suite 540W
Philadelphia, PA 19106
(215) 928-1100


*/s/ Nilam A. Sanghvi*
NILAM A. SANGHVI
The Pennsylvania Innocence Project
Temple University Beasley School of Law
1515 Market Street, Suite 300
Philadelphia, PA 19102
(215) 204-4255


*/s/ David Rudovsky*
DAVID RUDOVSKY
Kairys, Rudovsky, Messing, Feinberg & Lin
LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400


*Counsel for Petitioner*


Signed on October 14, 2021

*/s/ Patricia Cummings*
PATRICIA CUMMINGS
Supervisor, Conviction Integrity Unit
BANAFSHEH AMIRZADEH
Assistant District Attorney
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107
(215) 686-8747

*Counsel for Respondents*

Signed on October 14, 2021

3

SO ORDERED this _____ day of _____, 2021.

BY THE COURT:

_____
EDUARDO C. ROBRENO
UNITED STATES DISTRICT COURT JUDGE

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEVIN JOHNSON,** | : | |
| Petitioner, | : | **Civil Action** |
| | : | |
| v. | : | **No. 13-3197** |
| | : | |
| **JOHN W. KERESTES, et al.** | : | |
| Respondents. | | |

### Compromise and Settlement Agreement for Habeas Relief

After eight years of federal litigation, Petitioner Kevin Johnson and the Respondents have reached a compromise and settlement agreement to resolve this habeas proceeding. The Parties believe that the resolution of Johnson's claims without further litigation is in the interests of justice, as detailed below. The Parties are concurrently filing a Stipulation and Proposed Order detailing the specific terms of this Agreement.

### Basis for Agreement

1.     The habeas claims considered by the Parties here are a) the Commonwealth violated Johnson's right to due process by withholding material, exculpatory evidence in violation of *Brady v. Maryland*; b) trial counsel was ineffective for failing to meaningfully consult and meet face-to-face with Johnson prior to his capital trial, properly investigate the case, and secure evidence that would have undermined the prosecution's identification witnesses; c) Johnson's rights to due process and confrontation of witnesses were violated by the prosecutor's misconduct at trial including the introduction of highly prejudicial hearsay evidence; and d) Johnson, who has maintained his innocence since the 1986 arrest, is actually innocent.

2.     In 2020, the Conviction Integrity Unit (CIU) of the Philadelphia District Attorney's Office (DAO) began reviewing this case, and in Spring 2021, after conducting a review of all available

1

files and investigation, the CIU assumed responsibility of the state court PCRA litigation[1] and federal court habeas petition on behalf of the Commonwealth.[2]

3.      Having conducted a thorough review of the files and further investigation, the Commonwealth concedes that several of Johnson's claims, while not sufficient to establish his innocence, demonstrate that the trial was fundamentally unfair. At bottom, the record is clear that Johnson's trial was marred by egregious and unethical conduct on the part of his trial counsel and the prosecutor.

4.      As a result, the Commonwealth has concluded that the interests of justice are best served by entering into this Compromise and Settlement Agreement.

5.      The effect of this Agreement would be to allow Johnson to plead no contest to a lesser charge and be sentenced to time served after over 33 years of incarceration, during which time he has maintained an excellent institutional record and has pursued all available legal remedies to vindicate his claims of innocence and an unfair trial.[3]

---

[1] Johnson had a Post Conviction Relief Act petition pending in the Philadelphia County Court of Common Pleas that raised one of the *Brady* claims that is before this Court. As part of this Agreement, Johnson has withdrawn that petition and, as later noted, Respondents are waiving the exhaustion defense.

[2] The CIU is a separate and independent unit in the DAO that reviews claims of wrongful conviction and actual innocence. Cases are submitted to the CIU both internally from other units in the DAO and externally from *pro se* inmates and attorneys. The CIU exercises its discretion to litigate cases (or assume responsibility in pending litigation) only when the CIU has decided that both the law and facts support post-conviction relief and/or when a compromise and settlement agreement would further the ends of justice.

[3] A 2006 law review article addresses the issue of settlements in habeas cases. *See* Anup Malani, *Habeas Settlements*, 92 VA. L.REV. 1 (2006). Malani prefaces his article by asking, "Why is it that criminal cases nearly always settle, but habeas corpus cases do not?" *Id.* at 2. He then notes "the vast majority of criminal cases are resolved by guilty pleas, without a trial. But it is the rare habeas petition that is resolved out of court rather than litigated to completion." *Id.* Although not statistically common in 2006 when Malani's law review article was written, habeas settlements were and are as constitutionally valid as plea bargains, and both types of settlements are proper.

## Factual History

6.     The state court record reflects that on the night of October 8, 1986, two men shot Lyndon Morris to death. Morris sold drugs from the upstairs front bedroom of Opal Nickson's rowhome in Southwest Philadelphia.

7.     James Smith worked for Morris and would answer the front door of Nickson's rowhome and ferry drugs and money between Morris and customers who purchased the drugs.

8.     When James Smith answered the door on the night of the shooting, one man with a shotgun and one man with a pistol forced their way into the home, demanding that James Smith take them to Morris's room. On the second floor, the man with the shotgun followed James Smith to the front bedroom, and, as Morris opened the door, the man with the shotgun fired at Morris.

9.     Meanwhile, the man with the pistol had made his way to the back bedroom, where Nickson, Angelo Smith, and Elisha Bennett were getting high on crack cocaine and marijuana.

10.    While at the doorway of the back bedroom, the man aimed his pistol at the three occupants and ordered them to the floor, but almost immediately the light in the room went out, and hearing shotgun fire, this assailant ran from the back bedroom and began firing his pistol in Morris's direction, evidently hitting Morris once.

11.    Within two days, following eyewitness identifications, Johnson was arrested based on allegations that he was the man with the pistol.[4] As detailed, *infra,* at ¶¶45-49, the identifying witnesses at trial—James Smith, Nickson, and Bennett—assert that they were pressured and coerced into doing so, and have since recanted their identifications.

12.    Johnson immediately denied any involvement and told police that at the time of the murder, he had been selling clothes in West Philadelphia with Ronald Crawford.

---

[4] The assailant with the shotgun was never apprehended.

13.     No physical evidence linking Johnson to the offense was found at the crime scene, nor were any weapons or drugs recovered when police arrested Johnson and searched his family home.

14.     The three eyewitness identifications were obtained by police after a tentative identification made by the third occupant of the back bedroom, Angelo Smith, who, after reviewing a "book of photos" at 4:30 in the morning, told police only that Johnson "looks like him, I am not positive." Doc. 37 at 10.

15.     At 5:50 in the morning, after Angelo Smith's tentative identification of Johnson, James Smith, in a second interview with police, identified Johnson as one of the two perpetrators. At 9:45, Bennett identified Johnson; and then at noon, Nickson identified him. Doc. 37. at 13, 20, 24.

### Procedural History

16.     On February 4, 1988, at the conclusion of a seven-day trial, Johnson was found guilty of first-degree murder, conspiracy, and possession of an instrument of crime. After the trial court ruled that it would be unlawful for the jury to consider the death penalty, Johnson was sentenced to life imprisonment without the possibility of parole.

17.     Trial counsel continued to represent Johnson on direct appeal, but he failed to file a brief on Johnson's behalf, resulting in the dismissal of the appeal. The Disciplinary Board of the Supreme Court of Pennsylvania found that counsel violated his duty to: act with reasonable diligence and promptness in representing a client; keep Johnson "informed about the status of the matter and promptly comply with reasonable requests for information;" and refrain from "conduct that is prejudicial to the administration of justice." Doc. 19-4 at 9-10. Johnson's appeal rights were later reinstated.

18.     After the denial of his direct appeal, Johnson continued to have deficient representation by counsel. For example, the attorney appointed in 1997 to represent Johnson in PCRA proceedings filed nothing for nearly five years and was eventually dismissed from the case in 2002.

4

Johnson's other PCRA counsel have both conceded they had no strategic reason for not investigating the eyewitnesses.

19.     Johnson eventually filed a *pro se* petition for a writ of habeas corpus in this Court on June 7, 2013, challenging his judgment of conviction in connection with the 1986 murder of Morris. Doc. 1.

20.     On November 8, 2013, after the appointment of counsel, Johnson filed an amended habeas petition, which was followed by a supporting memorandum of law. Docs. 17, 19.

21.     Since then, two supplements and amendments to the amended petition have been filed based on newly-discovered evidence, the first on October 6, 2014, and the second on May 4, 2020. Docs. 36, 63-1.

22.     The Court stayed these habeas proceedings to allow Johnson to return to state court to exhaust his new claims and engage in discovery. Docs. 47, 62 & 70.  Johnson's state court PCRA petition was withdrawn on September 17, 2021.

23.     Based on the CIU investigation, the Commonwealth is now waiving all non-jurisdictional bars to relief, including exhaustion, in this habeas proceeding. The Commonwealth concedes that Johnson's claims are properly before this Court.

### The Constitutional Claims for Relief

24.     The Commonwealth's evidence at trial consisted largely of impeached eyewitness identifications.

25.     The three eyewitnesses who testified at trial – James Smith, Nickson, and Bennett – claimed that Johnson was one of the two gunmen (all three had previously given statements to police shortly after Angelo Smith provided a tentative identification to police).

5

*The Commonwealth Violated Johnson's Right to Due Process of Law*
*by Failing to Disclose Exculpatory Evidence*

26.　　In his affidavit provided to the defense in 2014, Angelo Smith claims that the Commonwealth subpoenaed him to testify, but he told "either the DA or the police" in the courtroom that he could not identify the defendant [Johnson] as the man with the pistol. In response, he was told he did not have to testify.[5]

27.　　On these facts, Johnson alleges that the prosecutor deliberately failed to inform the defense of this exculpatory evidence regarding Angelo Smith.

28.　　According to Johnson, suppression of this evidence prevented the jury from hearing evidence that the first person to even tentatively identify Johnson, and whose statement allegedly was used to get others to make an identification, did not recognize Johnson as the assailant upon seeing him in the courtroom.[6]

29.　　Johnson alleges another *Brady* violation: the failure of the police and prosecutor to provide to the defense the arrest photograph of Johnson, taken two days after the shooting, which showed him with a visible mustache.

30.　　Since Angelo Smith and James Smith had described the man with the pistol to police as clean-shaven, this claim while not by itself sufficient to show innocence, states a plausible violation of *Brady*.

*Trial Counsel Was Ineffective in His Representation of Johnson*

31.　　In this capital prosecution, trial counsel failed at virtually every significant point in his representation of Johnson.

---

[5] The Commonwealth has attempted to interview Smith, who is believed to currently reside in Williamsport, Pennsylvania, but those attempts have been unsuccessful.

[6] At the end of his statement, Angelo Smith told police that the "photo that I picked out looked like the guy and if it comes down to where I see him again, I will identify him, he threatened my life to[o]." Doc. 19-4 at 11.

32.     Johnson was granted a new trial by a panel of the Pennsylvania Superior Court in 2011 on the ground that trial counsel had failed to adequately consult with his client prior to trial. That ruling was reversed on *en banc* reconsideration. *See* Doc. 19-1 at 21 (*Commonwealth v. Johnson*, 2187 EDA 2009 (Pa. Super. June 27, 2011) (JJ. Donahue, Lazarus and Mundy granting relief)); *Commonwealth v. Johnson*, 51 A.3d 237 (Pa. Super. 2012) (*en banc*) (reversing relief).

33.     A basic duty that an attorney owes their client is communication.[7] *See, e.g.*, Pa. R. Prof. Cond. 1.4. In this case, there is no dispute regarding trial counsel's failure to properly represent Johnson.

34.     As then-Judge, now Pennsylvania Supreme Court Justice Wecht stated, in this capital trial where, "[t]he stakes can be no higher[;] [t]he punishment can be no more severe. . . . [Johnson's] lawyer visited [him] in jail exactly once." *Johnson*, 51 A.3d at 247 (Wecht, J., concurring). That sole visit was no more than 15 to 20 minutes, on the eve of jury selection. Prior to trial, apart from no meaningful meeting, there also were no telephone calls between Johnson and counsel, and no letters from counsel responding to Johnson's writings. *Id.* at 252.

35.     Counsel also apparently failed to secure or use at trial the arrest photograph of Johnson that showed him with a mustache while some eyewitnesses described a clean-shaven assailant. *See* Doc. 68 at 8-10.

---

[7] Without communication, a client cannot "participate in the representation." Pa. R. Prof. Cond. 1.4 (cmt. 1). It is not only critical in building a relationship of trust, but also necessary in the investigation, development, and presentation of a defense. In capital cases, communication is even more necessary in providing effective assistance of counsel. The 1989 and 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Guidelines), which the U.S. Supreme Court has repeatedly referenced, advise counsel to "maintain close contact with the client." Guideline 11.4.2 (1989); Guideline 10.5(A) (2003). The 2003 Guidelines states that "[b]arring exceptional circumstances," a capital client is to be interviewed within 24 hours of counsel entering their appearance. Guideline 10.5(B)(1) (2003).

36.     No competent trial lawyer faced with a prosecution case dependent entirely on eyewitness identifications would fail to secure and use a photograph of the defendant taken within approximately 36 hours of the crime that showed discrepancies between witness descriptions and the defendant's physical characteristics.

37.     Johnson alleges (and the Commonwealth tends to agree) that counsel's failure to investigate and secure the photograph caused prejudice to Johnson, depriving him of critical information to use in cross-examining James Smith.

38.     The factual record also supports the claim that trial counsel was ineffective for failing to call Angelo Smith as a defense witness.[8] Much like James Smith, Angelo Smith described the man with the pistol as having "no mustache or facial hair." Doc. 37 at 9. If called, Angelo Smith could have refuted Nickson, Bennett and James Smith's testimony that Johnson was the man with the pistol.

39.     Counsel's omissions were arguably prejudicial, and there appears to be a reasonable likelihood of a different result at trial if they had not occurred.

*The Eyewitness Testimony at Trial Appears Coerced and Otherwise Unreliable*

40.     As noted in paragraph 25, the Commonwealth's case at trial rested on the credibility of the eyewitness testimony of three witnesses. Johnson, in turn, testified on his own behalf and presented an alibi defense (though one that was materially incomplete).

41.     At the time of the offense, the eyewitnesses were high on cocaine and marijuana. Lighting conditions were poor. It was nighttime and as one of the assailants ordered the witnesses in the back bedroom to the floor, Nickson kicked the electrical cord to the sole light in the room, leaving them only with the lighting from the living room below. As a result, Nickson and Bennett admittedly

---

[8] The failure to call Angelo Smith as a witness resulted in part from trial counsel's failure to properly confer with Johnson prior to trial.

8

had only a few seconds to view the assailant, who according to Bennett appeared "half hidden in the doorway" of the bedroom. Doc. 37 at 20.

42.     Johnson alleges that detectives used Angelo Smith's uncertain identification to persuade the other witnesses to identify Johnson, and at the same time, threatened each of the witnesses with murder and/or drug charges, if they did not identify Johnson.

43.     The CIU has relied on the 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications (Report) in its assessment of this case. That Report makes the critical point that eyewitness misidentifications are a significant contributing factor to wrongful convictions. Report, 92 Temple L. Rev. 10-11 (Fall 2019).

44.     According to what the science has taught us about eyewitness identifications, the facts surrounding the identifications in this case (i.e., the time and circumstances of the offense) suggest there is a significant risk of mistaken identifications.

45.     In addition, since Johnson's trial, each Commonwealth witness has recanted, and alleged that that their police statements and trial testimony were coerced.

46.     In 2001, James Smith signed an affidavit, attesting that he only identified Johnson because police told him that everyone else had identified him and that if he didn't do the same, he

would "be going to jail for murder."[9] Doc. 19-2 at 76. He further stated that, at trial, he "really could

not recognize [K]evin as being the person . . . but I said it a[ny]way." *Id.*[10]

      47.    Like James Smith, Nickson signed an affidavit in 2014, stating that she falsely testified

against Johnson at trial, and that when she identified Johnson, she knew it was not him. She stated

that she told police that while Johnson "looked a little like the guy with the pistol," the perpetrator

had dark skin, Johnson's "was much lighter." Doc. 32-2 at 31. Nickson stated that the police told her

that if she did not pick Johnson, she could lose her children and home; she also stated that she had

been up all-night smoking crack she'd taken from Morris's room after the shooting. Nickson claimed

that prior to trial she also told the prosecutor that the perpetrator had darker skin than Johnson, but

was told that she "would go to jail" if she testified that way.[11] *Id.*

---

[9] James Smith gave police two statements in the hours after the murder. In his first on October 8, 1986 at 11:30 p.m., he denied any involvement in drug dealing and stated that the two perpetrators were friends of Keith's and from the 54th Street Gang. He described the man with the pistol as a black male, 6'1, brown skin, thin build, about 20-21, clean shaven, wearing all black leather. Doc. 32-2 at 2-6. In a second statement, at 5:00 a.m. on Oct. 9, 1986, he "positively identified photo B#105 [Kevin Johnson] as the male who was armed with the pistol." *Id.* at 12-13. Johnson's arrest photo shows him to be 5'6", weighing 114 lbs and with a moustache. *See* Doc. 68 at 8-10.

[10] In 2014, James Smith again reiterated that he had not identified the right person. He also claimed that the police included details in his second statement that he had not, and could not have, witnessed. When he told the prosecutor this, he claims that the prosecutor threatened him with "charges" if he didn't testify in accord with his police statement. Doc. 32-2 at 33-34.

[11] In 2019, during a sworn deposition, Nickson provided additional details about her questioning, which undermine the reliability of her identification. She testified that when she returned home the next morning, police considered her a suspect, handcuffed her, and took her to the station, where her legs remained shackled for the entire time. In addition, evidence indicates her brother may have played a role in the shooting. The record reflects that her brother Keith Nickson was at the house only a few minutes before the murder. According to James Smith, he was carrying two bags, one of which appeared to contain metal. Minutes later, when the assailants were at the front door and James Smith asked who was there, the response was "Keith." Immediately after the shootings, James Smith saw Keith Nickson standing outside of the house. N.T. 1/27/88 at 43-45, 49, 136, 162, 171.

48. In 2014, Bennett executed an affidavit stating that he falsely identified Johnson. He stated that the police "kept pointing to one picture" (similar to what James Smith stated) and told him that his friends had all identified that person. Doc. 32-2 at 36. The police also told him if he "didn't pick a picture I could get charges for drugs and murder." *Id.* He stated that he never read the statement he signed because he was high and has difficulty reading.

49. In 2014, Angelo Smith stated that he was subpoenaed to trial, and that when he arrived, the police asked him if he saw the man with the pistol in the courtroom. When he told the police that he did not get a good look at the man's face and had been high on crack staring at the gun aimed at them, police told him they did not need him to testify that day. Doc. 32-2 at 29-30, 35.

50. In sum, the credibility and reliability of the eyewitness testimony presented appears in doubt.[12]

---

[12] The Commonwealth notes that the recantations are not without issue. For instance, after recanting her identification of Johnson, Nickson was re-interviewed by police in 2016 and stated that she was certain that Johnson was the man with the pistol. At the 2019 deposition, Nickson, who admittedly was suffering from memory problems, did not recall either her 2014 affidavit or 2016 statement to police. She made clear, however, that she could not identify Johnson as the perpetrator. Nickson had been in poor health since at least 2014 and after the CIU went to interview Nickson, the CIU learned from her sister that she had passed away in 2020.

Similarly, when re-interviewed by police in 2016, Angelo Smith claimed that he signed one affidavit without reading it, and for the other, he signed a blank piece of paper. However, he affirmed the most significant fact: that he did not testify at trial because he "told the cops I didn't recognize the guy in the courtroom."

Bennett suffers from memory loss and has no memory of testifying at trial.

Although it has attempted to do so, the Commonwealth has not been able to interview Bennett or Angelo Smith.

*Prosecutorial Misconduct Infected the Trial Proceedings and Constituted a Violation of Johnson's Rights to Due Process of Law and Confrontation of Witnesses*

51.     In a remarkable statement regarding the tactics and misconduct of the prosecutor, the trial judge asserted that the prosecutor had "violate[d] every standard of professional conduct known to [the trial] court." N.T. 2/3/88 at 766. The conduct of the prosecutor justified this assertion and, notwithstanding the trial court's attempts to cure the egregious errors, the prejudice suffered was irreparable.

52.     At trial, no evidence was presented (nor did any credible evidence exist in the prosecution files reviewed by the Commonwealth) that Johnson was a hitman for a rival drug supplier. Yet, the prosecutor repeatedly asserted that he was a hitman as a motive for the murder. *See* N.T. 1/27/88 at 17-18 (describing Johnson as a "muscle m[a]n" sent to "snuff out the little nothings" operating in their territory).[13]

53.     The trial prosecutor, without any admissible evidence of Johnson's supposed motive, resorted to a highly improper cross-examination of Johnson, with specious accusations that he was a hitman. As the trial court recognized, the prosecutor "deceived" the court and trial counsel in this line of questioning; and while "scream[ing] at the top of [his] lungs," leveraged his position as an officer of the Commonwealth and accused Johnson as being one of the "strongmen" and "gunmen" for one

---

[13] John Spencer, a jailhouse informant who was charged with a string of armed robberies and was seeking a plea deal, had asserted that Johnson had confessed to him. His statement was not disclosed by the Commonwealth until the trial was underway due to a protective order, and it made no mention of Johnson's supposed motive (i.e., that he knew Johnson sold drugs for Big Roach and that months earlier he had threatened Morris in a bar). Spencer allegedly provided information relating to a motive to the Commonwealth on a later date, but that information was never memorialized in a formal statement. The Commonwealth did not call Spencer as a witness, and he later recanted his statements. *See* Doc. 19-2 at 74. Given that the jury found Johnson guilty of first-degree murder, it appears that the jury gave credence to the Commonwealth's theory of the case—that Johnson had been hired to kill Morris.

of the city's main drug bosses, Ricky ("Big Roach") Nelson. N.T. 2/2/88 at 725-26; N.T. 2/3/88 at 767.[14]

54.     The trial court admonished the prosecutor for his misconduct and while the court initially indicated it was "going to grant a mistrial," the mistrial motion was ultimately denied. N.T. 2/2/88 at 727; N.T. 2/3/88 at 767. [15]

### Conclusion

In light of the facts that support the above claims, there are serious concerns about the fairness of Johnson's capital trial and the integrity of his conviction. Accordingly, the Commonwealth agrees that Johnson is entitled to habeas relief that is conditioned on his agreement to enter a plea of no contest in state court to third degree murder, criminal conspiracy and possessing an instrument of crime with a time-served sentence, as set forth in the Stipulation and Proposed Order.

---

[14] That question was then followed by the prosecutor suggesting that Johnson had talked to Morris inside a neighborhood lounge, again presenting to the jury facts not in evidence. N.T. 2/2/88 at 730. On re-cross, the prosecutor did the same when he questioned Johnson as to whether he had admitted to shooting Morris, but that he would "beat the case" because he had a preacher testifying to seeing him around church that night. N.T. 2/2/88 at 746-47. The prosecutor's prejudicial conduct was repeated when Douglas Yancy, a minister, testified on behalf of the defense, and the prosecutor asked Yancy whether he had "reason to know why [Johnson] would tell someone that he's going to beat the case because he's got a minister." The prosecutor also repeatedly asked Yancy whether Johnson would bring his gun to church. *See* N.T. 2/2/88 at 610, 612-13.

[15] The prosecutor in this case has a history of similar misconduct. *See, e.g., Commonwealth v. Perillo*, 376 A.2d 635 (Pa. Super. 1977) (trial court abused its discretion by not ordering mistrial after Campolongo asked questions implying perjury/bribery of witness); *In re Campolongo*, 435 A.2d 581 (Pa. 1981) (reversal of summarily holding Campolongo in criminal contempt of court because evidence insufficient to support it; contempt citation "was not based on the pattern of intentional prosecutorial misconduct which cumulatively resulted in the mistrial[; . . . much of appellant's conduct deemed by the trial court to be sufficiently reprehensible to require the declaration of a mistrial occurred after the contempt citation"); *Commonwealth v. Bronzeill*, 1980 WL 194165 (Pa. C.P. Ct. Jan. 4, 1980) (barring retrial of defendant after grant of mistrial because of intentional prosecutorial misconduct; Campolongo "intentionally and deliberately engaged in a course of conduct from his opening speech to the declaration of the mistrial, calculated to inflame the passion and prejudice of the jury"); *Commonwealth v. Kelly*, 797 A.2d 925 (Pa. Super. 2002) (reversal of finding that defendants could be retried after sua sponte grant of mistrial because trial court admittedly was "so fed up with [Campolongo's] crap, I don't know if I can preside fairly in this matter").

/s/ Arianna J. Freeman
ARIANNA J. FREEMAN
Managing Attorney, Non-Capital Habeas Unit
Federal Community Defender Office
  for the Eastern District of Pennsylvania
601 Walnut St., Suite 540W
Philadelphia, PA 19106
(215) 928-1100


/s/ Nilam A. Sanghvi
NILAM A. SANGHVI
The Pennsylvania Innocence Project
Temple University Beasley School of Law
1515 Market Street, Suite 300
Philadelphia, PA 19102
(215) 204-4255


/s/ David Rudovsky
DAVID RUDOVSKY
Kairys, Rudovsky, Messing, Feinberg & Lin LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Petitioner*


Signed on October 14, 2021

/s/ Patricia Cummings
PATRICIA CUMMINGS
Supervisor, Conviction Integrity Unit
BANAFSHEH AMIRZADEH
Asst. District Attorney, Conviction Integrity Unit
Philadelphia District Attorney's Office
3 S. Penn Square
Philadelphia, PA 19107
(215) 686-8747

*Counsel for Respondents*


Signed on October 14, 2021

14

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

KEVIN F. JOHNSON,            :
    Plaintiff,            :
                    :   CIVIL ACTION
    vs.                  :   NO.  13-3197
                    :
JOHN W. KERESTES, et al.,:
    Defendants.          :

- - -

June 24, 2019

- - -

Oral deposition of OPAL NICKSON, taken
pursuant to notice, held in the residence of
Opal Nickson at 768 North 49th Street,
Apartment-A, Philadelphia, Pennsylvania  19139,
commencing at 1:00 p.m. on the above date,
before Sharise J. Thompson, a Court Reporter,
Notary Public in and for the Commonwealth of
Pennsylvania.

A P P E A R A N C E S:


FEDERAL COMMUNITY DEFENDER OFFICE
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
DEFENDER ASSOCIATION OF PHILADELPHIA
BY:  ARIANNA FREEMAN, ESQUIRE
Curtis Building
601 Walnut Street, Suite 540 West
Philadelphia, Pennsylvania 19106
(215) 928-1100
Arianna_Freeman@fd.org
Counsel for Plaintiff


CITY OF PHILADELPHIA
DISTRICT ATTORNEY'S OFFICE
BY:  SAMUEL H. RITTERMAN, ESQUIRE
Three South Penn Square
Philadelphia, Pennsylvania  19107
(215) 686-5693
Samuel.Ritterman@phila.gov
Counsel for Defendant


ALSO PRESENT:

Kierra Smith, Ms. Opal Nickson's aide

I N D E X


WITNESS:

Opal Nickson


EXAMINATION


DIRECT   CROSS   REDIRECT   RECROSS


By Ms. Freeman    4                    63

By Mr. Ritterman        44                        --




- - -

E X H I B I T S


NO.                DESCRIPTION


Exhibit-1   October 9, 1986 Investigation
               Interview Record

Exhibit-2    Municipal Court Transcript

Exhibit-3   Court of Common Pleas Transcript

Exhibit-4         An Affidavit

Exhibit-5   June 21, 2016 Investigation
               Interview Record

1                        - - -

2                    PROCEEDINGS

3                        - - -

4           OPAL NICKSON, after having been first

5    duly sworn, was examined and testified as

6    follows:

7                        - - -

8                       DIRECT

9                    EXAMINATION

10                       - - -

11   BY MS. FREEMAN:

12        Q.  Ms. Nickson, my name is Arianna

13   Freeman.  I'm an attorney with the Federal

14   Community Defender Office and I represent Kevin

15   Johnson, and with me today sitting next to me

16   is Samuel Ritterman.  He is an attorney with

17   the District Attorney's Office, the prosecutors

18   here in the City of Philadelphia, and he

19   represents the respondents in this case.  I'm

20   going to begin by asking you some background

21   questions and telling you a little bit about

22   what this deposition is, why we are asking you

23   questions today.

24           So, are you aware you are being

25   deposed today in the case of Kevin Johnson

1  versus John Kerestes?

2      A.  Who's John Kerestes?

3      Q.  Well, are you aware that you are being

4  deposed in a case that involves Kevin Johnson?

5      A.  Yeah.  Well, who is the other guy?

6      Q.  The other guy is a party in the case,

7  and there's no reason why you would have met

8  him.  I think we can stipulate that.  This is

9  just a case that --

10      A.  I saw him on the paper.  I would like

11  to know who he is.

12          MR. RITTERMAN:  He is the warden at

13  the prison where Mr. Johnson is kept.  So,

14  under the law, at this stage, Mr. Johnson, in

15  order -- it ordinarily would be the

16  Commonwealth versus Kevin Johnson, the State

17  versus him, but because it's just a strange

18  thing in the law, he has to bring this lawsuit

19  against the warden of his prison to be able to

20  have his case heard in federal court.  So,

21  that's who John Kerestes is.

22          THE WITNESS:  He's not that man --

23          MR. RITTERMAN:  You've never met him.

24          THE WITNESS:  Who's the guy that took

25  us to court?

```
1    BY MS. FREEMAN:
2         Q.  So, Ms. Nickson, I think maybe at the
3    end of this process we can let you ask some
4    questions, but we have to stick to a pretty
5    formal process right now where the attorneys,
6    Mr. Ritterman and I will ask you questions and
7    then you will give us answers.  And if you need
8    any clarification about the questions that we
9    ask, then you can ask us for that, but this is
10   similar to if you were testifying in a
11   courtroom where we would ask you questions as
12   the witness and then you will just answer those
13   questions, okay?
14        A.  Uh-huh.
15        Q.  Okay.  Have you ever been deposed
16   before?
17        A.  What's deposed?
18        Q.  It's where you are not in court, but
19   you have someone take sworn testimony from you.
20        A.  No.
21        Q.  Okay.  So, in this deposition, I'm
22   going to ask you questions and you are going to
23   be answering under oath.  Do you understand
24   that?
25        A.  Um-hum.
```

1      Q.   And there are some differences between

2   a deposition and a regular conversation.   One,

3   is that we have the court reporter here.

4      A.   Yes.

5      Q.   She is trying to transcribe everything

6   that we say.   So, we have to do our best not to

7   interrupt each other or talk over each other.

8   Do you understand that?

9      A.   Yes.

10      Q.   And the court reporter can't record if

11   you nod your head or shake your head, so please

12   try to answer every question verbally.

13      A.   Yes.

14      Q.   And, finally, your answers today are

15   under oath.   So, this subjects you to potential

16   criminal charges of perjury for making a false

17   statement under oath.   Do you understand that?

18      A.   Yes.

19      Q.   I have a few questions just for

20   background.   How old are you?

21      A.   Sixty-five.

22      Q.   And do you have any health problems?

23      A.   Plenty of them.

24      Q.   Are there any specific health problems

25   that we should know about that are affecting

1   you today?

2          A.  Yes.

3          Q.  What are those?

4          A.  I have spinal stenosis, that's the

5   main one.

6          Q.  Okay.  Are you taking any medications

7   today?

8          A.  Yes.  I take 13 pills in the morning

9   and nine at night and two more during the day.

10         Q.  And is there anything about your

11  physical or mental condition today that would

12  prevent you from giving truthful answers to our

13  questions?

14         A.  Maybe.

15         Q.  Can you explain that?

16         A.  I can't remember things clearly.  I

17  have a short memory.  I fall asleep easily.

18         Q.  Okay.  If you do not remember the

19  answer to a question, you are welcome to

20  respond that you don't remember, okay?

21         A.  Okay.

22         Q.  And if you need a break, you are

23  welcome to ask for a break and we will give you

24  that, okay?

25         A.  Okay.

1     Q.  And do you have any vision problems?

2     A.  Yes.

3     Q.  Are you able to read documents?

4     A.  Yes, with glasses.

5     Q.  Okay.

6     A.  Matter of fact, I have an appointment

7  for Wills Eye on Wednesday.  It's something

8  wrong with my retina.

9     Q.  Okay.  Ms. Nickson, this deposition

10  was scheduled to take place last Monday, that

11  was June 17th, 2019.

12     A.  Yes.

13     Q.  And the court issued a subpoena for

14  you to appear and testify on that date.

15     A.  Yes.

16     Q.  Were you served with a copy of that

17  subpoena?

18     A.  Yes.

19     Q.  And did someone explain to you the

20  meaning of that subpoena?

21     A.  No.  Yeah, that private investigator

22  shouting all in my ears, which I didn't

23  appreciate, so I asked him not to come back to

24  my door.

25     Q.  Okay.  Did you understand that the

 1   subpoena required you to appear and testify

 2   last Monday, June 17th?

 3        A.  Yes.  That's why I called the Judge.

 4   I was unable to make it.

 5        Q.  Okay.  And in advance of June 17th,

 6   did you receive any telephone calls reminding

 7   you of the deposition?

 8        A.  Yeah, from the private investigator.

 9        Q.  Did someone come to your home on June

10   17th about that deposition?

11        A.  Yes.

12        Q.  And who was that?

13        A.  The private investigator and another

14   man.

15        Q.  Okay.  And did you speak to them?

16        A.  Yeah.

17        Q.  What did you tell them?

18        A.  That I couldn't come.

19        Q.  Did you say to them, "Get the fuck

20   away from my door?"

21        A.  I told the investigator that, because

22   I asked him to leave at first and he wouldn't

23   leave.  He kept shouting through my door,

24   banging on my windows, and all of that, calling

25   me on the phone, and I didn't appreciate it,

1   and he would not leave, so I did verbal abuse

2   on him.

3       Q.   Okay.  And, so, you did not testify on

4   June 17th, last Monday.

5       A.   Testify to who?  Oh, no.

6       Q.   Okay.  Did a United States marshal

7   come to your house last week?

8       A.   Yes.

9       Q.   Did that marshal give you any

10  paperwork?

11      A.   Yes, he did.

12      Q.   And was that paperwork related to

13  Kevin Johnson's case?

14      A.   Yes.

15      Q.   Did you tell the marshal anything

16  about whether you would appear for a

17  deposition?

18      A.   I told him I wasn't coming.

19      Q.   At some point, did you speak with a

20  federal Judge about this case?

21      A.   Yes.

22      Q.   And as a result of your conversation

23  with the Judge, did you agree to testify in

24  this deposition today?

25      A.   Yes.  I told the private investigator

1    that I would, but I wasn't able to come down

2    there, but he insisted on coming out here

3    getting me and taking me down there, and I

4    couldn't go.

5        Q.  Were there dates before this month --

6    were there previous dates when you were

7    scheduled to testify in a deposition in this

8    case?

9        A.  I think so.

10       Q.  Do you recall if there was a scheduled

11   deposition in February of 2019?

12       A.  Maybe.

13       Q.  Do you recall whenever those previous

14   dates were that you informed the investigator

15   that you would not come?

16       A.  Say that again.

17       Q.  Do you recall -- I'll rephrase.  When

18   the deposition was scheduled previously, did

19   you cancel?

20       A.  Yes.  I had surgery done on my legs.

21       Q.  Okay.  I'm going to move on to asking

22   you some questions about the murder of Lyndon

23   Morris.  He was also known as Cowboy.

24       A.  Yes.

25       Q.  Did you refer to him by his name

1  Lyndon or by the nickname, Cowboy?

2       A.  Cowboy.  I never knew his name.

3       Q.  When I ask you questions today, I'll

4  call him Cowboy and I will be referring to Mr.

5  Morris.

6       A.  All right.

7       Q.  Ms. Nickson, the record shows that

8  Cowboy was killed on October 8th, 1986.  Do you

9  recall that Mr. Morris was killed around that

10 date?

11      A.  No, I don't.

12      Q.  You don't, okay.

13      A.  I don't remember.

14      Q.  Do you recall where you were when Mr.

15 Morris -- when Cowboy was killed?

16      A.  Yes.

17      Q.  Where were you?

18      A.  In my home.

19      Q.  And was Cowboy also in your home?

20      A.  Yes.

21      Q.  And what was your relationship to

22 Cowboy?

23      A.  I was someone we were selling drugs

24 for.  I let them use my home.

25      Q.  You said you were someone who was

1  selling drugs for him?  I didn't hear you

2  clearly.  Could you say that again?

3      A.  I was selling -- I was letting them

4  sell drugs out of my home.  They were

5  Jamaicans.

6      Q.  When you say "they," are you talking

7  about Cowboy and anybody else?

8      A.  Yes, some of his people.

9      Q.  Was he also living in your home?

10     A.  No.  They were renting a room.  That

11 was it.

12     Q.  And was that 1226 South 56th Street?

13     A.  Yes.

14     Q.  And you testified that you were

15 present in the house when Mr. Morris was

16 killed.

17     A.  Yes.

18     Q.  Do you recall what time that was?

19     A.  No, I can't.

20     Q.  Approximately.

21     A.  No.

22     Q.  If the records said that it was around

23 10:00 p.m., does that sound familiar?

24     A.  It was before that, because my

25 daughter was next door eating Chinese food with

1  her girlfriend, and she wouldn't be out that

2  late.

3      Q.   Okay.  How many people came into the

4  home with weapons on the night that Cowboy was

5  killed?

6      A.   I can't recall.  I only seen three,

7  but it was more than that.

8      Q.   There were more than three people?

9      A.   Yes.

10      Q.   Why don't you describe to me what

11  happened, to the best of your recollection, the

12  night that Cowboy was killed?

13      A.   It was a knock at the door.  The

14  doorman went down the steps and said, "Who is

15  it?"  Because they would open the door, let the

16  people in, and bring them up the steps and they

17  would cop the Jamaicans that were selling,

18  they would walk with them.  So, from what I

19  recall, they said something like Keith.  So,

20  whoever it was, the doormen knew them or he

21  wouldn't have let them in.  So, he let them in,

22  somebody came running up the steps and started

23  firing the shotgun, then another man came to

24  the back bedroom where me and three other

25  people were back there getting high.  That's

1    all I remember.

2         Q.  Who were the three other people who

3    were back in the back bedroom with you?

4         A.  Angelo -- no, it was two others,

5    Angelo and Little James.  No, Angelo and

6    Elijah.  Little James was the doorman.

7         Q.  And by Angelo, do you mean Angelo

8    Smith?

9         A.  Yes.

10        Q.  And by Elijah, do you mean Elijah

11   Bennett?

12        A.  Yes.

13        Q.  You said the three of you were in the

14   bedroom getting high.

15        A.  Yes.

16        Q.  Did anyone who came in with guns that

17   night say anything to you?

18        A.  "Lay down, bitch."

19        Q.  And did you lay down when you were

20   told to?

21        A.  Yes.

22        Q.  Did anyone say anything to Elijah and

23   Angelo?

24        A.  "Lay down."

25        Q.  Someone asked them to lay down or told

1    them to lay down.

2         A.   Yes.

3         Q.   And did they lay down?

4         A.   They laid back.

5         Q.   Okay.  At some point that night, did

6    anything happen with the lights?

7         A.   Yes.  When they told me to lay down, I

8    dodged down on the floor and all the lights

9    went out.

10        Q.   And were you high on cocaine that

11   night?

12        A.   Yes.

13        Q.   And at some point that night, did you

14   hear gunshots in your house?

15        A.   Yes.

16        Q.   At some point, did you go and look

17   into Mr. Morris' room, into Cowboy's room?

18        A.   After the gunman left.

19        Q.   What did you see?

20        A.   Him laying on the floor shot with both

21   his pants pockets turned inside out, and the

22   room was a wreck.

23        Q.   How were you feeling at that time?

24        A.   Shocked.

25        Q.   Did you come to learn that Mr. Cowboy

1  had been killed?

2       A.  Yes.

3       Q.  That he was dead?

4       A.  Yes.  He was dead when I walked in

5  there.  Noway he was, uh --

6       Q.  Did the police speak to you about

7  Cowboy's murder?

8       A.  Yeah, when I went down to 8th and

9  Race.  Because after he was killed and I seen

10  him, I ran.

11      Q.  Where did you run to?

12      A.  Another house they had up on 60th

13  Street.

14      Q.  But eventually you went down to the

15  police station and spoke to police about the

16  murder.

17      A.  Yes.  I called my mother.  She told me

18  you got to go home, because they got your house

19  under surveillance.  So, when I went home, they

20  stopped me right at the front steps and locked

21  me up.

22      Q.  They locked you up.  What do you mean

23  by that?

24      A.  They took me downtown.

25      Q.  Did they put you in handcuffs?

1      A.   Yeah.   They thought I was the killer.

2      Q.   When you got to the police station,

3  what happened?

4      A.   I sat there handcuffed to a chair for

5  hours.   They came and questioned me, and my

6  father came down and got me out of there.

7      Q.   How were you feeling when you were at

8  the police station?

9      A.   Depressed, hurt.   I never seen a

10  shooting before or a dead man.   I never been in

11  a robbery, so --

12      Q.   And did you answer questions when the

13  police asked them of you?

14      A.   Yes.

15      Q.   How long did you spend answering

16  questions with the police?

17      A.   I was down there for hours.

18      Q.   Were you in handcuffs the whole time?

19      A.   No.

20      Q.   How did the police treat you?

21      A.   All right.

22      Q.   Did you ask them to take the handcuffs

23  off?

24      A.   No, they took them off.

25      Q.   But they were on for hours before they

1    took them off.

2         A.   No, they weren't on for hours, but my

3    legs were shackled.

4         Q.   Were your legs shackled the whole time

5    that you were down there?

6         A.   The whole time.

7         Q.   And you said that the police thought

8    you were the murder.   Why do you say that?

9         A.   Because she said so, when I was in the

10   van.   "We may have caught the murder."

11        Q.   By "she," are you referring to a

12   female police officer?

13        A.   Yes, a female.

14        Q.   When you were at the police station,

15   did you give a written statement?

16        A.   I can't remember.

17        Q.   Ms. Nickson, I'm going to show you a

18   document that I have marked as Exhibit-1.

19             Ms. Nickson, I'm handing you this

20   document that I have marked as Exhibit-1.   You

21   don't have to read the whole thing, but could

22   you just take a look at the first page?

23        A.   I can't see.   Can you hand me my bag?

24        Q.   Yes.

25        A.   Thank you.

1        Q.   You're welcome.

2        A.   Now, what is it that you want me to

3    read?

4        Q.   Well, I would like for you to take a

5    look at the first page.  Do you see your name

6    on the top of the page where it says

7    Investigation Interview Record and then

8    underneath it says Opal Nickson?

9        A.   Yes.

10       Q.   And if you look about the third of the

11   way down the page on the right side it says,

12   Date, 10-9-86.

13       A.   Yes.

14       Q.   And then it says, Time, 12:00 p.m.

15       A.   Um-hum.

16       Q.   Have you ever seen this document

17   before?

18       A.   No.

19       Q.   Do you see at the top where it says

20   Philadelphia Police Department Homicide

21   Division?

22       A.   Yes.

23       Q.   And do you see at the bottom of the

24   first page there's a signature?

25       A.   Yes.

1      Q.   Whose signature is that?

2      A.   That's mine.

3      Q.   This is a four page document.  I would

4  like for you to flip through each page and take

5  a look at the signature at the bottom of each

6  page and let me know if you recognize that.

7      A.   Yeah, yup, yes.

8      Q.   Are all four of those your signature?

9      A.   Yes, they are.

10          MS. FREEMAN:  So, can we stipulate

11  that this is a police statement?

12          MR. RITTERMAN:  Yes.

13  BY MS. FREEMAN:

14      Q.   So, Ms. Nickson, this is a statement

15  that the police took in 1986 that is signed by

16  you, and the date is October 9th, 1986, which

17  is the day after Cowboy was killed.  Do you

18  remember signing this statement?

19      A.   No, I don't.

20      Q.   If you flip to the third page of this

21  statement, and we are skipping over a lot of

22  the questions and answers in this statement,

23  but I'm just going to take you to the third

24  page.

25          Ms. Nickson, I can read it to you.

```
 1   And about three-quarters of the way down the

 2   question says, "Showing you a group of photos.

 3   Do you see anyone that you know?"  The answer,

 4   "I know all of them guys, except for one."

 5   Question, "Is the picture of the person that

 6   pointed the -- at you in a group of photos?"

 7            MR. RITTERMAN:  "In that group of

 8   photos."

 9            MS. FREEMAN:  "In that group of

10   photos."

11   BY MS. FREEMAN:

12       Q.  So, there appears to be a missing word

13   here, Ms. Nickson, but it states, "Is the

14   picture of the person that pointed the -- at

15   you in that group of photos?"  You said, "Yes,

16   number three."  (Identifying PP number 584615,

17   Kevin Johnson.)

18       A.  I remember it.

19       Q.  What do you remember about that?

20       A.  Pointing him out.

21       Q.  And by pointing him out, do you mean

22   his photograph?

23       A.  Yup, and in court.  Only one

24   difference.  Kevin Johnson is light brown skin,

25   and the man that pointed the gun at us was
```

1    dark, but they favor each other.

2         Q.  They favor each other.

3         A.  Yes.

4         Q.  Did you tell the police that Kevin

5    Johnson has lighter skin than the man who

6    pointed the gun at you?

7         A.  Yes, I did.  I told the attorney that,

8    too, the man that took us down there.  The man

9    who pointed the gun at us was dark, but he

10   looked just like Kevin Johnson, and everybody

11   else testified to that, too.

12        Q.  You mentioned a few moments ago that

13   you said something similar to that in court,

14   right?  You pointed out Kevin Johnson in court.

15        A.  Yes.

16        Q.  Do you remember testifying at Kevin

17   Johnson's preliminary hearing?

18        A.  I guess that's what it was.

19        Q.  Let me ask.  How many times did you

20   testify in court about Kevin Johnson?

21        A.  Once.

22        Q.  Once?

23        A.  (No verbal response.)

24        Q.  Ms. Nickson, I have some exhibits that

25   I can show you that are transcripts of

1    testimony.  I have a preliminary hearing

2    testimony and a trial testimony.  The

3    preliminary hearing I'm going to mark this as

4    Exhibit-2, and I'm going to hand this to you

5    right now.  Take a look at the first page,

6    please.

7         A.  (Witness complies.)

8         Q.  Do you see that it says towards the

9    top Commonwealth versus Kevin Johnson?

10        A.  Yeah.

11        Q.  And do you see a little bit more than

12   halfway down it says Philadelphia,

13   Pennsylvania, October 29th, 1986?

14        A.  Um-hum.

15        Q.  And if you would flip, please, to page

16   three.  Actually, Ms. Nickson, let me hand you

17   page three.  This is the same thing.

18             I've handed you page three.  You see

19   where it says index and it says Commonwealth's

20   Evidence, Opal Nickson?

21        A.  Yeah.

22        Q.  And then if you flip one more page to

23   page four, you see at the bottom of the page

24   the court crier says, "State your full name and

25   address for the record."  And the witness

1   states, "Opal Nickson."  Do you see that?

2        A.   No.

3        Q.   The very bottom of page four the court

4   crier says, "State your name and address for

5   the record."  And the witness states, "Opal

6   Nickson."

7        A.   Okay.

8        Q.   So, I'm going to submit to you, Ms.

9   Nickson, that you gave testimony in Kevin

10  Johnson's case on the date of this document,

11  which is October 29th, 1986.  Now, do you

12  recall the substance of that testimony?

13       A.   What do you mean?

14       Q.   Well, were you asked about the

15  statement that you gave to police?

16       A.   I don't remember none of that.

17       Q.   Did you see Kevin Johnson in the

18  courtroom that day?

19       A.   Yes.

20       Q.   Did you testify about whether Kevin

21  Johnson participated in the murder of Cowboy?

22       A.   I don't remember none of that.

23       Q.   Were you asked questions similar to

24  the type of questions that the police asked you

25  the day after the shooting?

1       A.   Say that again.

2       Q.   Let me rephrase.  At some point, did

3  you testify in court that Kevin Johnson was the

4  person who pointed a gun at you?

5       A.   Yes.

6       Q.   Did you explain that he had lighter

7  skin than that person?

8       A.   Nobody asked.

9       Q.   Did you explain that he favored that

10 person, but --

11      A.   Nobody asked.

12      Q.   Okay.  But you just said that he was

13 the person that pointed the gun at you.

14      A.   Yes.  That's what we were told to say

15 anyway.

16      Q.   And who told you to say that?

17      A.   Whoever that man was.

18      Q.   Is this a man that spoke to you on the

19 day that you testified?

20      A.   No.

21      Q.   I'm sorry?

22      A.   One of those attorneys, I don't know.

23      Q.   Did you say yes or no to whether he

24 spoke to you on the day that you testified?

25      A.   Yeah, he did.

1        Q.  He did, okay.  And do you remember

2   what he said to you?

3        A.  No.

4        Q.  But you do remember that he told you

5   to testify -- you mentioned that the man told

6   you to say something, right?  Just a few

7   minutes ago.

8        A.  No.  He didn't tell me to say none of

9   that.  He just told me to tell the truth, and I

10  told him what I saw.  He looked like the man

11  that pointed the gun.  I didn't say he was.  I

12  said he looked like him.

13       Q.  Ms. Nickson, I have another transcript

14  here, and I'm going to mark it for the record

15  as Exhibit-3, and I will ask Mr. Ritterman, the

16  district attorney here, if he will stipulate

17  this is the testimony from Kevin Johnson's

18  trial on January 28th.

19       A.  Wait, is he on Kevin Johnson's side or

20  your side?

21       Q.  The man sitting next to me?

22       A.  Yes.

23       Q.  Is from the District Attorney's

24  Office.  I represent Kevin Johnson, and the

25  District Attorney's Office represents the

1   opposing party, so we are on different sides.

2        A.   Okay.

3        Q.   So, I'm going to ask him to stipulate

4   this is the transcript from Kevin Johnson's

5   trial, and that also Ms. Nickson's testimony

6   appears on this.

7             MR. RITTERMAN:   That's right.

8   BY MS. FREEMAN:

9        Q.   So, Ms. Nickson, the parties have

10  agreed that there is a transcript from Kevin

11  Johnson's trial in 1988 and that you testified

12  at that trial.   And, Ms. Nickson, during that

13  trial, do you recall what your testimony was?

14       A.   No, I can't remember none of that.

15       Q.   I won't ask you to try to recall any

16  specifics about that.

17            Ms. Nickson, in the year 2014, were

18  you interviewed by an investigator working for

19  Kevin Johnson's lawyers?

20       A.   I don't remember.   In 2014, is when I

21  had my first stroke.

22       Q.   When did you have your first stroke?

23       A.   In 2014.

24       Q.   Do you remember the month?

25       A.   No.

1     Q.  Do you remember a woman investigator

2   named Marilyn Peterson?

3     A.  No.

4     Q.  Do you remember a male investigator

5   named Brian O'Leary?

6     A.  That's the only one I remember,

7   because he got a big mouth.

8     Q.  Do you remember speaking to Mr.

9   O'Leary about Kevin Johnson?

10    A.  Yes.

11    Q.  Do you remember speaking with Mr.

12  O'Leary on more than one occasion?

13    A.  Yes.

14    Q.  And do you --

15    A.  He stayed harassing me.

16    Q.  Do you remember that I was present at

17  one of the meetings?

18    A.  Yes, I do.

19    Q.  Do you remember signing an affidavit

20  during one of those meetings?

21    A.  No, I don't.

22    Q.  I'm going to show you another

23  document.  Ms. Nickson, I'm showing you a

24  document that I have marked as Exhibit-4.

25  Could you take a look at that and look at the

1   signature on the second page of that document?

2        A.   Yes.

3        Q.   Do you recognize that signature?

4        A.   Yes.

5        Q.   Whose is that?

6        A.   Mine.

7        Q.   Do you see on the first page it says

8   Affidavit Of Opal Nickson?

9        A.   Yes.

10       Q.   Now that you have seen this, do you

11  recall signing this document?

12       A.   Nope.  I don't remember none of this.

13       Q.   In paragraph one -- I'll read to you

14  what paragraph one of this affidavit states.

15  It says, "I testified against Kevin Johnson at

16  his trial in January 1988.  I falsely testified

17  that Kevin Johnson was the person who pointed a

18  pistol at me, Elijah Bennett and Angelo

19  Smith..."

20       A.   I never said that, that "I falsely..."

21  I never said that.

22       Q.   Okay.  I'm going to finish reading

23  this paragraph and then I'm going to --

24       A.   Why didn't you read this when I first

25  got it.  Nobody read this to me.  If they did,

1    I don't remember it.

2         Q.   Okay.   That statement continues that

3    you said, "I falsely testified that Kevin

4    Johnson was the person who pointed a pistol at

5    me, Elijah Bennett and Angelo Smith during the

6    robbery and murder of Lyndon "Cowboy" Morris."

7              Now, Ms. Nickson, you said you had

8    never said this.   Is that your testimony today?

9         A.   That's right, I never said that.   You

10   sat there and heard me say that?

11        Q.   Well, Ms. Nickson, do you -- so, you

12   don't recall signing this affidavit at all?

13        A.   No, I don't.

14        Q.   I'm going to have you flip to page two

15   of this affidavit.   At the top of page two I

16   will read that to you, paragraph seven, it

17   states, "I have cataracts in both eyes and have

18   trouble with my vision.   Before signing my name

19   below, my affidavit was read out loud to me by

20   Brian O'Leary."   Do you see where it says that?

21        A.   What page?

22        Q.   I'm at the top of page two.   It's

23   paragraph seven.   Flip to the other page.

24        A.   I'm not doing all that.   I can't do

25   it.   Like I couldn't then, I can't do it now.

 1          Q.   Let me ask you a few questions about
 2     this, then.   Did you have cataracts in your
 3     eyes at some point?
 4          A.   Yes, I had them removed.
 5          Q.   Do you recall when you had them
 6     removed?
 7          A.   No.
 8          Q.   But before you had them removed, did
 9     you have trouble reading because of the
10     cataracts?
11          A.   One of them, yes.
12          Q.   So, Ms. Nickson, do you recall the
13     conversation that -- you said you recall me
14     meeting with you along with the investigator,
15     Brian O'Leary.
16          A.   Yeah.
17          Q.   Do you recall that we discussed Kevin
18     Johnson's case?
19          A.   Yeah.
20          Q.   Do you recall getting emotional during
21     that conversation?
22          A.   Yes.   Like I'm getting emotional now.
23     I'm tired of it.   Now ya'll asked me to help,
24     to tell you what I knew and it's over.   That's
25     all, that's all I want to do.   I don't want to

1    sit here and have another stroke.

2         Q.  Ms. Nickson, I have to ask you some

3    more questions because of the process and the

4    court case that we are in, okay?

5         A.  What.

6         Q.  Well, I'm getting to that now.  Do you

7    recall expressing regret at falsely --

8         A.  I don't recall nothing now, nothing.

9         Q.  You're saying you do not recall

10   anything?

11        A.  I don't remember nothing now.  When I

12   get upset, I don't remember anything, except

13   for the main things.

14            MS. SMITH:  Ms. Opal, try to --

15            THE WITNESS:  No, they getting me

16   upset.  I'm tired of all of these questions.  I

17   went through this years ago.

18   BY MS. FREEMAN:

19        Q.  Would you like to take a break, Ms.

20   Nickson?

21        A.  I don't want ya'll here at all.  I'm

22   tired.

23        Q.  Ms. Nickson, I understand that you are

24   tired and I know you are not feeling well.  We

25   can take a break for a few minutes, and then we

1    will try to ask you as few questions as

2    possible, but we do need to ask you questions

3    because of this case that we are working on.

4    That's why, you know, we asked the court to

5    help guarantee that you would be here.

6         A.  That's why I didn't go to court,

7    because I knew I was going to act like a fool.

8    That's just why I wasn't in front of no Judge.

9    I can't take this kind of stuff no more.

10        Q.  Would it help to take maybe a five

11   minute break?  Why don't we do that and then we

12   will regroup.

13        A.  I wish ya'll would hurry.

14        Q.  Excuse me?

15        A.  I wish ya'll would hurry.

16        MS. SMITH:  So, you want to keep it

17   going so they can hurry?

18        THE WITNESS:  Yes, go ahead.

19        MS. FREEMAN:  So, you would like for

20   us to continue now.

21        THE WITNESS:  Yes.

22   BY MS. FREEMAN:

23        Q.  Ms. Nickson, did you tell me and Brian

24   O'Leary that you regretted what you said about

25   Kevin Johnson and Cowboy's murder?

1      A.  Yeah, I regret giving him all that

2  time.

3      Q.  And did you tell us that the reason

4  why you regretted what you said is because it

5  was not true?

6      A.  No, I didn't say that.  How do I know

7  if it's true or not?  I just said it ain't true

8  for me to identify him, that's what I'm talking

9  about.  I don't know whether he did it or not.

10  Who am I to say?  I was high.  Who am I to say

11  he pointed the gun?  I was high.

12                  - - -

13              (A knock at the door.)

14                  - - -

15      MS. FREEMAN:  We're going to take a

16  quick break.  There was a knock at the door.

17      THE WITNESS:  No, that's her daughter.

18  BY MS. FREEMAN:

19      Q.  So, Ms. Nickson, I just want to make

20  sure I understand what you are saying.

21          Are you saying that you don't know if

22  Kevin Johnson was the person who pointed the

23  gun at you or not?

24      A.  No, I don't know.  I just know the man

25  pointed the gun at me was dark, and Kevin

1   Johnson is brown skin.  He is light brown skin.

2   That's all I know.

3        Q.  Ms. Nickson --

4        A.  We just said he favored him, that's

5   all.

6        Q.  How were you treated by the

7   prosecutors in this case when you went to

8   court?

9        A.  They didn't treat us mean.  They

10  weren't screaming and shouting like O'Leary was

11  thinking he's a lawyer.

12       Q.  Did you at some point fear that you

13  would get in trouble because --

14       A.  Not really.

15       Q.  You never felt you were going to get

16  in trouble from the police in this case?

17       A.  No, I didn't kill him.  I didn't kill

18  him.  Only thing they could have done to me was

19  lock me up for selling drugs, and back then

20  they weren't doing that, so that's why we sold

21  them.

22       Q.  Did you have any children living with

23  you at the time of Cowboy's murder?

24       A.  Not really.  My son lived with my

25  mother, and so did my daughter.  I just kept

1    them sometimes.  I ran a speakeasy and all

2    that.  How could I have kids living there with

3    me?  I just kept them sometimes, and that was

4    one of those times we got robbed, but none of

5    them were there.  None of them were there.

6         Q.  Ms. Nickson, did some police officers

7    come meet with you in the last few years about

8    Kevin Johnson's case?

9         A.  Not that I can recall.

10        Q.  Do you recall asking -- I'm going to

11   show you another document.  I'm not going to

12   make you read it.  I just want you to take a

13   look at it.  I'm marking this Exhibit-5.  And I

14   just want you to take a look at the bottom of

15   the first page and the bottom of the second

16   page and tell me if you recognize the signature

17   there.

18        A.  Yeah.  You know it's my signature.

19   You keep showing me this stuff, same signature

20   everywhere.

21        Q.  So, that is your signature.

22        A.  Yes.

23        Q.  Ms. Nickson, the front of this page

24   says that it's a Philadelphia Police Department

25   Investigation Interview Record and it says the

```
 1   date is 06/20/16, meaning June 20, 2016.

 2       A.  They came out to my house?

 3       Q.  Well, it says the address -- it says

 4   the name Opal Nickson at the top.  It says

 5   address 4901 Old Stenton Avenue, Apartment 218.

 6       A.  Oh, I don't remember this, but I did

 7   live there.

 8       Q.  You did live there?

 9       A.  Yeah.

10       Q.  But you don't remember talking to

11   police there?

12       A.  Uh-uh, not about this.  The only

13   person I remember is that O'Leary man.

14       Q.  It says here, Ms. Nickson -- I will

15   read this to you.  You don't have to read it

16   yourself, but there is a question from police

17   to you.  It says, "Are you absolutely sure it

18   was Kevin who held you, Elijah and Angelo in

19   the front bedroom at point of handgun when

20   Cowboy was shot and killed?"

21           Do you remember being asked that

22   question?

23       A.  No.  And what did I say?

24       Q.  This document says, "Yes."

25       A.  I was high.  I don't know.
```

1      Q.  So, your testimony is you don't know

2  if it was Kevin?

3      A.  No, I was high.

4      Q.  This document also asks you if you

5  told a private investigator that it was not

6  Kevin Johnson who held you in your bedroom at

7  point of gun.

8      A.  I might have told him I don't know if

9  it was Kevin or not.

10     Q.  And according to this document, you

11 said, "Yes."  Meaning, yes you did say that to

12 the private investigator, and then you

13 explained, "But that was only because I was

14 still mad at the district attorney for

15 screaming at us."

16     A.  The only person I'm mad at is Kevin

17 (sic) O'Leary.  The district attorney never

18 screamed at us.

19     Q.  The district attorney never screamed

20 at you?

21     A.  No.  He might have been shouting.  All

22 police officers do that, even the cops did

23 that.  So, he wasn't no different from nobody

24 else.

25     Q.  Ms. Nickson, do you understand that

1  when I ask you about the district attorney, I

2  mean the lawyer, the prosecutor that would have

3  asked you questions in court?

4      A.  Um-hum.

5      Q.  And you may have met with the

6  prosecutor before court to discuss the

7  questions the prosecutor would ask you.

8      A.  Here, take your paper, please.

9      Q.  All right, just a few more questions,

10  Ms. Nickson.  You mentioned earlier that when

11  there was a knock on the door on the night that

12  Cowboy was killed, someone said the name Keith.

13     A.  Um-hum.

14     Q.  Do you have a brother named Keith?

15     A.  Brian Keith Nickson.

16     Q.  You said Brian Keith Nickson?

17     A.  Yes.

18     Q.  Did you refer to him as Keith?

19     A.  Keefy.  It couldn't have been him

20  because he was in the service.  He was in the

21  Army.  I have another friend name Keith, who

22  they said he might have done it, but he is dead

23  today.  I have another friend named Kirk Coff.

24  They said he was involved and he's dead today.

25  Who else?  Oh, another person named Gregory

1    Dawn, he's dead today, but he knows Kevin

2    Johnson.  All of them do, all three of them.

3        Q.  Ms. Nickson, I'm not going to make you

4    look at this document, but if I were to tell

5    you one of the statements I showed you earlier

6    this afternoon, the statement that you gave to

7    police in October 1986, in that statement you

8    mentioned that Keith was at your house a few

9    minutes before the shooting, do you remember

10   that?

11       A.  Yes.

12       Q.  Was that your brother Keith?

13       A.  No, the other one.

14       Q.  It was another Keith.

15       A.  Yeah, a very good friend.  A very good

16   friend, but he's dead today.

17       Q.  Let me take a look at one document,

18   Ms. Nickson, and then I'm going to give Mr.

19   Ritterman an opportunity to ask some questions.

20          Ms. Nickson, I'm going to read from

21   Exhibit-1 on the second page.  The question is,

22   "Opal, would you go on and tell me what

23   happened last night."  Answer, "I had went out

24   to the store and returned home close to nine

25   o'clock, p.m.  When I went in the house, James,

1    Little James, Angelo and Elijah were up on the

2    second floor rear bedroom.  Cowboy and Abdul

3    were in the second floor front bedroom.  A bull

4    diker named Evette had stopped a little later

5    at the house and bought some coke from Cowboy."

6         A.  Right.

7         Q.  "And afterwards stopped in the back

8    room to talk a little bit.  Then my brother

9    Keith came to the house and called me aside

10   saying that he wanted to do some coke, but that

11   there were too many people there.  He said that

12   he would come back later.  Keith then left.

13   About five to ten minutes after Keith left, the

14   bull diker Evette left.  Then a few minutes

15   later there was another knock at the door."

16   And it continues, but did you hear where I just

17   read that you mentioned your brother Keith?

18        A.  Yes.  The other Keith we consider as

19   my brother also, but he wouldn't have left --

20   my brother wouldn't have left with Evette.  She

21   was a dike, but the other would've.

22        Q.  Do you remember the last name of that

23   other Keith?

24        A.  Keith Brockenboro.

25        Q.  Brockenboro?

1        A.   Yes, he's dead.   I identified him on

2   some of those pictures, too.   He is a friend of

3   Kevin Johnson, and they said they were in

4   robberies throughout the neighborhood robbing

5   Jamaicans, so we just figured it was Kevin

6   Johnson.   Who knows, I don't know.

7        Q.   When you say, "We just figured it was

8   Kevin Johnson," who are you referring to as we?

9        A.   Everybody.   We didn't know, though.

10   We didn't know, because, like I said, the other

11   guy was dark skin, real dark.   It couldn't have

12   been no paint.   He was just dark skin.   When I

13   saw Kevin Johnson in the courtroom, what, a

14   little bit lighter than me or darker than me.

15   That man was nowhere near his color, nowhere

16   near it, and I'm quite sure Angelo testified

17   that, too.   He just look like him.

18        Q.   Thank you Ms. Nickson.   Mr. Ritterman

19   has some questions for you.

20                      - - -

21                CROSS-EXAMINATION

22                      - - -

23   BY MR. RITTERMAN:

24        Q.   Thank you, Ms. Nickson.   Ms. Nickson,

25   I want to ask you about the last statement that

1  was shown to you.  This is from the one from

2  2016 that you gave to the police.  We've agreed

3  that was your signature at the bottom of that,

4  yes?

5       A.  Right.

6       Q.  Okay.  And the last question asked to

7  you is, "Did you tell some other private

8  investigator, you called them, that it was not

9  Kevin Johnson who held you in your bedroom at

10  point of gun?"  And you said, "Yes, but that

11  was only because I was still mad at the

12  district attorney for screaming at us.  It was

13  really Kevin that had his gun on the three of

14  us."  Is that what you told the police?

15      A.  I can't remember that.

16      Q.  Is it possible you told them that?

17      A.  I don't know.  I just know now it was

18  just a resemblance.  That's all I know.

19      Q.  Do you have any idea why three years

20  ago you would have told police that it was

21  Kevin?

22      A.  I have no idea.

23      Q.  Okay.

24      A.  Maybe I was scared.

25      Q.  Scared of what?

1    A.  I don't know.  I was high back then.

2    Q.  In 2016?

3    A.  No, not in 2016.

4    Q.  Right.

5    A.  In 2016, I was probably feeling guilty

6    for letting this man do all this time in prison

7    if he didn't do it.  So, I figured if I could

8    help him, then I will.

9    Q.  So, did you think that telling the

10   police that it was Kevin who had the gun would

11   help Kevin?

12   A.  No.

13   Q.  Okay.  So, if you were feeling guilty

14   in 2016, why would you tell them that --

15   A.  I don't remember telling them that,

16   no, I don't remember that, because in 2016 I

17   was sober.

18   Q.  Okay.  Now --

19   A.  Real sober.

20   Q.  Real sober?

21   A.  Yes, for years.

22   Q.  Do you remember the first time an

23   investigator for Mr. Johnson spoke to you?

24   A.  No.

25   Q.  But it was around -- if it was in

1   2014, you had just suffered a stroke, is that

2   right?

3        A.  Yes.

4        Q.  How did the stroke affect your memory?

5        A.  It didn't affect it.  It affected my

6   limbs.

7        Q.  Okay, but your mind is -- okay.

8        A.  Yes, it affected my limbs.

9        Q.  Okay.  And what did the defense

10  investigator talk to you about?  What did they

11  say to you?

12       A.  I don't remember that.

13       Q.  Do you think that Cowboy got what he

14  deserved?

15       A.  No, no.

16       Q.  Do you think the person who did this

17  should be in prison for life?

18       A.  I don't know.

19       Q.  Why not?  What would be your reason

20  they shouldn't?

21            MS. FREEMAN:  I'm going to object to

22  the relevance of her opinion about the

23  appropriate punishment for the shooters, but,

24  Ms. Nickson, you can answer the question.  I'll

25  preserve my objection for the record.

1          MR. RITTERMAN:  Your objection is

2    preserved.

3    BY MR. RITTERMAN:

4          Q.  Okay, the question is, you had said --

5    I had asked you, did the person who did the

6    shooting should they spend their life in

7    prison.  And you said, I don't know.  So, I'm

8    asking you what would be a reason they should

9    not?

10         A.  Yeah, they should, because they could

11   have shot me and killed me, and I didn't have

12   nothing.  Could have killed one of my kids if

13   they were there, which I shouldn't have them

14   there.  They should have been out here working

15   and getting their own money instead of trying

16   to take other people's.

17         Q.  Now, you said the shooter looked like

18   Kevin.  In what way did he look like Kevin?

19         A.  In all ways.

20         Q.  So, he had the exact same eyes?

21         A.  Yup, everything.

22         Q.  Same nose?

23         A.  Yes.

24         Q.  Same mouth?

25         A.  He looked just like him.

1         Q.   Same haircut?

2         A.   Yes.

3         Q.   Same height?

4         A.   Yup.

5         Q.   Same weight?

6         A.   Yes.

7         Q.   But the skin color was the one thing

8    that was --

9         A.   That was different.

10        Q.   It was different, okay.  And have you

11   ever seen this guy before, the shooter?

12        A.   No.

13        Q.   Have you ever seen this guy after the

14   shooting?

15        A.   I thought I did.

16        Q.   Where do you think you saw him?

17        A.   In the courtroom.

18        Q.   In court?

19        A.   Yes, but it wasn't.

20        Q.   So, when you were in court, was that

21   when you were testifying in the Kevin Johnson's

22   case?

23        A.   Yes.

24        Q.   And when you first see him in court,

25   you think that's the guy who had the gun on me.

1        A.   Yes.

2        Q.   At what point do you change your mind

3   to decide actually that isn't the guy?

4        A.   Because of the color of his skin.

5        Q.   No, I said at what point did you

6   decides that.   That was a when question.   When

7   did you decide that?

8        A.   When?

9        Q.   Yeah.

10       A.   After I left that courtroom and I

11  didn't testify, the color of his skin.

12       Q.   Okay.   So, when you testified, you

13  still thought it was him, right?

14       A.   Yes.

15       Q.   It's after you left you suddenly

16  realized, oh, my God.   I picked the wrong guy.

17       A.   Yeah.   When I looked at the mugshot,

18  you know, I just thought maybe a camera would

19  make him look lighter, but he was really light.

20       Q.   So, after you leave the courtroom and

21  you realize you had the wrong guy, who do you

22  call about that?

23       A.   I didn't call nobody.   I was still

24  getting high.

25       Q.   At what point did you stop getting

1   high?

2       A.  A year after that.

3       Q.  So, a year after, after you are no

4   longer high, did you give someone a call then

5   and say, listen, I actually got the wrong guy?

6       A.  No.  You know why?

7       Q.  Why.

8       A.  Because your guy stated to us that

9   Kevin Johnson had a record long as the Board of

10  Health of robbing and stealing and all of that

11  from people.  So, I just said the hell with it.

12  I never did anything else about it.

13      Q.  Okay.  So, you thought maybe Kevin

14  Johnson was getting what he deserved anyway?

15      A.  Yeah.

16      Q.  When you say, "your guy," who is my

17  guy?

18      A.  The district attorney?

19      Q.  The one at the trial?

20      A.  Yeah.

21      Q.  Okay.  Now, he was not the same one as

22  the one before him, the one at the preliminary

23  hearing the first time you testified?

24      A.  I don't know.  I have no idea.

25      Q.  Okay.  And did you ever ask the other

```
 1    people you knew from the house like who this

 2    other guy was that looks exactly like Kevin

 3    Johnson, except for his skin color?

 4         A.  No.

 5         Q.  Were you curious to know who he was?

 6         A.  No.

 7         Q.  Were you afraid he might come back?

 8         A.  No.  They never came back after us.

 9    They got what they wanted.

10         Q.  Okay.  Did you talk to them about what

11    they wanted?

12         A.  Who?

13         Q.  The people who did the shooting.

14         A.  I don't know who did the shooting.

15         Q.  Did you recognize -- did you see any

16    of the other people who came into the house

17    with the shooter?

18         A.  They're dead, yes.

19         Q.  So, you recognize them?

20         A.  I ain't recognize them.  I heard that

21    through the neighborhood.

22         Q.  So, through the neighborhood you

23    heard.

24         A.  Yeah.  I ain't recognize none of them.

25    The only person I saw was the one who looked
```

1   like Kevin Johnson.  The other ones were talked

2   through the neighborhood.

3        Q.  Okay.

4        A.  We never saw them.  Now, if you want

5   to know who they was, you ask Little James.

6   How come ya'll didn't look him up?

7        Q.  Okay.

8        A.  He seen all of them.

9        Q.  So, you talked to Little James and he

10  told you he saw all of them.

11       A.  Little James?  He was the doorman.

12       Q.  So, did you ever talk to Little James

13  about what he saw?

14       A.  Yeah.

15       Q.  And did Little James tell you who this

16  guy was who looked just like Kevin Johnson?

17       A.  Never.

18       Q.  Did he say he was Kevin Johnson?

19       A.  No.

20       Q.  So, did you say to him, "Who is this

21  guy?"

22       A.  No.

23       Q.  He just told you about everybody else

24  except Kevin, that guy who looked like Kevin

25  Johnson.

1        A.   After he died, he told it.

2        Q.   After what?

3        A.   After the people died, he told it.   He

4    told the truth.

5        Q.   To you.

6        A.   Yeah, and everybody in the

7    neighborhood.

8        Q.   But he never talked about who this --

9    he told the truth about some of them, but not

10   all of them is what you are saying.

11       A.   He told the truth about who set it up.

12       Q.   Okay.

13       A.   Which was Kirk Coff and Gregory Dawn,

14   and they're both dead.

15       Q.   Right.   Gregory was killed in a Korean

16   deli, correct?

17       A.   Yup.

18       Q.   But he didn't tell you who the guy was

19   that pointed the gun at you.

20       A.   No.

21       Q.   Why not?

22       A.   Because he didn't know who it was, I

23   don't know.   Yeah, he had to know who it was.

24   He had to know.

25       Q.   So, did you say to him you have to

1  know who this is, tell me?

2      A.  No.

3      Q.  Why not?

4      A.  I didn't care.  I didn't care back

5  then.

6      Q.  Do you care now?

7      A.  Yeah, I care now.  I mean, wouldn't

8  you care if you sent a man away for 20 years

9  and he didn't do it?  You got to have some kind

10  of conscience, you have to.

11      Q.  Sure.  That's why I wouldn't tell the

12  police in 2016 that Kevin did it if that was on

13  my conscience, right?

14      A.  If you were getting high, you would.

15      Q.  2016.

16      A.  They all up in your face, you would

17  want them to get out your face, leave me alone.

18      Q.  But you said in 2016 you weren't high.

19  You were very sober.

20      A.  I wasn't high.

21      Q.  Right.  Now, I want to quickly go over

22  a couple things in your statement to police,

23  the original statement from 1986.  If you go to

24  page three -- I'm just going to read it.  I'm

25  on the third page.  Do you want to read along

1    or would you just like for me to read it?

2          A.   Just read it.

3          Q.   I'll read it.  Ms. Freeman is going to

4    make sure I do it correctly.  "Describe the

5    male that pointed the gun at you."  Answer,

6    "Black male in his 20s, late, between 5'6" to

7    5'7", small build, 160 pounds wearing a black

8    leather cap, black jacket waist length, dark

9    colored shirt."

10              Was that the correct description of

11   what the person looked like?

12         A.   I don't know nothing about no hat.

13         Q.   Okay.  Other than that, was that

14   correct?

15         A.   Yes.

16         Q.   And then the question was, "Had you

17   ever seen this male before?"  Answer, "Yes, I

18   had seen him earlier in the day.  I was at..."

19         A.   Yup.

20         Q.   And that was true, okay.  "I was at --

21   over my mother's house and I seen the guy pull

22   up in a car..."

23         A.   Talking to Gregory Dawn.

24         Q.   So, you saw this happen.

25         A.   Yup.

1          Q.  At the time you saw him, did you think

2     he was Kevin Johnson or do you think he was

3     someone that looked like him?

4          A.  Someone who looked like him.

5          Q.  But at the time you're out there and

6     you see him talking to Greg, who do you think

7     that is?  Do you think that's Kevin Johnson?

8          A.  I never knew his name.  I just seen

9     him riding through the neighborhood in his

10    little car.  I never knew his name.

11         Q.  That's right.  In fact, it says here

12    -- the very next thing it says is, "I don't

13    remember what name he used.  And the guy pulled

14    over down by small street and then Greg went

15    down to talk to him."

16         A.  Um-hum.

17         Q.  Is that yes?

18         A.  Yes.

19         Q.  And, so, what happened there is

20    absolutely true, right?

21         A.  Yes.  That was the day that it

22    happened.

23         Q.  Right, earlier that day.

24         A.  Yup.

25         Q.  And -- sorry, just a moment, please.

1   Now, at the preliminary hearing, I'm going to

2   look at page 29, please.  This is the first

3   time you testified against Kevin Johnson.  You

4   had said to Ms. Freeman you didn't recall this,

5   so we're going to read it to you to remind you.

6   This was October 29th, 1986, which is a long

7   time ago.  And you're asked on page 29, "How

8   long have you known this defendant?"  And you

9   said, "I don't really know him.  I know his

10  face from around the neighborhood."  Is that

11  true?

12       A.  Yes.

13       Q.  "You don't know his name?"  Answer,

14  "No."  And that was true, right?

15       A.  Right.

16       Q.  "And -- but you do know his face."

17  Answer, "Yes."  And that was true, right?

18       A.  Yes.

19       Q.  And it says, "How was he dressed that

20  night?"  You said, "He had on all dark colors."

21  Was that true?

22       A.  Yes.

23       Q.  Okay.  Now, if I could just refer you

24  to page ten of this, you said he had -- the

25  question to you -- before I get to that.  You

1    had said earlier that had they asked you in

2    court and said, did this guy have a different

3    skin color, you would have told them that, am I

4    understanding that correctly?

5         A.  Yeah, if they had asked me, I would

6    have told them.

7         Q.  Okay.

8         A.  Probably not that first day.

9         Q.  Which first?  Why not?

10        A.  The first time, because I ain't even

11   think about it then.  After I left the

12   courtroom, I thought about it and I saw the

13   look on his face.

14        Q.  And what was that look?

15        A.  He was saying it wasn't me or

16   something he was saying, and I kept looking at

17   him, and I realized that the man was dark, but

18   I wasn't going to be an that stand saying it.

19   Plus he had his family there.  They were all

20   trying to say something to me and everything,

21   his mother and aunts and stuff like that.

22        Q.  They tried to say something to you?

23        A.  Yeah.

24        Q.  What did they say to you?

25        A.  I don't remember.  I told the district

1   attorney.

2       Q.   That they were saying things to you?

3       A.   Yes.

4       Q.   Because you were bothered by what they

5   were saying to you?

6       A.   I can't remember, though.

7       Q.   Do you think it involved some threats

8   against you?

9       A.   I don't know what they were saying.

10      Q.   They weren't kind words, though, fair

11  to say?

12      A.   No.

13      Q.   And on page ten it says, "You said he

14  had a gun in his hand."  Answer, "Yes."

15  Question, "Do you see that man in court now?"

16  Answer, "Yes."

17      A.   And I pointed to him.

18      Q.   And you pointed to him.  And you

19  pointed to Kevin Johnson, correct?

20      A.   Correct.

21      Q.   And that's because you believed at

22  that moment he was the shooter, correct?

23      A.   Yes.

24      Q.   Now, I'm going to refer you quickly to

25  the trial.  So, this is Exhibit-3, page 200,

1    line four.  So, the question asked of you --

2    this is now the second time you testified.

3    "And did you see the defendant's face as he

4    came through the -- as he was in the doorway?"

5    And you said, "Yes."  Do you recall that?

6         A.   Yes.

7         Q.   "And did you recognize the defendant's

8    face as the face you had seen before?"  And you

9    said, "Yes."

10        A.   Yes.

11        Q.   And then you were asked, "Now, can you

12   explain to the jury how you knew him from

13   before, how you had seen him before, under what

14   circumstances you knew about?"  Answer, "Well,

15   I knew him from the neighborhood I grew up in

16   and I had seen him the same day.  That's why I

17   remembered his face real good."  Do you

18   remember that?

19        A.   Yes.

20        Q.   And was that true?

21        A.   Yes.

22        Q.   Now, this Mr. O'Leary -- is his name

23   Mr. O'Leary?

24        A.   Who?

25        Q.   Who is this defense investigator who

1   has been showing up at your house?  Mr.

2   O'Leary, is that his name?

3        A.  Yeah.

4        Q.  How has he treated you?

5        A.  He's mean, he's loud, he's

6   disrespectful, pushy, everything.

7        Q.  And what is it that he's pushing you

8   to do?

9        A.  Trying to go to court.

10       Q.  And go to court for what purpose?

11       A.  To testify that Kevin didn't do it.

12       Q.  Okay.  And do you feel by saying today

13  I don't know who did it that's going to keep

14  Mr. O'Leary from coming back?

15       A.  Mr. O'Leary ain't coming back here.

16       Q.  Okay.

17       A.  He's not going to come back to my

18  house or I'm going to get a restraining order

19  on him.  I don't want to have nothing to do

20  with him.  He will cause me to have a heart

21  attack.  I don't want him here.

22       Q.  And does that have any influence on

23  how you are answering questions today?

24       A.  Yeah, he really makes me mad if you

25  even mention his name.  I don't like him.

 1          Q.  All right.

 2          A.  He bangs on my door, rings the

 3    doorbell, the window, the phone.  He's very

 4    disrespectful and I asked -- he wanted to be

 5    here today.  I asked the Judge don't let him

 6    come here, no.

 7          Q.  Ms. Nickson, I'm going to stop here.

 8    I don't want to take up anymore of your time,

 9    but thank you for your time.

10          A.  Thank you.

11          Q.  And thank you for having us in your

12    home.

13              MS. FREEMAN:  I just have a very brief

14    redirect.

15              MR. RITTERMAN:  Okay.  There may be

16    some more questions from Ms. Freeman.

17                      - - -

18                  REDIRECT EXAMINATION

19                      - - -

20    BY MS. FREEMAN:

21          Q.  Very, very brief, Ms. Nickson.  Thank

22    you so much for allowing us in your home.

23              You testified earlier that you were

24    high when the men came in with the guns that

25    night, and the lights went off, and you said --

1    I think you said to me at one point, you know,

2    how could I really see him, because I was high.

3    Is that accurate?  That you would have had a

4    hard time seeing and remembering the person who

5    held the gun to you because you were high.

6        A.   No.  I remember that everybody was

7    there, so I wouldn't have had a hard time.

8        Q.   And you said that someone told you

9    that Kevin Johnson had a really long record of

10   committing crimes.

11       A.   Oh, yeah.  Well, everybody knew that

12   anyway.

13       Q.   Did someone say that to you the first

14   time you picked out his picture when you were

15   at the police station?

16       A.   Um-hum.

17       Q.   They told you that he had a long

18   record?

19       A.   Yeah.

20       Q.   Did they tell you that everyone else

21   had picked his picture as the --

22       A.   Yes.

23            MR. RITTERMAN:  I object to the

24   leading.  By the way, this is your witness.

25            MS. FREEMAN:  I'll rephrase.

1    BY MS. FREEMAN:

2         Q.   When you picked out the picture that

3    day at the police station, did the police tell

4    you anything about Kevin Johnson when they

5    showed you his picture?

6         A.   After I picked it out.

7         Q.   What did they tell you?

8         A.   That he had a long record.  He, uh --

9    what else did they tell me?  I can't remember.

10   They told me quite a few things about him.

11        Q.   Did they tell you who they believed

12   was the assailant in this case?

13        A.   Uh-uh.

14        Q.   The police?

15        A.   No.

16        Q.   They didn't say that, no.  Did they

17   tell you who anyone else had identified?

18        A.   Yeah.

19        Q.   What did they say?

20        A.   That they identified him.

21        Q.   Did they say who else identified him,

22   who specifically?

23        A.   Little James, Elijah, Angelo,

24   everybody.

25        Q.   Did they tell you that before or after

1   you picked out the picture?

2        A.   After.

3        Q.   Okay.   That's all the questions I

4   have, Ms. Nickson.

5             MR. RITTERMAN:   I have no follow up.

6   Thank you.

7             THE WITNESS:   You're welcome.

8                       -  -  -

9             (Deposition concluded at 2:30 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

        I, Sharise J. Thompson, a Court

Reporter and Commissioner of Deeds for the

Commonwealth of Pennsylvania, do hereby certify

the foregoing to be a true and accurate

transcript of my original stenographic notes

taken at the time and place hereinbefore set

forth.


                        _Sharise Thompson_
                        Sharise J. Thompson
                        Court Reporter
                        Commissioner of Deeds


DATED:  _____


        (The foregoing certification of this

transcript does not apply to any reproduction

of the same by any means, unless under the

direct control and/ or supervision of the

certifying shorthand reporter.)

# Exhibit 4



**CITY OF PHILADELPHIA**
**POLICE DEPARTMENT**
FRANKLIN SQUARE
PHILADELPHIA, PA 19106

Kevin Johnson
Arrest Photos

10-10-86

KJ COPY



KJ (DAO) 0106



KJ COPY

| PHILA. POLICE NO. DEPT. | 584615 | | DATE | 10-10-86 |
| NAME | KEVIN JOHNSON | | | AGE 25 |
| ADDRESS | 1814 S. YEWDALL ST. | | | |
| CRIME | WILLFUL KILLING | | COMPLEX | MBR |

| HEIGHT 5-6 | WEIGHT 114 | EYES BRO | HAIR BR | BUILD |

| PHOTO BY LS | CLERK TLH |

KJ (DAO) 0107



| PHILA. POLICE NO. DEPT. | 584615 | | DATE | 10-10-86 |
|---|---|---|---|---|
| NAME | KEVIN JOHNSON | | AGE | 25 |
| ADDRESS | 1814 S. YEWDALL ST. | | | |
| CRIME | WILLFUL KILLING | | COMPLEX | MBR |

| HEIGHT 5-6 | WEIGHT 114 | EYES BRO | HAIR BR | BUILD |
|---|---|---|---|---|

| PHOTO BY | LS | CLERK | TLH |
|---|---|---|---|

KJ (DAO) 0108