IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**Civil Action No. 13-3197**

**KEVIN F. JOHNSON**,

Petitioner

v.

**JOHN W. KERESTES, *et al.*,**

Respondents

## BRIEF FOR THE OFFICE OF ATTORNEY GENERAL

Pursuant to the District Court's order of October 11, 2022, referring this matter to the Pennsylvania Office of Attorney General for the filing of an *amicus curiae* brief regarding the parties' "Compromise and Settlement Agreement for Habeas Relief."

MICHELLE A. HENRY
Attorney General
Commonwealth of Pennsylvania
JAMES A. DONAHUE
First Deputy Attorney General
MICHELE K. WALSH
Executive Deputy Attorney General
  Criminal Law Division
RONALD EISENBERG
Chief Deputy Attorney General
  Special Litigation Section

Office of Attorney General
1600 Arch Street
Philadelphia, PA 19103
reisenberg@attorneygeneral.gov
(267) 940-6676
January 23, 2023

# TABLE OF CONTENTS

Table of Citations                                                                              ii

Argument                                                                                         1

    I.   This Court is without authority to "settle" the petitioner's habeas claims
        by dictating or enforcing terms for a state court guilty plea.                 2

    II.  The "interests of justice" would not compel relief in any case.              3

    III. The proffered waiver of procedural bars amounts to forum-shopping;
        this Court has discretion to decline it.                                      23

    IV. The petitioner's claims, if reached, do not warrant relief.                   28

Conclusion                                                                                      36

Appendix

# TABLE OF CITATIONS

## Cases

*Beard v. Kindler*, 558 U.S. 53 (2009) ...................................................... 27

*Brooks v. Tennessee*, 626 F.3d 878 (6th Cir. 2010) ................................. 22

*Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013) ...................................... 23

*Christian v. Frank*, 595 F.3d 1076 (9th Cir. 2010) .................................. 22

*Christy v. Horn*, 115 F.3d 201 (3rd Cir. 1997) ........................................ 24

*Commonwealth v. Johnson*, 51 A.3d 237 (Pa. Super. 2012) ............................ 30, 35

*Ewing v. Horton*, 914 F.3d 1027 (2019) .................................................. 4

*Hall v. Paramo*, 734 F. App'x 519 (9th Cir. 2018) .................................. 22

*Hardiman v. Reynolds*, 971 F.2d 500 (10th Cir. 1992) .................................... 24, 27

*Harrington v. Richter*, 562 U.S. 86 (2011) .............................................. 31

*Hull v. Freeman*, 932 F.2d 159 (3rd Cir. 1991) ........................................ 24

*In re Lambrix*, 624 F.3d 1355 (11th Cir. 2010) ........................................ 23

*Isaac v. Cain*, 588 F. App'x 318 (5th Cir. 2014) ..................................... 22

*Jackson v. Sec'y, Fla. Dep't of Corr.*, 2017 WL 11679839 (11th Cir. 2017) ........ 23

*Jennings v. Stephens*, 574 U.S. 271 (2015) .............................................. 3

*Lafler v. Cooper*, 566 U.S. 156 (2012) ................................................ 3, 4

*Pitchess v. Davis*, 421 U.S. 482 (1975) ................................................ 3

*Shoop v. Twyford*, 142 S. Ct. 2037 (2022) ............................................. 22

*United States v. Bendolph*, 409 F.3d 155 (3rd Cir. 2005) ...................................... 27

*United States v. Gonzalez-Avalos*, 753 F. App'x 601 (10th Cir. 2018)................. 23

*United States v. Jackson*, 427 Fed. App'x. 109 (3rd Cir. 2011) ............................ 22

*Wilkinson v. Dotson*, 544 U.S. 74 (2005) ................................................................. 3

**Statutes**

28 U.S.C. § 2244(b)(2)(B)(i) ................................................................................... 27

28 U.S.C. § 2244(d)(1)(D) ...................................................................................... 27

28 U.S.C. § 2254 ...................................................................................................... 33

28 U.S.C. § 2254(a) ................................................................................................... 6

28 U.S.C. § 2254(d)(1) ............................................................................................ 30

28 U.S.C. § 2254(i) .................................................................................................. 35

42 Pa. C.S. § 9545(b)(1)(ii) .................................................................................... 27

**Rule**

Fed. R. Crim. P. 35................................................................................................... 7

**Other Authority**

Habeas Settlements, 92 Va. Law Rev. 1 (2006) ...................................................... 7

# ARGUMENT

Over 35 years ago, petitioner was convicted of first degree murder for an execution-style drug killing carried out inside a private home. There were four separate witnesses present in the house, three of whom promptly and positively identified petitioner as one of the shooters. They were able to do so not only because of their opportunity to view his face, but because he was a neighbor. All three witnesses already knew the petitioner from their neighborhood; indeed one of them had seen him that very day, when he drove by in a green car and stopped to chat with the witness' companion. Two of these witnesses described the perpetrator as dressed in black clothes, wearing a black leather jacket. As authorities later learned, petitioner's family owned a green car. And when police arrested him two days after the crime, they recovered his black leather jacket.

Decades later, petitioner's lawyers and family members procured statements from the witness/neighbors purporting to recant their prior testimony. All of these witnesses are now dead or unavailable. Post-conviction claims based on the recantations were dismissed in state court because of their untimeliness. A subsequent round of post-conviction litigation was intentionally terminated by the petitioner and his current counsel. Now the parties ask this Court to "resolve" the matter by way of a "Stipulation and [Proposed] Order" that does not identify any specific constitutional error, but that binds the state court to accept a guilty plea to a

reduced offense and sentence. To effectuate this federal court resolution, counsel for respondents offers to waive any and all procedural defaults.

This Court, however, lacks authority for such a "settlement." It would not be in "the interests of justice" in any case, as the parties have significantly understated the strength of the trial evidence and greatly overstated the alleged recantation evidence. Nor need the Court accept the procedural bar waiver, which is proffered to excuse defaults of petitioner's own making concerning claims that, because of the delay, are no longer capable of any additional factual development. And if the habeas claims could be reached on their merits, they would not warrant relief.

## I.   This Court is without authority to "settle" the petitioner's habeas claims by dictating or enforcing terms for a state court guilty plea.

The power of a federal habeas court over state court convictions is both considerable and constrained. It is considerable because the court can reach into another jurisdiction to remedy constitutional violations. But it is constrained because that is all it can do – require a remedy for a specific constitutional violation. A habeas court has no power to disturb a state court judgment if it has not found such a violation. And if it does find a violation, it has no power to reshape the judgment beyond elimination of the error. The parties ask this Court to grant the writ without ruling on any particular constitutional error, and then to preempt the discretion of the state court over further disposition of the matter by directing it to approve particular guilty plea terms to a lesser sentence. If the state court declines, the case

would return to this Court to do the only thing the Court had power to do to begin with – rule on petitioner's constitutional claims. A habeas court has neither authority nor ability to oversee state court proceedings in this manner.

Habeas relief generally takes the form of a "conditional" writ. But the United States Supreme Court has made clear that there is no federal power "to maintain a continuing supervision over a retrial conducted pursuant to a conditional writ granted by the habeas court." *Pitchess v. Davis*, 421 U.S. 482, 490 (1975); *accord Jennings v. Stephens*, 574 U.S. 271, 278 (2015) (conditional writs are not "a general grant of supervisory authority over state trial courts").

Rather, "[c]onditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one, and the consequence when they fail to do so is always release. Conditional writs are not an all-purpose weapon with which federal habeas courts can extort from the respondent custodian forms of relief short of release." *Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005) (Scalia, J., concurring). As a result, the conditional writ does no more than "afford the State an opportunity to remedy the specific constitutional violation identified by the district court." *Jennings*, 574 U.S. at 285 (Thomas, J., dissenting).

Thus the writ can apply in contexts such as guilty pleas – but only when the court identifies a constitutional violation specific to the plea process. *See Lafler v. Cooper*, 566 U.S. 156 (2012) (ineffective assistance of counsel in recommending

3

rejection of favorable plea offer). Any remedy granted by the federal court must be "tailored to the injury suffered from the constitutional violation[,] … the specific injury suffered." *Id.* at 170. And even then, the state court must be permitted discretion in how to proceed – whether to accept a plea, reduce the sentence, or order a new trial. *Id.* at 171-72.

The parties' settlement would violate these principles, which are fundamental to "[t]he entire habeas regime as it exists today." *Ewing v. Horton*, 914 F.3d 1027, 1032 (2019). As this Court noted in its order of October 11, "the parties agree that Petitioner has pointed to sufficient constitutional error in his state-court proceedings to warrant habeas relief." But the actual order they ask this Court to sign does not actually identify which constitutional error or errors the Court is actually supposed to rule on. Instead, the proposed order states only that this Court "shall conditionally grant Petitioner's Petition for Writ of Habeas Corpus based upon the Parties' agreement that the interests of justice so require."

Nor does counsel for respondents actually admit any particular constitutional error. According to the agreement, for example, the respondents concede that "several" claims "demonstrate that the trial was fundamentally unfair." Settlement agreement at 2. But again these "several" claims are not specified, and "fundamentally unfair trial" is not a specific constitutional error. The agreement states further: "Johnson alleges (and the Commonwealth tends to agree) that

counsel's failure to investigate and secure [evidence] caused prejudice." Settlement agreement at 8. But "alleges" and "tends to agree" is an odd way to concede a specific constitutional error. The agreement also states that the reliability of the trial testimony "appears in doubt," but that respondents' counsel "notes that the recantations are not without issue." Settlement agreement at 11. Again, such hedging fails to concede any specific constitutional violation.

The parties' imprecision is apparently purposeful. If the proposed order specified any particular constitutional violations, signing the order would constitute a ruling on those claims. And once this Court rules, its only power as a habeas court will be to release the petitioner if the state court does not vacate his conviction. All of petitioner's claims are claims of trial error, the remedy for which is a new trial. That is the only remedy tailored to the specific injury suffered.

None of the claims have anything to do with pre-trial plea offers; there is no indication that there even were any pre-trial plea offers. The Court will therefore have no legal basis for compelling the state court to do anything at all regarding a future guilty plea. If the state court vacates the conviction but then fails to go along with the parties' plea plans, there will be no proper way to return to this Court, because the Court will already have ruled on petitioner's constitutional claims, and the state court will already have complied with the writ. The promise offered this

Court – that, in exchange for a writ, petitioner will plead guilty to a lesser offense – will be completely unenforceable.

The parties think to get around this problem by not specifying any particular constitutional error in the proposed order. They call it a "compromise." They model their proposal on pre-trial settlements in purely civil matters, in which the civil defendant acknowledges the potential strength of the civil plaintiff's claims but does not explicitly concede any specific error. That way, they reckon, the Court will not technically have to rule on any particular legal ground, leaving the case open for the parties to return here if they do not get what they want from the state courts.

But this stratagem only creates a bigger problem. This is not a sidewalk slip-and-fall awaiting trial. This is a state court murder conviction that has been upheld through multiple rounds of direct and collateral appeal. Federal habeas cases are classified for administrative purposes as civil rather than criminal litigation, but they are a particular kind of civil litigation. This Court's sole power to interfere with a state criminal judgment is the power provided by the habeas act. Under that act, this Court may undo "the judgment of a State court *only* on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis supplied). Unless and until the Court finds such a violation, it has no power to grant a writ. If and when the Court finds

such a violation, it has power only to remedy that specific injury. Litigants cannot, by "agreement" or "compromise," invest this Court with any greater authority.

The parties offer no way around this dilemma, and there is none. They cite a 2006 law review article, by a professor specializing in economics and health law, who posits a cost-benefit analysis advocating for the use of "settlements" in post-conviction litigation. Anup Milani, "Habeas Settlements," 92 VA. LAW REV. 1 (2006). The professor notes that habeas petitioners can constitutionally waive post-conviction rights just as they waive trial rights when accepting a guilty plea.

But the roadblock here is not the petitioner's willingness to waive; it is this Court's inability to prescribe settlement terms to a state court. On that point, the professor explicitly concedes that, under current law, it is illegal for post-conviction courts to "settle" habeas cases by reducing the sentence. He proposes that Congress amend Fed. R. Crim. P. 35 to allow such reductions, and that states enact similar legislation. 92 VA. LAW. REV. at 48.

Neither Pennsylvania nor Congress, however, have taken up the professor on his proposal. Only the habeas statute applies, and it gives this Court no power to impose the parties' agreement on the state courts. The Court can deny petitioner's constitutional claims on their merits or grant them on their merits. But either way, it cannot control what happens to petitioner's sentence thereafter. The parties' pledges in that regard are illusory.

## II.    The "interests of justice" would not compel relief in any case.

Even if this Court did have authority to "resolve" the case "in the interests of justice," the settlement agreement would fall short. Review of the full record suggests that the parties have offered a partisan view of the evidence, both old and new. Perhaps most striking is the failure to advise the Court that the identifications did not depend on a brief opportunity to see the gunman's face. Rather, three of the four eyewitnesses *knew* petitioner from the neighborhood, and had seen him repeatedly in the area. All four eyewitnesses separately identified petitioner just hours after the crime, from an array of different photographs.

The settlement agreement suggests that multiple officers conspired together to fabricate the identifications by pressuring the witnesses to pick out petitioner. That theory is not only belied by the level of detail the witnesses originally provided; it is also contradicted by subsequent statements they made *after* the recantations procured by a defense investigator.

Thus the record as it stands cannot support the assertion that petitioner's conviction was unjust. Instead it only reinforces the firmly established unreliability of decades-late recantation claims.

<u>Opal Nickson</u>

Ms. Nickson owned the home where the shooting occurred. She was upstairs in her bedroom with two of the other witnesses when the shooters entered the house.

Petitioner, wearing a black leather jacket, went to Nickson's bedroom, pointed a handgun at her face, and ordered everyone to lay down while his cohort headed for the other bedroom to look for drugs and money. Nickson immediately recognized petitioner because she already knew him. She had seen him most recently only hours earlier, when he drove down the street where she was sitting with a friend. He pulled over and talked to the friend for several minutes. App. 13-16, 272-381.

After the shooting, Nickson ran out of her home in fear, went to a friend's house, and called the police. She was interviewed the next morning. She was shown a group of photographs. She recognized most of the men in the photos, and positively identified petitioner as the one who pointed a gun at her. A week later she came back, in order to volunteer additional information she had heard about the identity of petitioner's cohort. Later that month at the preliminary hearing, and then again at trial, she testified consistently with her initial statement. App. 13-16, 25-27, 38-76, 272-381, 511-516.

Twenty-eight years later, in 2014, petitioner produced an affidavit, written by a defense investigator (O'Leary) and signed by Ms. Nickson. The affidavit asserted that Nickson thought petitioner's skin was lighter than the gunman's. The affidavit claimed she identified him anyway because police told her everyone else already had, and if she didn't go along they would take away her house, and her children, and also put her in jail. The affidavit did not acknowledge that Nickson knew

petitioner and had seen him just before the murder, and did not explain how she knew he had a black leather jacket and a green car – facts that authorities had not yet ascertained when they interviewed her. App 1115-1116.

In 2016 Nickson provided another statement, in question and answer format, revealing that the 2014 defense affidavit was untrue. She said she only signed it because she was mad at the district attorney for yelling at her. She reiterated that she knew petitioner from the neighborhood, as well as his brother, and that she had seen petitioner in the green car on the day of the murder. She said she was "absolutely sure it was" petitioner who pointed the gun at her. App. 1122-1123.

In 2019, at petitioner's insistence, Nickson was deposed. By that time she had had multiple strokes, was on numerous medications, and admitted that she "can't remember things clearly." App. 1170. The parties state that Nickson "made clear, however, that she could not identify Johnson as the perpetrator." Settlement agreement at 11 n.12. That is a rather misleading characterization of her somewhat disjointed testimony.

First, Nickson clarified at the deposition that it was not the district attorney who had yelled at her; it was defense investigator O'Leary. She stated that O'Leary repeatedly "harass[ed]" her – calling her phone number, "screaming" at her, "banging on my windows," "shouting through my door" – pushing her to say "that Kevin didn't do it." She said O'Leary never read her the affidavit he prepared, and

she never told him she had testified falsely at the trial. App. 1172, 1192-1194, 1199, 1202, 1224-1225.

Nickson stated that the police and prosecutors, in contrast, all treated her "all right." She never felt she was in trouble. Police did tell her that other witnesses had identified petitioner, but they did so only *after*, not before, she had picked him out herself. The prosecutor "just told me tell the truth." App. 1181, 1190, 1199, 1202, 1226-1228.

After the trial, Nickson said, she began to feel uncomfortable about petitioner going to jail. He had looked at her when she was in court, and his family members said things to her that made her afraid. She decided that petitioner might not be the perpetrator, because petitioner was light-skinned and the gunman was darker. But she never reported this change of heart to authorities. App. 1189-1190, 1212, 1221-1222.

Other than this perceived skin tone difference, Ms. Nickson stated that petitioner looked exactly like the shooter "in all ways": same eyes; same nose; same mouth; same haircut; same height; same weight – same "everything." App. 1210-1211.

Elijah Bennett

Elijah Bennett[1] was a companion of Nickson and was in the back bedroom with her and another friend, Angelo Smith. Bennett gave a police interview the morning after the murder. He picked petitioner's photo out of an array and said "he is the guy who held us in the room with the gun." Bennett did not personally know petitioner, but stated that "I see him up on Woodland Avenue" – a commercial strip a short walk from the crime scene. At trial, Bennett testified consistently with the information he gave police. App. 17-19, 26-27, 557-600, 696-699.

Twenty-eight years later, in 2014, petitioner produced an affidavit, written by defense investigator O'Leary and signed by Mr. Bennett. The affidavit asserted that Bennett did not recognize petitioner as the gunman. The affidavit claimed he identified him anyway because police told him everyone else already had, and if he didn't go along they would put him in jail. The affidavit stated that he was scared, high, and confused at the time, that he had long-term memory issues as a result of impairments that predated the crime, and that he had no memory at all of testifying at the trial. The affidavit did not explain how Bennett might have absolutely no memory of his own sworn testimony at trial, but a perfectly detailed memory of his police interrogation, which occurred more than a year earlier and at a time when he was allegedly drugged and terrified. App. 1120-1121.

---

[1] Sometimes referred to in the record as "Elisha" rather than "Elijah."

Some time after this affidavit, Bennett's friend Angelo Smith also gave a statement. Although he himself could not make a definitive ID, Angelo noted that he and Bennett had gone to the courthouse together during the proceedings. He related that, as soon as they entered the courtroom, Bennett pointed to petitioner and said to Angelo, "there he is, the one who had the gun on us in Opal's house." App 1124-1126.

<u>James Smith</u>

James was also in the house that night, serving as a go-between for the victim and customers who wanted to buy drugs. James opened the door to find petitioner pointing a pistol at his head, joined by another man armed with a shotgun. James walked up the stairs with the men, and saw petitioner go to confront the witnesses who were in the back bedroom. He was a few feet away when the other man forced open the victim's bedroom door and blasted him with the shotgun, knocking him to the floor. He saw petitioner return and fire several shots at the prone victim to finish him off before searching for drugs and cash. James then ran out of the house and called police. App. 126-257.

James was first interviewed at 11:30pm, an hour after the shooting. He gave police the names and addresses of the other witnesses, Ms. Nickson and Mr. Bennett. He was able to provide physical descriptions of the two gunmen. He revealed that he had recognized them because "I see both of these guys all the time on the streets

around 54th and Warrington," which was a few blocks from the shooting and from petitioner's house. App. 1-5.

With that information police were able to put together an array of photographs to show to the witnesses. Several hours later they interviewed James again and asked him to review the photos. He positively identified petitioner as the pistol-holding shooter. James testified at trial consistently with his prior statements. App. 6-12, 126-257.

Fifteen years later, in 2001, petitioner produced an affidavit signed by James. The affidavit asserted that police showed James "a couple of" photos and told him that everyone else had picked petitioner. The affidavit claimed that police threatened to arrest him, so he picked the same photo, and identified petitioner again a year later at the trial. But he never told anyone at the time that his ID was false. App. 1087.

Thirteen years later, in 2014, petitioner produced another affidavit, written by defense investigator O'Leary and signed by James. The new affidavit both embellished and undercut the prior one. This affidavit asserted that police showed James four or five photos. The new affidavit, unlike the first, alleged that James was not just threatened by police; he was also supposedly going through cocaine withdrawal while they questioned him. And contrary to the old affidavit, the new affidavit claimed that James *did* tell the DA he couldn't make an ID, but no one would listen. App. 1117-1118.

Notably, the new affidavit focuses on a curious detail. In the second statement James had given police, the morning after the crime, he noted that petitioner had turned off the lights in the back bedroom after threatening the people gathered there. App. 6-12. The new affidavit denies that James gave the police this information. The affidavit claims that police made it up after they had interviewed Nickson, Bennett, and Angelo, and inserted it into James' statement to make him consistent with the other witnesses. The affidavit asserts that James couldn't have known about this detail, because he allegedly never looked toward the back bedroom, and had no idea whether petitioner turned off the lights there. App. 1117-1118.

But the affidavit's drafter has his facts wrong. At the time James was giving his second statement, police had not yet interviewed Nickson and Bennett, and Angelo's interview was still underway, with a different detective. And when they did talk to these three witnesses, *none* of them claimed that petitioner had turned off the lights. All of them said it was *Nickson* who cut the lights, by kicking a plug out of a socket after she was forced to lay flat on the floor. Angelo further explained that the plug was an extension cord, that all the lights on the second floor were connected to that extension cord, and that when Nickson unplugged it, the lights went off on the whole floor. App. 6-24.

James, therefore, knew the lights had gone off, because it wasn't just the back bedroom that was affected. Because he wasn't inside that room with the others, he

didn't know it was Nickson who had done it. He naturally assumed it had been petitioner, and that is what he told police. That was an honest statement. The only fabrication was 28 years later. It wasn't the police who put false words in James' mouth in 1986; it was the drafter of the affidavit in 2014.[2]

Angelo Smith

Angelo Smith was the fourth person in the house when the gunmen pushed their way inside. He was the only one of the four who had not previously known petitioner. Not surprisingly, he was the only one of the four who could not make an unequivocal identification. Angelo was shown a book of photos shortly before a different detective presented James with a photo array. Angelo spotted petitioner in the book and said "yes, [this photo] looks like him, I am not positive." At the end of the interview he was asked if he had anything to add and said "that photo that I picked out looked like the guy." In all other respects, Angelo's statement was consistent with the other witnesses. App. 20-24.

Twenty-eight years later, petitioner produced an affidavit, handwritten by defense investigator O'Leary and signed by Angelo. The affidavit asserted that Angelo was subpoenaed to the trial and told police that he did not recognize

---

[2] Petitioner makes much of the lighting conditions in an effort to undermine the identifications. But all the eyewitnesses at trial – who already knew petitioner from the neighborhood – testified that they had sufficient light to recognize him. The upstairs lights did not go off until after Nickson and Bennett had seen his face. The downstairs lights remained on throughout the incident. And James was with petitioner both upstairs and downstairs, from the time he opened the door. App. 144-151, 184-185, 190, 281-285, 293-302, 354-364, 560-567, 600.

petitioner as the perpetrator. The affidavit asserted that police told him he would not be needed that day. App. 1113-1114.

Two months later, petitioner procured a second affidavit, written by defense investigator O'Leary and signed by Angelo. The new affidavit purported "to clarify" the two-month old affidavit. This time it wasn't the police who he talked to at trial; it was supposedly either the police or maybe the prosecutor himself. This time Angelo supposedly stayed in the courtroom all day. This time he was supposedly told that he didn't have to testify at all, not just "that day." And this time Angelo supposedly asserted that he told police, back in his original interview in 1986, something they refused to write down: that he didn't get a good enough look at the perpetrator's face to make an ID. App. 1119.

In 2016 Angelo gave another statement, in question and answer format. In that statement Angelo revealed that he never even read the first affidavit from 2014; like Ms. Nickson, he just signed it because he wanted the defense investigator finally out of his house. That desire was thwarted when the investigator came back just two months later. On his return the investigator claimed his printer didn't work, so he directed Angelo to sign a completely blank piece of paper. Angelo never saw the contents of the affidavit later inserted above his name. Angelo confirmed, though, that his original statement, the one he gave police on the morning after the crime in 1986, was completely accurate. He was asked: "Is there anything that is not true in

your statement of 10-9-86?" He answered, "No. What is there is the truth. It is what I said back then." App. 1124-1126.

The parties nevertheless assert that Angelo's 2016 statement is exculpatory, because in it he also "affirmed the most significant fact: that he did not testify at trial because he 'told the cops I didn't recognize the guy in the courtroom.'" Settlement agreement at 11 n.12. But this was not "the most significant fact" at all. To begin with, the 2016 statement underscores the untrustworthiness of *all* the O'Leary affidavits, not just the ones attributed to Angelo.

More importantly, Angelo's 2016 statement demonstrates that, had he taken the stand at trial, his testimony would have *hurt* petitioner's case much more than it helped it. Had Angelo told the jury he did not recognize petitioner as the gunman, he would have been asked about his original statement from 1986. He would have affirmed that the statement, made hours after the crime when his memory was freshest, was true: that he picked *petitioner's* picture, no one else's, out of the book full of photos and said "yes [it] looks like him, I am not positive"; and that he then volunteered at the end of the interview that "that photo that I picked out looks like the guy." He would further have testified that while *he* did not recognize petitioner in the courtroom, his friend, Elijah Bennett, *did* – and that Bennett promptly pointed to petitioner and told Angelo he was the man who had held the gun at them.

The most significant fact, in other words, is that Angelo's qualified ID did not stand on its own. It was just one interlocking piece of an unusually strong identification case that included three other eyewitnesses, each of whom had seen petitioner on numerous prior occasions, including that same day, each of whom recognized petitioner as soon as he faced them, and each of whom *un*qualifiedly identified petitioner as the gunman within hours of the murder.

Alibi evidence

The parties contend that the verdict was unjust because petitioner had alibi witnesses. They assert that the alibi defense failed only because its "presentation" was "materially incomplete." Settlement agreement at 8. But the problem was not the "presentation" of the material, but the material itself. The witnesses just weren't able to place petitioner away from the crime scene at the time of the crime, and in trying to do so they tended to make matters worse.

Douglas Yancy, a longtime friend, appeared for the defense at trial. He claimed he saw petitioner at 8:00 or 9:00 the night of the murder, a few blocks away. But the shooting did not take place until more than an hour later, which would have given petitioner more than enough time to commit it, even if Yancy were telling the truth. App. 704-710.

James Lawrence, another friend, testified at trial that he saw petitioner near petitioner's house at about 10:50pm, more than half an hour after the crime, with

another man he could not identify or describe. As above, this is not alibi evidence. On the contrary, it is quite consistent with the evidence of guilt, placing petitioner near the murder scene, with a cohort. App. 723-737.

Wanda Johnson, petitioner's cousin, testified at trial that she saw petitioner at 11:00pm, 45 minutes after the murder, at a bar a mile and a half away. He had a car and was with a man she could not identify. Again the evidence was fully consistent with guilt. App. 740-742.

Hoping to plug the gaps on post-conviction review, petitioner proffered two new alleged alibi witnesses, Conchetta Parks and Evette Debose. Parks claimed that she saw petitioner at 10:00pm, about a mile away from the murder. That's closer in time and further in distance, although still not quite enough to preclude petitioner's participation in the crime. Petitioner's Appendix to Memorandum of Law in Support of Habeas Relief, 2-6-14, Doc. 19-1, A-160.

Debose, however, said she was with petitioner at the same time, 10:00pm, but at a different location that was several blocks away from where Parks said he was. The proposed witnesses therefore cancelled each other out. Petitioner's Appendix to Memorandum of Law in Support of Habeas Relief, 2-6-14, Doc. 19-1, A-161.

Petitioner didn't help himself. He took the stand on his own behalf at trial, and claimed that at 10:45pm, he was at a bar about three miles from home. But defense witness James Lawrence had testified that at almost that same time, he had seen

petitioner near petitioner's house. And defense witness Wanda Johnson had testified that, at 11:00, petitioner was actually at a completely different bar, about a mile away from the one he said he was at. App. 809-810, 723-737, 740-742.

Taken as a whole, this "alibi evidence" suggests not that petitioner is actually innocent, but that he and his friends made unsuccessful efforts to manufacture a defense that was contrary to fact.

Arrest photo

The parties assert that there is also new documentary evidence that indicates petitioner's innocence. This supposedly new evidence is an arrest photo, dated two days after the crime, that shows petitioner with a thin, pencil-style mustache. It is very significant, say the parties, because two of the eyewitnesses (James Smith and Angelo Smith) verbally described petitioner as clean-shaven during their interviews, before they viewed photo arrays.

The photograph is not, in fact, significant. It is one of ten different arrest photos of petitioner, spanning a five-year period from March 1981 through October 1986. In all of them, petitioner has exactly the same thin pencil mustache, and is otherwise completely clean-shaven.[3] One of these photos was included in the array from which all the witnesses made their identifications. None of them had any

---

[3] Except perhaps for the photo dated June 6, 1984, which appears to show some fuzz under the chin in the profile shot. App. 34.

difficulty selecting petitioner's photo rather than anyone else's. They knew what he looked like, with or without the slight mustache.

All these photos, including the array, are present in the appendix to this brief for the Court's review. App. 27-37. What they demonstrate is that petitioner's appearance was remarkably consistent over time. Same eyes, same nose, same ears, same mouth, same hair, same mustache, same "everything." Anyone who knew his face in 1981 or 1983 or 1985 would easily have recognized it in 1986. What the photos also show is petitioner's skin tone. Although the lighting varies, in none of the photos could he be readily described as light-skinned. This is the man Opal Nickson knew and saw that day, and the man James Smith and Elijah Bennett recognized at the murder scene.

There is a reason that trial, not habeas review, is the "main event" in the criminal justice truth-seeking process. *Shoop v. Twyford*, 142 S. Ct. 2037, 2044 (2022). "Recanting affidavits and witnesses are viewed with extreme suspicion." *United States v. Jackson*, 427 Fed. App'x. 109, 112 (3rd Cir. 2011).[4] Long-belated

---

[4] *See*, *e.g.*, *Isaac v. Cain*, 588 F. App'x 318, 326 (5th Cir. 2014) (recognizing "long-established view under both federal and state law that recantations are highly suspicious"); *Brooks v. Tennessee*, 626 F.3d 878, 897 (6th Cir. 2010) ("this court views with great suspicion the recantation testimony of trial witnesses in postconviction proceedings"); *Hall v. Paramo*, 734 F. App'x 519, 520 (9th Cir. 2018) (a witness' later recantation of trial testimony does not render earlier testimony false; recantation is particularly unreliable when the witness' trial testimony was consistent with the other evidence at trial, recantation was signed almost four years after the trial, and there was evidence that the witness was pressured to recant); *Christian v. Frank*, 595 F.3d 1076, 1084 n.11 (9th Cir. 2010) (noting that witness' recantation was especially unreliable given that it was made more than a decade after his original positive identification of petitioner as perpetrator); *United*

presentation of recantation affidavits often serves to obfuscate rather than illuminate. This case is a textbook example.

### III.    The proffered waiver of procedural bars amounts to forum-shopping; this Court has discretion to decline it.

In the settlement agreement, respondents declare that they waive any possible procedural bars. That is of note, as virtually all of the constitutional claims listed in the agreement are procedurally defaulted, because petitioner chose to wait too long to raise them in state court, and then intentionally withdrew even those that were timely. He thereby blocked the state courts from developing the facts, let alone from reaching the merits. Now he seeks relief from this Court on a cold record of old affidavits, untested allegations, and unavailable witnesses. Respondents aim to facilitate that effort by waiving the defaults. The plain purpose of this waiver, like the purpose of the settlement agreement, is to enable the parties to choose their own forum – one they apparently expected to comply with their efforts to refashion petitioner's sentence. That is not a purpose this Court should endorse.

---

States v. Gonzalez-Avalos, 753 F. App'x 601, 606 (10th Cir. 2018) ("we have observed that a court should view witness recantations with '*great suspicion*' because they are notoriously unreliable and often given for suspect motives") (emphasis in original); *Case v. Hatch*, 731 F.3d 1015, 1041-42, 1044 (10th Cir. 2013) (recantations are "notoriously unreliable, easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories"); *Jackson v. Sec'y, Fla. Dep't of Corr.*, 2017 WL 11679839, at *5 (11th Cir. 2017) (recantation especially unreliable where witness gave inconsistent sworn statements and subsequent deposition testimony that contradicted recantation, and there was other evidence of petitioner's guilt); *In re Lambrix*, 624 F.3d 1355, 1365 (11th Cir. 2010) (recanted testimony 20 years later exceedingly unreliable).

It is true that habeas respondents can elect to waive procedural defaults. It is also true, though, that habeas courts can elect to reject the waiver. *See*, *e.g.*, *Hull v. Freeman*, 932 F.2d 159, 164 (3rd Cir. 1991) ("In view of the interests of comity and federalism that undergird these two requirements," court may raise procedural default and nonexhaustion *sua sponte*); *Christy v. Horn*, 115 F.3d 201, 207 n.3 (3rd Cir. 1997) (court not required to accept waiver of procedural bar). Because habeas procedural bars "transcend the concerns of the parties to an action, … it is not exclusively within the parties' control to decide whether such a defense should be raised or waived." *Hardiman v. Reynolds*, 971 F.2d 500, 502-03 (10th Cir. 1992). Litigants cannot "effectively force a federal court to review the merits of a case." *Id.* at 503.

But that is exactly what the parties attempt here – as glaringly shown by their treatment of petitioner's most recent claims, concerning the alleged newly discovered arrest photo. Petitioner asserts that he only learned of this photo on May 7, 2019. He then delayed almost a full year – 363 days – until May 4, 2020, before filing an amended habeas petition in this Court. As the claim was undeniably unexhausted, petitioner simultaneously filed a new post-conviction petition in state court, promising this Court that he would exhaust there before returning here. Third Amendment and Supplement to Petition for Writ of Habeas Corpus, Doc. 63 at 5-6.

That is not what happened. Instead, more than a year later, petitioner suddenly abandoned the state PCRA petition, filing a praecipe to withdraw it without explanation on September 17, 2021. App. 1275-1278. The state court was sufficiently concerned that it conducted a hearing on the matter. The court asked petitioner's counsel to assure it that petitioner understood he would not be able to reinstate the claim thereafter, because a new filing on the same issue would be untimely. Counsel provided that assurance and the petition was withdrawn. App. 1279-1281.

The parties state that withdrawal of the PCRA petition, and respondents' waiver of the resulting default, was done as part of the settlement agreement. Settlement agreement at 2, n.1. But they never mentioned that to the state court, nor was the withdrawal made contingent on this Court's acceptance of the settlement. Indeed, petitioner withdrew his state petition a full month before the parties alerted this Court to the settlement proposal and, obviously, before the Court could consider that proposal. Exhaustion is no longer possible; petitioner has engineered his own procedural default. By doing so, the parties present this Court with a *fait accompli*. The intended effect of the withdrawal was to deprive the Pennsylvania court of the opportunity to rule or find facts. And the intended effect of the waiver is to reward the intentional default by forcing this Court to address the merits of a claim that could have and should have been adjudicated in state court first.

The parties similarly seek to circumvent all the defaults that resulted from petitioner's previous round of state post-conviction litigation. This habeas action was originally filed in 2013. This Court stayed the proceedings to allow petitioner to litigate a new PCRA petition. After thorough review, the state court dismissed the petition because it was filed without good cause years after the applicable deadline.

The state court had sound ground for doing so. These claims were largely based on the alleged recantations, the theme of which was that police had coerced all the eyewitnesses to falsely identify petitioner. But the state court pointed out that this same police coercion theory was petitioner's defense at trial, in 1988. He was plainly on notice, therefore, of this possible line of post-conviction inquiry. Indeed, he made it an issue in his first PCRA petition, when he presented an affidavit from trial witness James Smith in 2001. Yet despite the supposed revelations in that affidavit, he took no further action for another 13 years, until 2014, when he offered up a second, similar affidavit from the same witness, plus new affidavits from Opal Nickson, Elijah Bennett, and Angelo Smith. The state court further noted that Nickson, Bennett, and Angelo all stated in their affidavits that they would have come forward earlier if only they had been asked. By the time petitioner actually did so – 28 years after the murder – he was long past the filing deadline for a successive PCRA petition. App. 1136-1137.

That deadline exists for good reason: to allow timely factual development before witnesses move away, forget, or die. The federal habeas statute has exactly the same time limitation, for just the same reasons. 28 U.S.C. § 2244(b)(2)(B)(i), (d)(1)(D). That is no accident; Pennsylvania's time bar provision, 42 Pa. C.S. § 9545(b)(1)(ii), was modeled on the federal provision. The state has a valid interest in applying its deadlines, just as the federal courts do in applying theirs. "It would seem particularly strange to disregard state procedural rules that are substantially similar to those to which we give full force in our own courts." *Beard v. Kindler*, 558 U.S. 53, 62 (2009).

And just as federal courts enforce their own time bar, they also enforce the state's time bar, by recognizing procedural default. They do so not just for the state's sake, but for their own sake. The time bar, and the risk of default, help ensure the reliability of the review process "by channeling disputes to the best forum for their resolution … *while the record is fresh*." *Hardiman*, 971 F.2d at 504 (emphasis supplied). "Limitations periods protect defendants *and* the courts … because they "free ... courts from adjudicating stale claims." *United States v. Bendolph*, 409 F.3d 155, 163 (3rd Cir. 2005) (en banc) (emphasis in original). Habeas courts therefore may enforce these rules "regardless of the government's position" or "the vagaries of a prosecutor's decision." *Id.* at 166, 169.

The parties have advised the Court that the relevant witnesses are all dead or otherwise unavailable. Yet by way of default and waiver, the parties would channel the case from state court, which could have developed the facts to resolve timely claims, to this Court, which no longer can. The Court should say no.

## IV.   The Petitioner's claims, if reached, do not warrant relief.

If the Court declines to effectuate the proposed "compromise," but accepts the waiver of procedural default and reaches petitioner's claims, relief should be denied on the merits.

The settlement agreement identifies several claims as those the parties see as viable. The first of these concerns Angelo Smith's statement that he came to court for trial and told police, or perhaps the prosecutor, that he didn't recognize petitioner. The claim is that the Commonwealth hid this information from the defense and therefore committed a *Brady* violation. Petitioner has produced various versions of this incident, and all are questionable in light of the record, which shows that the Commonwealth requested a bench warrant to secure Angelo's presence because he could not be found on the day he was supposed to testify. App. 621-622, 685-686, 693. Further factual resolution is impossible, because petitioner defaulted the claim by waiting decades to seek Angelo out, and now reports that he is unavailable.

What we do know, however, is that the allegedly suppressed information is not exculpatory. As discussed above, had Angelo testified about his failure to

recognize petitioner at the time of trial, he would have reaffirmed that his original statement to police was correct in its entirety, and he would have related that his friend and fellow witness, Elijah Bennett, privately pointed out petitioner as the perpetrator as soon as they arrived in court. App. 1124-1126. Both facts would have been relevant to rebut the defense claim at trial that the witnesses identified petitioner only because police coerced them, not because they really thought it was him.

The settlement agreement submits another *Brady* claim concerning the Commonwealth's alleged suppression of the arrest photo. This claim too is factually dubious, in that petitioner has never offered any evidence that trial counsel did not already know about the photo. The notion that he did not is improbable, because counsel filed and litigated a suppression motion immediately before trial, focused entirely on the claim that the photographic identifications were unconstitutionally suggestive. App. 84-94. Again, we'll never know for sure what counsel did or didn't have, because petitioner did not raise the issue until 2014[5] – long before he "discovered" the photo in the Commonwealth's file in 2019, and long after trial counsel died in 2005. And given the delay, the stenographic notes of the suppression hearing are now lost.

---

[5] Supplement And Amendment To Petition For Writ Of Habeas Corpus And Motion For Discovery, Doc. 36, filed 10/6/14, at 7.

In any case, we now know that *all* of petitioner's arrest photos, over a five-year period, show exactly the same slight mustache, that the witnesses identified him from one of those photos, just hours after the crime, and that three of them knew him previously. The photo was not exculpatory.

The settlement agreement also specifies a few claims of ineffective assistance of counsel. Petitioner contends that trial counsel only met with him once in person, and that he was therefore ineffective for failing to communicate. This is one claim that actually isn't defaulted. Petitioner raised and litigated it in his first PCRA proceeding. The PCRA court and the Pennsylvania Superior Court rejected the claim on the merits. Although he does not acknowledge it, that means petitioner cannot prevail unless he can show that the state court's decision was an unreasonable application of clearly established law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). AEDPA deference is not something respondents can waive.

The en banc Superior Court held that the claim was without merit because, regardless of how many times counsel met with petitioner, he was clearly in communication with him, such that he was able to investigate 20 different potential witnesses, present alibi and fact witnesses contesting the prosecution's version of events, and subject the Commonwealth witnesses to extensive cross-examination. *Commonwealth v. Johnson*, 51 A.3d 237, 244-45 (Pa. Super. 2012).

Petitioner quotes from a separate opinion authored by Judge (now Justice) Wecht, which criticized trial counsel for not spending more time with his client. Petitioner fails to mention, however, that Justice Wecht *agreed* with the majority that counsel was not constitutionally ineffective. Counsel "secured the testimony of five defense witnesses; identified and attempted to locate an additional alibi witness; effectively cross-examined the Commonwealth's witnesses; and even successfully" blocked pursuit of the death penalty. *Id.* at 254 (Wecht, J., concurring). "Based on my review of the record," petitioner was convicted not because of his lawyer, but because "[t]he evidence against [him] was overwhelming." *Id.*

Petitioner does not explain how Justice Wecht and the unanimous en banc appellate court unreasonably applied clearly established United States Supreme Court authority. The statute required petitioner to show an error "well understood and comprehended in existing law," and "beyond any possibility of fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Petitioner has not come close to meeting that standard.

Next the settlement agreement spotlights petitioner's claim that counsel was ineffective for failing – "apparently" – to secure the allegedly missing arrest photo discussed above. Settlement agreement at 7. The word "apparently" is at least some acknowledgement that petitioner has failed to establish that counsel didn't have the photo. But in any case there was no ineffectiveness, as it is now apparent that

petitioner's arrest photos actually incriminate rather than exonerate him, because they show that his appearance was quite consistent over time. That is why the witnesses who knew him were immediately able to recognize him when he broke into their house.

One other ineffectiveness claim is noted in the settlement agreement: that counsel should have called Angelo Smith as a defense witness, since Angelo's police statement said the gunman had no mustache or facial hair. But that would only have opened the door to all the photographs of petitioner, which illustrated how closely shaved he kept the mustache, and how cleanly shaved he kept the rest of his face. And then Angelo would have been asked about the rest of his police statement, and his selection of petitioner's photo – which, while not "positive," was nonetheless to the exclusion of all other photos in the book. Angelo didn't contradict the other eyewitnesses. He corroborated them.

The settlement agreement next contains a series of paragraphs contending that the eyewitness testimony was unreliable. These paragraphs primarily consist of highlights from the defense-procured 2014 affidavits, but also refer to "what the science has taught us about eyewitness identifications." Settlement agreement at 9. As noted in argument I above, such arguments do not state a specific constitutional violation. In any case, the shortcomings of the affidavits have been detailed above in argument II. As for the "science," petitioner neglects to explain how it applies to

eyewitnesses who already know the perpetrator, as he nowhere even acknowledges that crucial fact. Petitioner's desire to retry his case three decades late, on the basis of affidavits crafted by his own investigator, does not provide an independent basis for the grant of relief under § 2254.

Finally the settlement agreement raises a claim of prosecutorial misconduct. Petitioner complains that the prosecutor asked him on cross-examination if he had been hired by a drug dealer to kill the victim, and not just rob him. A witness was prepared to testify to that fact, but the judge subsequently excluded the testimony on the ground that the witness should have been presented during the case-in-chief rather than on rebuttal. The judge therefore sustained objection to the question, and thoroughly instructed the jury, as he had throughout the trial, that lawyers' questions are not evidence.

Petitioner now contends that, since he was convicted of first degree murder, the jury must have improperly relied on the unanswered question to find intent to kill. But that ignores the evidence at trial, which was that petitioner's cohort fired a shotgun point blank at the victim's stomach, knocking him to the ground, at which point petitioner stood over him and fired repeatedly at his chest until he was fatally wounded. App. 159, 637, 645, 669, 683. That evidence was more than sufficient to support the first degree murder charge.

Petitioner nonetheless quotes the trial court, which criticized the prosecutor for his line of questioning and related statements during his opening argument. But petitioner fails to mention the court's actual ruling on this point. The court addressed the issue at length in its post-trial opinion. App. 1078-1084. Because the judge was there, he was in the best position to determine whether the jury was capable of following his instructions in the context of the entire trial. The issue was revisited on direct appeal by the Superior Court, which upheld the trial court's ruling. App. 1288-1292.

Because this claim was addressed on the merits, it is not enough for petitioner to allege "misconduct." He must demonstrate that the alleged misconduct rose to the level of a constitutional violation, *and* that the state court adjudication of the claim was erroneous "beyond any possibility of fair-minded disagreement." As before, petitioner has not even tried to meet this standard.

Aside from these claims, the first amended habeas petition raised others which, deservedly, did not rate a mention in the settlement agreement. Some of these, such as petitioner's objection to an alibi instruction, were addressed on petitioner's direct appeal. They are therefore subject to the deference standard, which petitioner cannot satisfy.

Others are ineffectiveness claims, such as failure to call character witnesses, that were raised by petitioner's lawyer in his first PCRA petition. After the petition

was denied, however, petitioner was provided a new lawyer for his PCRA appeal. That lawyer failed to preserve those claims for review, and the appellate court found them waived, but for the failure-to-communicate issue. *Commonwealth v. Johnson*, 51 A.3d at 246-47. Petitioner is therefore challenging the ineffectiveness of PCRA appellate counsel for not raising more claims of prior counsel's ineffectiveness. But the ineffective assistance of state post-conviction appellate counsel is not cognizable in federal habeas corpus proceedings. 28 U.S.C. § 2254(i). Like subsection (d)'s deference requirement, this is a substantive limitation on this Court's power of review. It is not a procedural bar that respondents can expunge by proffering a waiver. Relief should be denied.

## CONCLUSION

WHEREFORE, the Office of Attorney General respectfully submits this

brief, in accordance with this Court's referral, regarding the parties' "Compromise

and Settlement Agreement for Habeas Relief."

Respectfully submitted,

/s/  *Ronald Eisenberg*

MICHELLE A. HENRY
Attorney General
Commonwealth of Pennsylvania
James A. Donahue
First Deputy Attorney General
MICHELE K. WALSH
Executive Deputy Attorney General
  Criminal Law Division
RONALD EISENBERG
Chief Deputy Attorney General
  Special Litigation Section

Office of Attorney General
1600 Arch Street
Philadelphia, PA 19103
reisenberg@attorneygeneral.gov
(267) 940-6676
January 23, 2023

36

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEVIN F. JOHNSON** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **JOHN W. KERESTES,** *et al*. | : | **NO. 13-3197** |

## CERTIFICATE OF SERVICE

I, RONALD EISENBERG, certify that on January 23, 2023, a copy of this brief was served through the Court's electronic filing system upon:

Michael Garmisa, Esq.
Philadelphia District Attorneys Office
3 South Penn Square
Philadelphia, PA 19107
(215) 686-8724
michael.garmisa@phila.gov

Nilam A. Sanghvi, Esq.
Pennsylvania Innocence Project
Beasley School of Law
1515 Market Street, suite 300
Philadelphia, PA 19102
nilam.sanghvi@temple.edu
(215) 204-4225

Claudia Flores, Esq.
Federal Community Defender Office
Curtis Center, suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-1100
claudia_flores@fd.org

David Rudovsky, Esq.
Kairys Rudovsky, LLP
The Cast Iron Building, ste. 501 south
718 Arch Street
Philadelphia, PA 19106
(215) 925-4000
drudovsky@krlawphila.com

*/s/ Ronald Eisenberg*
RONALD EISENBERG
Office of Attorney General
Philadelphia, PA  19103
reisenberg@attorneygeneral.gov
(267) 940-6676