**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEVIN JOHNSON,** | : | **CIVIL ACTION** |
| | : | **(habeas corpus)** |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **NO.  13-cv-03197** |
| | : | |
| **JOHN KERESTES, et al.** | : | |
| | : | |
| **Respondents** | : | |

---

**PETITIONER'S REPLY TO BRIEF OF ATTORNEY GENERAL IN SUPPORT OF
HABEAS RELIEF AND THE COMPROMISE AND SETTLEMENT AGREEMENT**

Petitioner Kevin Johnson, through counsel, submits this Reply Brief in response to the
brief of the Attorney General and in support of the Petition for Writ of Habeas Corpus and the
Proposed Compromise and Settlement Agreement ("Agreement"). Contrary to the Attorney
General's position, Mr. Johnson has, as detailed in his prior filings and discussed below,
identified constitutional violations that are properly before this Court and that warrant habeas
relief. We file this brief to address arguments made by the Attorney General regarding the terms
of the parties' agreement, the factual record, and Mr. Johnson's constitutional claims.

**I.      The Terms of the Agreement**

The Attorney General leads with an argument that a grant of the writ cannot bind the state
court in further proceedings other than to honor the grant of a new trial and that the parties have
allegedly asked this Court to grant habeas relief without ruling on any constitutional error. *See*
ECF No. 91 at 2-7.[1] On both issues, the Attorney General misrepresents the parties' positions.

---

[1] Citations to ECF No. 91 refer to the Attorney General's brief filed on January 23, 2023.

The first issue is moot. The parties previously agreed with the Court's view, as expressed at the September 22, 2022 hearing, that it has the power to issue the writ with an order to release or retry Mr. Johnson in state court within the prescribed time of 120 days (or other time frame ordered by the Court), but that it has no power to direct a specific plea or sentence in state court. *See* ECF No. 84 at 1-2 (setting forth Mr. Johnson's position on this issue); *see also* ECF No. 85 at 2 (setting forth Respondents' position on this issue).[2]

Accordingly, the state court would be required to accept this Court's habeas order, *see Commonwealth v. Speight*, 249 A.3d 1075 (Pa. 2021), but the parties agree that the Court of Common Pleas would have its usual power to accept or reject a plea based on an agreement between the parties. As with any plea agreement, the only parties bound by the portion of the Stipulation and Proposed Order detailing the agreed-upon resolution of the state charges are Mr. Johnson and the District Attorney's Office. Moreover, contrary to the Attorney General's assertions, this Court has the authority to settle habeas cases, as other judges in this district have done. *See* ECF No. 85 at n.1 (noting stipulations and orders entered to resolve habeas proceedings in 2017 (*Bentley v. Lamas*, No. 13-6045) and 2018 (*Wright v. Lamas*, No. 13-6420)); *see also Washington v. Sobina*, 471 F. Supp. 2d 511, 518 (E.D. Pa. 2007) ("tak[ing] the opportunity to note tangentially the possible value of promoting settlement negotiations in habeas corpus actions").

As to the second issue, as discussed further below, Mr. Johnson has in his habeas petition, in the amendments thereto, in his argument to the Court on September 22, 2022, and in his October 2022 supplemental brief, identified a number of constitutional claims on which he is

---

[2] Citations to ECF No. 84 refer to Mr. Johnson's supplemental brief filed on October 11, 2022. Citations to ECF No. 85 refer to the Respondents' supplemental brief filed on October 11, 2022.

entitled to relief, particularly his *Brady* claim related to the Commonwealth's suppression of his arrest photograph showing him with a mustache and therefore not matching witnesses' descriptions of the assailant as a man who was clean-shaven. *See generally* ECF No. 84 at 6-12 (discussing constitutional claims warranting relief whether viewed individually or cumulatively).

## II.     The Eyewitness Identifications, Recantations, and Alibi Evidence

The Commonwealth's case against Mr. Johnson rested solely on eyewitness identifications, and all witnesses have recanted their identifications. The Attorney General's brief attempts to paint a picture of Mr. Johnson as being identified by people who knew him and of the recantations as untested and unreliable. While the Court need not reach issues related to the reliability of the identifications or recantations to grant this habeas petition on Mr. Johnson's *Brady* claim related to the suppression of his arrest photographs or his ineffective assistance of counsel claims, the record does not support the Attorney General's narrative. We briefly address these issues.

### A.     The Factual Background

As an initial matter, we set forth the core facts of this case as agreed by the parties. Although stipulations of law are not binding on the courts, *see, e.g.*, *In re Mintze*, 434 F.3d 222, 228 (3d Cir. 2006), "[i]t is a well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside." *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998) (alteration in original; internal quotation marks omitted). Indeed, "[i]n general, courts encourage parties to enter into stipulations to promote judicial economy by narrowing the issues in dispute during litigation." *Id.* Other circuits have ruled that courts must enforce factual stipulations that, like those at issue here, are supported by the record. *See, e.g.*, *Tapia-Felix v. Sessions*, 755 F. App'x 602, 604 (9th Cir. 2018) ("Factual stipulations, unlike

legal stipulations, are ordinarily binding on courts and 'are formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.'" (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 676-78 (2010) (alteration in original)); *Gander v. Gander*, 250 F.3d 606, 609 (8th Cir. 2001) ("Trial courts are bound by the facts established by the stipulation. Valid stipulations are controlling and conclusive, and courts must enforce them." (internal citations omitted)); *Fisher v. First Stamford Bank & Trust Co.*, 751 F.2d 519, 523 (2d Cir. 1984) ("Generally, a stipulation of fact that is fairly entered into is controlling on the parties and the court is bound to enforce it.").

On October 8, 1986, two men shot Lyndon "Cowboy" Morris, who sold drugs from a bedroom in Opal Nickson's residence in Southwest Philadelphia. *See* ECF No. 77 at ¶ 6.[3] James Smith, who worked for Morris, opened the door on the night of the shooting; one man with a shotgun and one man with a pistol forced their way into the home and demanded to be taken to Morris's room. *Id.* at ¶¶ 7-8. Once upstairs, the man with the shotgun followed Smith to the bedroom and fired at Morris as he opened the door. *Id.* at ¶ 8.

In the meantime, the man with the pistol went to the back bedroom, where Opal Nickson, Angelo Smith, and Elisha Bennett[4] were getting high on cocaine and marijuana. *Id.* at ¶ 9. While at the doorway of that bedroom, that man aimed his pistol at the three occupants of the room and ordered them to the floor; almost immediately the light in the room went out and, hearing shotgun fire, the man with the pistol ran from the back bedroom and began firing his pistol in Morris's direction, evidently hitting him once. *Id.* at ¶ 10.

---

[3] Citations to ECF No. 77 refer to the parties' Compromise and Settlement Agreement for Habeas Relief.

[4] Bennett's first name appears as both Elisha and Elijah in the record.

Within two days, Johnson was arrested after being identified as the man with the pistol. *Id.* at ¶ 22. Johnson immediately denied any involvement and told police that, at the time of the murder, he had been selling clothes in West Philadelphia with Ronald Crawford. *Id.* at ¶ 12. No physical evidence linked Johnson to the offense, and police did not recover any weapons or drugs when they arrested Johnson and searched his family home. *Id.* at ¶ 13. Mr. Johnson has asserted his innocence throughout this case. The above facts underpin the parties' agreement.

### B.     The Eyewitness Identifications

The police obtained eyewitness identifications from Opal Nickson, James Smith, and Elisha Bennett *after* a tentative identification by Angelo Smith, the third occupant of the back bedroom. *Id.* at ¶ 14.[5] Angelo Smith reviewed a "book of photos" at 4:30 am and told police that Johnson "looks like him, I am not positive." *Id.*; *see also* App. at 23.[6] At 5:50 am, James Smith identified Johnson as one of the two perpetrators in his second interview with police; at 9:45 am, Bennett identified Johnson, and at noon, Nickson identified him. *See* ECF No. 77 at ¶ 15; *see also* App. at 7, 15, 18.

Only two witnesses, Angelo Smith and James Smith, commented about facial hair in describing the man holding the pistol. Both described him as having *no facial hair*:

- James Smith: "B/M 6'1", brown skin, thin build about 20-21, both men were about the same age, ***he was clean shaven***, he was wearing all black leather to [sic]." App. at 5 (emphasis added).

---

[5] As discussed below, when Angelo Smith first had the opportunity to view Mr. Johnson (at his trial), he told the investigators that Mr. Johnson was not the person who entered the house. Smith was excused from appearing and that exculpatory information was not provided to the defense.

[6] Citations to "App." refer to the appendix filed by the Attorney General. The citations refer to the Bates-stamped pages, not to the page numbers at the top of the document that were added by the ECF system.

- Angelo Smith: "I don't know if I saw him before, he was a black male, dark complexion, close cut hair, **no mustache or facial hair**, but he had a black gun, a revolver, it was as big as a .38 caliber snub nose. After I saw the gun, that is what I was looking at." *Id.* at 21-22 (emphasis added); *see also* ECF No. 77 at ¶ 30.

James Smith, Opal Nickson, and Elisha Bennett identified Mr. Johnson at trial; Angelo Smith did not testify. ECF No. 77 at ¶ 25.

The Attorney General's brief asserts that the parties "fail[ed] to advise the Court that the identifications did not depend on a brief opportunity to see the gunman's face. Rather, three of the four eyewitnesses *knew* petitioner from the neighborhood, and had seen him repeatedly in the area." ECF No. 91 at 8 (emphasis in original). However, it is the Attorney General, not the parties, who misrepresents the record evidence.

### *Opal Nickson*

The Attorney General contends that Nickson "immediately recognized the perpetrator because she already knew him" and had seen him earlier that day when he "pulled over and talked to [her] friend for several minutes." *Id.* at 9. In her police statement, however, Nickson noted only that she had seen the man with the pistol earlier in the day; she did not indicate how long she saw him speaking with her friend, nor did she indicate that she "immediately recognized" him. App. at 15.

At Mr. Johnson's preliminary hearing, Nickson was pointedly asked whether she knew the defendant and made clear that she did not really know him:

Q.     How long have you known this defendant?

A.     *I don't really know him*. I know his face from around the neighborhood.

Q.     You don't know his name?

A.     No.

> A. And but you do know his face?
>
> Q. Yes.

*Id.* at 66 (emphasis added). Nickson also made clear, as she had to the police at the time of her initial statement, that, when the man with the pistol came to the back bedroom around 10:00 pm, there were no lights on in the hallway, that the man had a small black gun, that she "accidentally kicked the lamp cord and the lights went out" in the bedroom when she laid down after the man ordered her to do so, and that she was only able to observe the man for "maybe couple minutes." *Id.* at 42-43, 46-47, 67-69.

At trial, Nickson reiterated that the man she identified as Mr. Johnson had a gun and "pointed it straight to my face, and he was shaking a little." *Id.* at 282-83; *see also id.* at 285 ("Pointed it straight to my face."); *id.* at 294 ("Like this, straight to my face."). She again testified that she knew him from the neighborhood and had seen him earlier that day, when Mr. Johnson talked to her friend "for *a couple of minutes*." *Id.* at 296 (emphasis added). On cross-examination, Nickson testified that she was smoking marijuana while in the back bedroom and, as she had at the preliminary hearing, that the lights went out in the back bedroom when her foot got tangled in the cord and that there were no lights on in the hallway or middle bedroom. *Id.* at 334, 353-56.

When Nickson saw the man with the pistol, there was poor lighting, weapon focus by the witnesses, and limited opportunity to view, all factors that render an eyewitness identification less reliable:

- *Weapon focus*: "The visible presence of a weapon during a witnessed event can influence eyewitness accuracy by directing attention towards the weapon and away from the perpetrator, an effect termed weapon focus." *2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness*

*Identifications*, 92 Temple L. Rev. 1, 19 (2019) (internal quotation marks omitted);

- *Stress*: "Like the presence of a weapon, increased levels of stress can affect memory." *Id.*;

- *Exposure duration*: "Not surprisingly, the length of time that a witness has to view an event, known as the exposure duration, can impact the accuracy of the memory. Exposure of limited duration may also result in poorer quality person descriptions." *Id.* at 20 (internal quotation marks omitted);

- *Lighting*: "Lighting is another viewing factor that influences the quality of memory. Specifically, low illumination may result in poorer quality person descriptions and reduced identification accuracy." *Id.* at 21 (internal quotation marks omitted).

That Nickson said she knew Mr. Johnson from the neighborhood does not negate the impact of these factors and provides scant support for the identifications. Indeed, "[u]nder some conditions, prior exposure to a face can increase the chances it will be chosen in a line up despite the fact that it is not the face of the perpetrator. One example is the 'innocent bystander' or 'unconscious transference' effect, whereby a face seen near the time of a crime, or even during the crime itself, is falsely identified as the perpetrator when in fact it is not." *The Handbook of Eyewitness Psychology Vol. II: Memory for Events*, Chapter 13, James C. Bartlett & Amina Memon (2007).

### Elijah Bennett

The Attorney General acknowledges that Bennett "did not personally know petitioner," ECF No. 91 at 12, but asserts that Bennett had at some point seen the man with the pistol "up on

Woodland Avenue," *id.* at 12. However, Bennett did not give any indication in his police statement or trial testimony of when he observed Mr. Johnson in the neighborhood. *See* App. at 18 (police statement); *id.* at 566-67 (Bennett's trial testimony that he had previously seen Mr. Johnson "[t]owards Woodland Avenue" without indicating how often).

Like Nickson, Bennett testified that the man he identified as Mr. Johnson pointed a gun in the doorway of the back bedroom, that they got under the bed when the man told them to lie down, and that the lights in the room went off as Nickson got on the floor. *Id.* at 561-64. On cross-examination, he testified that he was also smoking marijuana and that he could not recall any lights being on in the hallway. *Id.* at 570, 585. As with Nickson, the fact that Bennett saw Mr. Johnson in the neighborhood does not negate the effect these conditions may have had on his identification.

### *James Smith*

The Attorney General similarly highlights James Smith's statement to police that he had seen the men who came to Nickson's house with guns "around 54th and Warrington." ECF No. 91 at 13-14. At trial, however, Smith clarified that he had seen the man with the pistol only *"once, saw him a couple times*." App. at 190 (emphasis added). As with Nickson and Bennett, the fact that James Smith saw Mr. Johnson in the neighborhood does not negate the effect that conditions at the scene, particularly weapon focus, may have had on his identification.

Further, the Attorney General sidesteps Smith's description of the man with the pistol: that "*he was clean shaven. . . .*" *Id.* at 5 (emphasis added). As we more fully argue below, that description was inconsistent with Mr. Johnson, who had a clearly observable mustache at the time of the incident.

*Angelo Smith*

The Attorney General acknowledges that Angelo Smith "had not previously known petitioner." ECF No. 91 at 16. Smith's tentative identification of Mr. Johnson from a book of photographs was critical because it set the other identifications in motion. ECF No. 77 at ¶ 14. As with James Smith, the Attorney General downplays Angelo Smith's description of the man with the pistol which, as discussed above, specifically stated that he had "*no mustache or facial hair. . . .*" App. at 22 (emphasis added). Like the other witnesses in the back bedroom, Smith told police that "all of the lights went out" when Nickson "kicked the plug out." *Id.* at 21. He further told police: "*After I saw the gun that is what I was looking at.*" *Id.* at 22 (emphasis added); *see also id.* at 24 (Angelo Smith's statement to police that he would recognize the man if he saw him again because "he threatened my life to[o]"). Again, a number of factors, including weapon focus, were present when Angelo Smith saw the man with the pistol that created a risk of an inaccurate identification.

### C.   The Recantations

As discussed above, all three witnesses who positively identified Mr. Johnson have recanted their identifications. Angelo Smith, who only tentatively identified Mr. Johnson to the police, has now attested that he could *not* positively identify Mr. Johnson when he saw him in person. The Attorney General asks this Court to view these recantations with "extreme suspicion." ECF No. 91 at 22 (internal quotation marks omitted). The Third Circuit has instructed that, "[a]lthough recantations are generally looked upon with suspicion, they are not subject to a categorical rejection. . . ." *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 55 (3d Cir. 2020). In *Howell*, the Court emphasized that "recantations should be analyzed on an individual and fact-specific basis" and that "multiple recantations may themselves be mutually

corroborating evidence, with each one having the potential to bolster the reliability of the others." *Id.* at 60-61. That is precisely the situation present here.

The three witnesses who identified Mr. Johnson at trial—James Smith, Opal Nickson, and Elijah Bennett—all pointed to a consistent police tactic of identifying Mr. Johnson only after police pointed out his picture and said that others had already identified him:

- James Smith's 2001 affidavit: "He told me that everyone else had pick one of the photographs as one of the robbers who killed [C]owboy. I went along with picking that photograph out too because the detective told me if I didn't pick out one of these picture[s] I would be going to jail for murder. That is why I did it." App. at 1087.

- James Smith's 2014 affidavit: "At some point in this conversation a policeman came into the room with some photographs. I think it was only about four or five pictures. They put the pictures down in front of me and told me that Angelo, Elijah and Opal had all picked the picture of Kevin as the guy with the pistol. They pointed to the picture of Kevin. This confused me because Kevin's picture didn't look like the guy with the pistol. The police also told me that I had to pick a picture or I was going to be charged with drug dealing and I could even be charged with the homicide. At that point I was so tired, scared, confused and just wanting to go home that I sent along with picking Kevin's picture." *Id.* at 1118.

- Opal Nickson's 2014 affidavit: "I only picked Kevin's picture after the police pointed to Kevin's picture and said Elijah Bennett, James Smith and Angelo Smith had all picked Kevin as the guy with the pistol." *Id.* at 1115.

- Elijah Bennett's 2014 affidavit: "The police showed me some pictures, I don't really remember how many. They kept pointing to one picture and saying that my friends Angelo Smith, James Smith and Opal Nickson had all picked that picture as the guy who pointed a pistol at us the night before in Opal's house. They told me that if I didn't pick a picture I could get charges for drugs and murder." *Id.* at 1120.

The consistency of this information, coupled with the many factors making it unlikely that these witnesses could have made accurate identifications in the first instance, make these recantations "mutually corroborating." Each bolsters the reliability of the others. In addition, when interviewed in August 2014, Angelo Smith reiterated what he had told police—that the man with the pistol had "no facial hair" and that when he realized the man "wasn't playing," "all [he] could do was stare at his gun." *Id.* at 1119.

Angelo Smith also stated that, when he came to the courtroom for Mr. Johnson's trial pursuant to a subpoena, he "did not recognize anyone in the court room as the person who pointed the pistol at me, Elijah, and Opel." *Id.* at 1113; *see also id.* at 1119 (same). The Attorney General attempts to undermine this significant fact by reason of Smith's assertions that it was either a police officer or a prosecutor who told him that he did not need to testify. *See* ECF No. 91 at 16-17. It is hardly surprising that a witness might not remember who from the law enforcement/prosecutor team made that statement, and when detectives interviewed Angelo Smith in 2016, during Mr. Johnson's then-pending PCRA proceedings, he told them that he did not testify "because [he] told the cops [he] didn't recognize the guy in the courtroom." App. at 1126. Further, regardless of Smith's failure to fully read his 2014 affidavits, he affirmed the critical information that he could not recognize Mr. Johnson to a defense investigator and later to

Philadelphia homicide detectives. Finally, Smith's confirmation of his 1986 police statement *supports* his recantation, as that statement was *tentative*, and he described the man with the pistol as having "no facial hair."

The Attorney General also asserts that because the witnesses are dead or unavailable, their statements cannot be tested. *See, e.g.*, ECF No. 91 at 1, 28. However, the fact that the Conviction Integrity Unit was not able to interview Angelo Smith during its investigation at the height of the pandemic is not critical as his statement has been tested by interviews, as discussed above, by the defense and by homicide detectives.

Opal Nickson is deceased, but her testimony was preserved by deposition. Nickson testified, on both direct and cross examination, that Mr. Johnson had lighter skin than the man with the pistol:

- "Q. And by pointing him out, do you mean his photograph? A. Yup, and in court. Only one different. *Kevin Johnson is light brown skin*, and the man that pointed the gun at us was dark, but they favor each other. Q. They favor each other. A. Yes. Q. Did you tell police that Kevin Johnson has lighter skin than the man who pointed the gun at you? A. *Yes, I did*. I told the attorney that, too, the man that took us down there. *The man who pointed the gun at us was dark*, but he looked just like Kevin Johnson, and everyone else testified to that, too." App. at 1185-86 (emphasis added).

- "Q. So, Ms. Nickson, I just want to make sure I understand what you are saying. Are you saying that you don't know if Kevin Johnson was the person who pointed the gun at you or not? A. No, I don't know. *I just know the man pointed the gun at*

*me was dark, and Kevin Johnson is brown skin. He is light brown skin*. That's all I know." *Id.* at 1198-99 (emphasis added).

- "Q. When you say, 'We just figured it was Kevin Johnson,' who are you referring to as we? A. Everybody. We didn't know, though. We didn't know, because, like I said, the other guy was dark skin, real dark. It couldn't have been no paint. He was just dark skin. When I saw Kevin Johnson in the courtroom, what a little bit lighter than me or darker than me. *That man was nowhere near his color*, nowhere near it, and I'm quite sure Angelo testified that, too. He just look like him." *Id.* at 1206 (emphasis added).

- "Q. So when you were testifying in court, was that when you were testifying in Kevin Johnson's case? A. Yes. Q. And when you first see him in court, you think that's the guy who had the gun on me. A. Yes. Q. At what point do you change your mind to decide actually that isn't the guy? A. *Because of the color of his skin*. Q. No, I said at what point did you decide[] that. That was a when question. When did you decide that? A. When? Q. Yeah. A. After I left the courtroom and I didn't testify, the color of his skin. Q. Okay. So, when you testified, you still thought it was him, right? A. Yes. Q. It's after you left you suddenly realized, oh, my God. I picked the wrong guy. A. Yeah. When I looked that mugshot, you know, I just thought maybe a camera would make him look lighter, *but he was really light*." *Id.* at 1211-12 (emphasis added).

In an effort to negate this testimony, the Attorney General states, based on a review of a number of Mr. Johnson's black and white arrest photographs, that "[a]lthough the lighting varies, in none of the photos could he be readily described as light-skinned." ECF No. 91 at 22. The

speculation of the Attorney General, who has never met Mr. Johnson, hardly rebuts Nickson's consistent testimony on this issue.

Finally, while attorneys from the Conviction Integrity Unit were unable to interview James Smith and Elijah Bennett (who, as stated in his affidavit, has memory issues) during their investigation, their accounts are not relevant to the *Brady* claims. The *Brady* claim based on the arrest photograph is record-based and can be resolved without reference to the credibility of any of these witnesses. Mr. Johnson's additional *Brady* claims based on information from Angelo Smith and Opal Nickson also rest, as discussed above, on information given by witnesses in an adversarial process.

**D.    The Alibi Evidence**

Finally, the Attorney General takes issue with the alibi evidence presented at Mr. Johnson's trial and in support of his state post-conviction petition, which was briefly referenced by the parties in the Settlement Agreement and, in doing so, again casts the evidence in a misleading light. Mr. Johnson presented several alibi witnesses at trial and two more through affidavits in support of his first PCRA petition to establish his general whereabouts and activities on the night of October 8, 1986.

When he was arrested, Mr. Johnson immediately told police that he had been with Ronald Crawford selling clothing in West Philadelphia that night. ECF No. 77 at ¶ 12. At trial, Mr. Johnson testified that, on that evening, he had met with Mr. Crawford and agreed to help him sell women's clothing out of his car. App. at 781-82. Mr. Johnson described how he and Crawford went from one location to another in West Philadelphia throughout the evening, between the hours of approximately 9:00 p.m. and midnight, to try to sell clothing to different people Mr. Johnson knew at various businesses in the area. *Id.* at 782-91. During his testimony, Mr. Johnson

named at least 12 people and 10 different locations he visited, including five bars, offering approximate times for when he encountered each. *Id.* He testified that he and Mr. Crawford decided to "call it a day" after he met his cousin, Wanda Johnson, at Neet's bar and she asked him for a ride home. *Id.* at 789-91.

The Attorney General attempts to cast doubt on Mr. Johnson's trial testimony and on the accounts of the alibi witnesses by arguing that none of them could confirm his whereabouts at the exact time of the murder and that their testimony "tended to make matters worse." ECF No. 91 at 19. To the contrary, the witnesses' accounts support Mr. Johnson's trial testimony and the initial alibi he provided to the police as soon as he was arrested—that he was driving around West Philadelphia selling clothing out of a car with a friend. The Attorney General failed to mention that all five of the witnesses it takes issue with—Douglas Yancy, James Lawrence, Wanda Johnson, Conchetta Parks, and Evette Debose—stated that Mr. Johnson had been selling clothing out of a car with another man. Further, their accounts are entirely consistent with Mr. Johnson's testimony and with each other's.

The Attorney General claims that Parks and Debose "cancelled each other out" because both purported to see Mr. Johnson at around 10:00 p.m. in the affidavits they provided decades after the murder. ECF No. 91 at 20. It then argues that Mr. Johnson hurt himself by testifying that he was at Foxy's Bar at 10:45 p.m. when Wanda Johnson testified that she saw him at Neet's bar at 11:00 p.m. *Id.* at 20-21. These arguments are red herrings meant to cast doubt on Mr. Johnson's alibi defense by dissecting it to a matter of minutes. Mr. Johnson could not be expected to be able to provide exact times for each location he visited and each person he spoke with, nor could the other witnesses. While he acknowledges that he cannot provide a perfect alibi given that he happened to be in proximity to the murder in time and location, Mr. Johnson has

presented a plausible account of his activities on that evening, which do not comport with robbing and murdering a drug dealer.

In any event, even if the alibi evidence was as unreliable as the Attorney General suggests and disbelieved by the jury, it does not impact the merit of Mr. Johnson's other claims or his assertion of innocence. *See Rayner v. Superintendent Forest SCI*, No. 21-3230, 2023 WL 1433610, at *2 n.13 (3d Cir. Feb. 1, 2023) (non-precedential) (observing that "[w]hile a jury is free to disbelieve alibi witnesses," a verdict must be supported by sufficient evidence and "[r]ank speculation cannot supply the missing link"). Regardless of the strength of the alibi evidence presented by the defense, Mr. Johnson's conviction must nonetheless be secured through legally obtained, reliable evidence and a trial that conforms to the requirements of due process.

In conclusion, a full review of Mr. Johnson's alibi defense, the eyewitness identifications, and the recantations paints a far different picture from the narrative the Attorney General offers.

## III.   The Commonwealth's Waiver of Procedural Bars to Habeas Relief Was Appropriate, and There Was No Improper Forum Shopping

The Attorney General argues that the Court should reject Respondents' waiver of procedural bars on the ground that the waiver is linked to improper forum shopping. *See* ECF No. 91 at 23-28. The Attorney General is wrong on the facts and the law.

As to the procedural history, the Attorney General's assertion that Mr. Johnson "blocked the state courts from developing the facts, let alone from reaching the merits," *id.* at 23, is simply incorrect. Mr. Johnson first filed his habeas petition in this Court on June 7, 2013. *See* ECF No. 1. In August of 2013, this Court appointed the Federal Community Defender Office to represent Mr. Johnson. *See* ECF No. 10. When that office investigated the case, all of the witnesses against Mr. Johnson recanted their identifications of him. Opal Nickson, Angelo Smith, and Elijah

Bennett did so for the first time, and James Smith provided additional information following his earlier recantation in 2001.

On November 7, 2014, Mr. Johnson moved for a stay of these proceedings so that he could exhaust his new claims in state court, which this Court granted. *See* ECF Nos. 39, 45, 47. He then filed a PCRA petition raising claims based on these recantations, which the state courts ultimately denied as untimely in 2018. *See* Docket, *Commonwealth v. Johnson*, CP-51-CR-1108001-1986, at 15 (*Johnson* State Docket) (attached as Exhibit 1). After the denial of his PCRA petition, Mr. Johnson and the Commonwealth engaged in informal discovery in this proceeding. *See, e.g.*, ECF No. 51. Upon learning that Nickson was ill, the parties moved to subpoena and depose her to preserve her testimony, and this Court granted that motion. *See* ECF Nos. 52, 53. In addition, through this informal discovery, the Commonwealth finally produced Mr. Johnson's arrest photographs to him on May 7, 2019, *three decades after his trial*. *See* May 7, 2019 E-mail from S. Ritterman (attached as Exhibit 2). Mr. Johnson then timely amended his habeas petition within the year provided by statute to raise a *Brady* claim based on this disclosure and also timely filed a new PCRA petition also raising a *Brady* claim within the year provided by the PCRA. *See* ECF No. 63; *Johnson* State Docket at 15. Indeed, although the Attorney General characterizes the timing of these filings as a delay, *see* ECF No. 91 at 24, it concedes the claims in those petitions are timely, *id.* at 28.

Because the bulk of Mr. Johnson's post-conviction claims were before this Court, aside from the claims raised in his 2020 PCRA petition which are record-based, because this habeas proceeding has been pending for several years, and because Mr. Johnson has been incarcerated *since 1986*, when Respondents agreed to waive exhaustion of his new claims, Mr. Johnson, with the advice of counsel, elected to withdraw his state court PCRA petition and proceed on all of his

claims in this Court at one time so that the Court could have the full post-conviction picture before it, particularly given the applicable cumulative prejudice analysis. *See, e.g.*, *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007).

Contrary to the Attorney General's assertions, *see* ECF No. 91 at 25, the state court was not "concerned" about this withdrawal. It simply held a short hearing to ensure that Mr. Johnson had made the decision with the benefit of the advice of counsel and understood its implications, including that he would not be able to reinstate his PCRA claims. App. at 1280.

Mr. Johnson did not engage in forum shopping. The claims now before this Court were either exhausted in state court or needed no further development of the factual record.[7] Opal Nickson's testimony was preserved by deposition in this habeas proceeding, and this Court has the benefit of her sworn testimony. Mr. Johnson made a reasoned and legally legitimate decision to proceed in federal habeas and did so with the understanding that nothing requires this Court to rule in his favor.

As to the law, the Third Circuit has stated that when the Commonwealth's waiver of exhaustion is "a product of careful consideration," accepting that waiver "respects the Commonwealth's primary authority for defining and enforcing the criminal law." *Kennedy v. Superintendent Dallas SCI*, 50 F.4th 377, 382 (3d Cir. 2022). As reflected in the Settlement Agreement and Respondents' supplemental brief, Respondents have thoroughly reviewed this case, and there is no reason to think that their waiver of "all non-jurisdictional bars to relief,

---

[7] The Attorney General claims that "[t]he parties similarly seek to avoid all of the defaults that resulted from petitioner's previous round of state post-conviction litigation." ECF No. 91 at 26. It is unclear how this is the case, as the claims that were deemed untimely in state court are now before this Court, and this Court can decide whether to reach them.

including exhaustion," ECF No. 77 at ¶ 23, is anything other than the product of careful consideration.[8]

## IV. The Constitutional Claims Support Habeas Relief

Mr. Johnson has alleged constitutional violations that, as detailed below and in his October 2022 supplemental brief, provide grounds for habeas relief.

### A. Mr. Johnson's *Brady* Claims Warrant Relief

"[T]o establish a *Brady* violation requiring relief, a defendant must show that (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable; and (3) the withheld evidence was material." *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004) (citing *Banks v. Dretke*, 540 U.S. 668 (2004)). Mr. Johnson raises three *Brady* claims which, whether viewed individually or cumulatively, warrant relief: (1) the suppression of his arrest photographs showing a mustache violated his due process rights; (2) the suppression of Angelo Smith's statement to representatives of the Commonwealth at trial that he could not identify Mr. Johnson violated his due process rights; and (3) the suppression of Opal Nickson's statements to police and the prosecutor that Mr. Johnson had lighter skin than the man with the pistol violated his due process rights.

---

[8] In the cases cited by the Attorney General, the courts did not reject express waivers of exhaustion. In *Hull v. Freeman*, 932 F.2d 159 (3d Cir. 1991), *overruled on other grounds by Caswell v. Ryan*, 953 F.2d 853 (3d Cir. 1992), neither party raised the exhaustion issue, and the Court addressed the issue only in "the interests of comity and federalism" and determined the claim had been exhausted. *Id.* at 164-65. In *Christy v. Horn*, 115 F.3d 201 (3d Cir. 1997), and *Hardiman v. Reynolds*, 971 F.2d 500 (11th Cir. 1992), the Courts recognized that district courts have the authority to reject waivers of exhaustion or procedural default, but they did not reject express waivers of exhaustion. *See Christy*, 115 F.3d at 207 n.3 (noting the Commonwealth could waive exhaustion of a particular claim but that the district court would not be required to accept the waiver); *Hardiman*, 971 F.2d at 502-05 (examining exhaustion issue not raised by the parties and holding that the district court had the authority to consider it *sua sponte*).

1. **The Commonwealth suppressed material, exculpatory evidence of Mr. Johnson's arrest photos in violation of his constitutional rights**

The Commonwealth violated Mr. Johnson's constitutional rights under *Brady v. Maryland* by suppressing Mr. Johnson's October 10, 1986 arrest photographs, which show that Mr. Johnson did not match the description of the shooter. The Attorney General's arguments fail to come to terms with this clear violation.

*First*, the arrest photographs were suppressed. There is *no* evidence that the Commonwealth produced the arrest photographs to Mr. Johnson before trial, as it was constitutionally obligated to do. The dispositive fact is that the letters that accompanied all discovery provided to defense counsel before trial do not list the arrest photo. *See* ECF No. 85, Exhibit C (discovery letters). Further, on a full review of the files, Respondents "have not located any other document memorializing the arrest photo being passed as discovery, or otherwise disclosed to the defense before trial." *Id.* at 4. Defense counsel would surely have cross-examined James Smith and called Angelo Smith on this issue. The Attorney General's argument that trial counsel must have known about this photograph because he litigated a suppression motion, ECF No. 91 at 29, is entirely speculative and without foundation as the motion would have been filed even if the discovery had not been provided.

*Second*, the photographs are both exculpatory and impeachment evidence. Within hours of the shooting, both James Smith and Angelo Smith (the only two witnesses to discuss facial hair) described the man with the pistol, who the Commonwealth later contended was Mr. Johnson, as "*clean shaven*" and as having "*no mustache or facial hair*." App. at 5 (James Smith) (emphasis added); *id.* at 22 (Angelo Smith) (emphasis added). The arrest photographs taken just two days after the murder, by contrast, show that Mr. Johnson had a full, defined mustache. *Id.* at 36. These photographs are exculpatory because they show that Mr. Johnson did not fit James

Smith's or Angelo Smith's descriptions of the man with the pistol. They could also have been used to impeach James Smith's identification of Mr. Johnson at trial.

The Attorney General argues that the photos are "not exculpatory" because ten arrest photos of Mr. Johnson taken from March 1981 to October 1986 show Mr. Johnson having "exactly the same thin pencil mustache" and "otherwise completely clean-shaven." ECF No. 91 at 21, 30. This argument defies common sense and the English language. A mustache is a mustache, regardless of its style. Someone who has a mustache is not "clean shaven" regardless of whether they have any other facial hair. *See, e.g.*, Cambridge Academic Content Dictionary (defining "clean-shaven" as "having no beard or mustache on his face"), *available at* https://dictionary.cambridge.org/us/dictionary/english/clean-shaven (last accessed Mar. 3, 2023); Dictionary.com (defining "clean-shaven" as "having the beard and mustache shaved off"), *available at* https://www.dictionary.com/browse/clean-shaven (last accessed Mar. 3, 2023); The Britannica Dictionary (defining "clean-shaven" as "having a shaved face; having no beard or mustache"), *available at* britannica.com/dictionary/clean–shaven (last accessed Mar. 3, 2023).

Indeed, if an assailant has a mustache, one would expect that any witness who observed that person and offered an opinion on "facial hair" would state just that fact. The same would be true if the assailant had another unique style, such as a handle-bar mustache. Instead, the witnesses here who provided a description that included a comment on facial hair stated that the assailant was clean shaven, which is a direct assertion that he had no mustache, beard, or observable stubble. Moreover, the fact that other photographs of Mr. Johnson over a five-year period show a consistent appearance over time, *including a mustache*, is even more proof of his appearance on the day in question and that he did not match the descriptions of the man with the pistol given by James Smith and Angelo Smith.

*Third*, the arrest photographs are material. The "touchstone of materiality is a reasonable probability of a different result." *Dennis v. Sec'y, Pa. Dep't of Corrections*, 834 F.3d 263, 285 (3d Cir. 2016) (*en banc*) (internal quotation marks omitted). The relevant question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). There can be no confidence in the outcome of a trial in which Mr. Johnson was deprived of evidence that affirmatively shows that he in fact did not meet the description of the man with the pistol that two eyewitnesses gave police shortly after Morris's murder, including the eyewitness whose tentative identification set the other identifications in motion and where the evidence would have impeached James Smith. This case turned entirely on eyewitness identifications, as emphasized by the prosecutor in his opening statement and closing argument. *See, e.g.*, App. at 118-19, 939-40, 947-48.

In addition, this evidence could have been used to attack the testimony of Detectives Nachurski and Bittenbender, who sought to convince the jury that their investigation was comprehensive and reliable. *See, e.g.*, *id.* at 514-16, 525-26, 696-99. The arrest photographs call into question the integrity of that investigation. *See Dennis*, 834 F.3d at 302 (holding suppressed evidence was material where "[c]ounsel also could have used the information to challenge the adequacy of the police investigation").

This *Brady* claim is sufficient to support relief, and it requires reference only to record documents, not to any witnesses. As discussed below, there are additional *Brady* violations that provide grounds for a cumulative prejudice analysis. *See Kyles*, 514 U.S. at 420 ("the state's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense not on evidence considered item by item").

2. **The Commonwealth violated Mr. Johnson's due process rights under** ***Brady*** **by suppressing Angelo Smith's statement to investigators that Mr. Johnson was not the man with the pistol**

The Commonwealth suppressed Angelo Smith's statement to the police or the prosecutor at trial that, when brought to the courtroom, he was asked if saw the man with the pistol and was told that he did not need to testify when he said he did not. If the Commonwealth had disclosed this evidence before trial, Mr. Johnson would have called Angelo Smith as a witness. Given the centrality of the identifications to the case (there was no other evidence linking Mr. Johnson to the incident), if Mr. Johnson could show the jury that the person who tentatively identified him, setting the other three identifications in motion, did not recognize him in person, there is a reasonable probability of a different result at trial.

The Attorney General seeks to rebut this claim, ECF No. 91 at 28-29, not by any evidence that Mr. Smith could recognize Mr. Johnson at trial, but through an end run: that the testimony by Angelo Smith that he did not recognize Mr. Johnson would have opened the door to Smith's initial statement to police investigators. Assuming the prosecutor would have used the statement, *that evidence would have also been favorable to Mr. Johnson*. Angelo Smith was the first person interviewed by investigators, and he told police that Mr. Johnson's photo "looks like" the man with the pistol, but "*I am not positive*." App. at 23 (emphasis added). Significantly, the confrontation in the courtroom was just the opportunity that Angelo Smith stated he needed to make a reliable identification: "[T]hat photo that I picked out looked like the guy and if it comes down to where I might see him again, I will identify him, he threatened my life to[o]." *Id.* at 24. On his observation of Mr. Johnson, Smith did not recognize him as the assailant. He affirmed this to a defense investigator in 2014 and to homicide detectives in 2016.

The Attorney General also claims that Smith's account is questionable because the Commonwealth asked for a bench warrant to secure Angelo Smith's presence at trial. *See* ECF

No. 91 at 28. To the contrary, the record shows that "[a] witness fee certificate found in the prosecution file shows approval of a $10 payment to Smith on February 23, 1988 for two days of attendance as a witness in this case, lending support to Petitioner's claim that Smith did appear at trial." ECF No. 85 at 4 & Exhibit B (fee certificate). [9]

Finally, the Attorney General claims that, had Mr. Johnson called Angelo Smith to testify, he would have said that Elijah Bennett pointed out Mr. Johnson as the perpetrator to Smith in the courtroom. But that testimony would not be harmful because the jury heard directly from Mr. Bennett at trial. There is a reasonable probability of a different outcome had this evidence been disclosed.

> **3.    The Commonwealth violated Mr. Johnson's due process rights under *Brady* by suppressing Opal Nickson's statements to police and the prosecutor that the assailant had darker skin than Mr. Johnson**.

In 2019 deposition testimony, Opal Nickson repeatedly affirmed her previous statements that Mr. Johnson has lighter skin than the man with the pistol and testified that she told this to police and the prosecutor. *See* App. at 1185-86 (deposition testimony: "Q. Did you tell police that Kevin Johnson has lighter skin than the man who pointed the gun at you? A. *Yes, I did*. I told the attorney that, too, the man that took us down there." (emphasis added)); *see also id.* at 1115 (affidavit: "I told the police that Kevin looked a little like the guy with the pistol but Kevin's skin was much lighter, like mine, and the guy with the pistol was a dark skinned black guy. . . . Before I testified, I told the prosecutor that I thought that the guy with the pistol had darker skin than Kevin.").

---

[9] The argument that Smith's excusal from appearance by Commonwealth agents is not fully developed, ECF No. 91 at 28, is without foundation. *See* Section II.C, *supra* (discussing the recantations); Section III, *supra* (discussing the procedural history).

The Attorney General does not address this claim, but in any event, there is no factual dispute. The Commonwealth did not disclose Nickson's statements about Mr. Johnson's and the perpetrator's respective skin tones to Mr. Johnson before trial. If it had, Mr. Johnson would have been able to impeach Nickson's testimony which, again, would have been critical given the role identifications played in the case. There is a reasonable probability of a different outcome had this evidence been disclosed.

In sum, all of Mr. Johnson's *Brady* claims are based on record documents or on witness statements and testimony that have been tested through the adversarial process. Mr. Johnson is entitled to habeas relief based on the suppression of his arrest photographs, but the conclusion that the Commonwealth's suppression of evidence violated his due process rights is only stronger when the suppressed information is considered collectively, as *Brady* and its progeny require.

As detailed below, there are also claims of ineffective assistance of counsel and gross prosecutorial misconduct that entitle Mr. Johnson to relief based on cumulative prejudice when viewed together with the *Brady* violations. The Third Circuit has "recognize[d] that errors that individually do not warrant habeas relief may do so when combined." *Albrecht*, 485 F.3d at 139 (citing *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2007)).

**B.      Mr. Johnson Is Entitled to Habeas Relief Due to the Cumulative Prejudice Caused by the Constitutional Violations in His Case**

**1.      Mr. Johnson's trial counsel was ineffective**

Trial counsel's deficient performance permeated Mr. Johnson's trial. Most significantly, even if the arrest photograph is not considered *Brady* material, trial counsel rendered constitutionally ineffective assistance by failing to secure the arrest photograph. This was an essential step both in the litigation of a motion to suppress identification testimony and at trial to

impeach the Commonwealth witnesses. There is simply no strategic reason why defense counsel would not seek this discovery in a case that turns entirely on identification testimony. The Attorney General appears to agree with this point, as he argues only that the photographs may have been secured by defense counsel in connection with the suppression hearing. *See* ECF No. 91 at 29. But that proposition is implausible, given the fact that he did not use them at trial and there is no record or other documentation that he sought or received them in discovery or by formal court subpoena. Certainly, if trial counsel had the photos and used them at the suppression hearing, he would also have used them at trial.

On this record (and on *de novo* review of this issue), the failure to secure and use the arrest photographs to impeach the Commonwealth identification witnesses reflects deficient performance. Competent defense counsel would have secured the photographs before trial, *and* upon examination immediately understood how they impeached the Commonwealth's case: a witness not only had him at 6'1" when he was 5'6", but the pictures showed Mr. Johnson with a mustache, where witnesses described a clean-shaven assailant without a mustache. The prejudice to Mr. Johnson from these failures is manifest, including in its cumulative impact.[10]

---

[10] Regarding trial counsel's failure to adequately consult with Mr. Johnson before his trial, the Attorney General discusses the Superior Court's *en banc* decision denying relief on this claim. However, the Superior Court did not have the benefit of the post-conviction record of recantations by all of the identification witnesses or the suppressed arrest photographs when examining this claim. Moreover, the Attorney General fails to grapple with the fact that all of the courts that looked at this claim—including the Court of Common Pleas, two Superior Court panels, and the *en banc* Superior Court—were troubled by counsel's performance. *See* July 7, 2010 PCRA Court Op. at 7, 11-12 (dismissing the petition but acknowledging trial counsel's "professional and ethical failings") (attached as Exhibit 3); Jan. 31, 2005 Super. Ct. Op. at 11 (remanding for an evidentiary hearing and finding genuine issues of material fact regarding trial counsel's representation) (attached as Exhibit 4); June 27, 2011 Super. Ct. Op. at 20 ("Attorney Gallagher was ineffective in his representation of Johnson for failing to adequately consult with him prior to trial") (attached as Exhibit 5); *Commonwealth v. Johnson*, 51 A.3d 237, 244 (Pa. Super. 2012) (*en banc*) (reversing the grant of a new trial but "acknowledge[ing] that more

4. **The prosecutor engaged in repeated acts of misconduct violated Mr. Johnson's due process rights**

At trial, the prosecutor, knowing that a conviction would be difficult to achieve without proof of a motive, repeatedly asserted that Mr. Johnson was hitman in a drug operation and that was his motive for the murder. *See, e.g.*, App. at 121-22; *see also* ECF No. 77 at ¶¶ 52-53 & n.13. There was not a shred of evidence to support this theory, leading the trial court to admonish the prosecutor multiple times. The presiding judge stated that the prosecutor, who has a history of similar misconduct, *see* ECF No. 77 at n.15, had "violate[d] every standard of professional conduct known to [the] court," App. at 866.

The Attorney General does not defend the highly improper assertions that provided a basis for a first-degree verdict as a planned and deliberate killing. Rather, the Attorney General argues that the trial court cured any prejudice by a boiler plate instruction that questions are not evidence. Ignored by the Attorney General is the pattern of misconduct throughout the trial by a prosecutor who had a professional history of such misconduct. In these circumstances, the misconduct was highly prejudicial.

In sum, the cumulative prejudice in this case was overwhelming. The only evidence implicating Mr. Johnson was the identification testimony of James Smith, Opal Nickson, and Elisha Bennett, whose identifications were all set in motion by Angelo Smith's tentative (and as it turn out mistaken) identification. The constitutional violations prejudiced Mr. Johnson by depriving him of essential impeachment and exculpatory evidence and by unfairly characterizing him as a hired killer.

---

contact may have been advisable"); *see also id.* at 247, 254 (Wecht, J., concurring) (stating that, "[a] fair review of the record in this case reveals that the attorney-client interactions were anything but substantive. Indeed, they were cursory and shallow," but concurring in the judgment because of the "Commonwealth's overwhelming identification evidence," which has now, as discussed above, been called into question).

## V. Conclusion

Mr. Johnson's trial was rife with constitutional violations, the cumulative effect of which caused him significant prejudice, warranting habeas relief. Under *Brady* and under *Strickland* ineffectiveness standards, there is far more than a "reasonable probability" of a different result at trial.

Respectfully submitted,

/s/ *Claudia Flores*
CLAUDIA FLORES
Assistant Federal Public Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 540W
Philadelphia, PA 19106
215-928-1100

/s/ *Nilam A. Sanghvi*
NILAM A. SANGHVI
The Pennsylvania Innocence Project
1515 Market Street, Suite 300
Philadelphia, PA 19102
215-204-4255

/s/ *David Rudovsky*
DAVID RUDOVSKY
Kairys, Rudovsky, Messing, Feinberg & Lin LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
215-925-4400

*Counsel for Petitioner, Kevin Johnson*

DATE: March 9, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this supplemental brief was served on all counsel of record via the

Court's ECF system.

/s/ *Claudia Flores*
Claudia Flores
Assistant Federal Defender
*Attorney for Petitioner, Kevin Johnson*

DATE: March 9, 2023

# EXHIBIT 1

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## CASE INFORMATION

Cross Court Docket Nos: 2187 EDA 2009, 449 EAL 2012, 1368 EDA 2017

| | |
|---|---|
| Judge Assigned: DeFino-Nastasi, Rose | Date Filed: 11/06/1986    Initiation Date: 11/06/1986 |
| OTN: M 286519-2         LOTN: | Originating Docket No: 08610050611 |
| Initial Issuing Authority: | Final Issuing Authority: |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant |
| Complaint/Citation No.: | Incident Number: |
| Case Local Number Type(s) | Case Local Number(s) |

| | |
|---|---|
| Police Incident Number | 8612070075 |
| PSI Microfilm Number | 881418 |
| Legacy Microfilm Number | 97013583 |
| District Control Number | 8612070075 |
| Legacy Docket Number | C8611080011 |

## STATUS INFORMATION

| Case Status: | Closed | | | Arrest Date: | 10/26/1986 |
|---|---|---|---|---|---|
| | | Status Date | Processing Status | | |
| | | 09/17/2021 | Completed | | |
| | | 05/04/2020 | Awaiting PCRA Decision | | |
| | | 05/21/2018 | Completed | | |
| | | 05/21/2018 | Appeal Decided | | |
| | | 03/09/2017 | Awaiting Appellate Court Decision | | |
| | | 03/03/2017 | Completed | | |
| | | 07/02/2014 | Awaiting PCRA Decision | | |
| | | 05/15/2013 | Completed | | |
| | | 09/12/2012 | Awaiting Appellate Court Decision | | |
| | | 08/15/2012 | Appeal Decided | | |
| | | 08/15/2012 | Completed | | |
| | | 07/23/2009 | Awaiting Appellate Court Decision | | |
| | | 05/31/2007 | Awaiting PCRA Decision | | |
| | | 03/28/2007 | Awaiting Trial | | |
| | | 03/05/2007 | Awaiting PCRA Decision | | |
| | | 02/26/2007 | Awaiting Trial | | |
| | | 11/20/2006 | Awaiting PCRA Intitial Review | | |
| | | 09/25/2006 | Completed | | |
| | | 04/18/2005 | Awaiting PCRA Decision | | |
| | | 07/01/1988 | Migrated Final Disposition | | |
| | | 11/06/1986 | Migrated Case (Active) | | |

Complaint Date:    11/06/1986

CPCMS 9082

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kevin F Johnson

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Post Conviction Relief Act | 04/20/2005 | 8:30 am | 206 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Post Conviction Relief Act | 05/02/2005 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 05/23/2005 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 06/13/2005 | 8:30 am | 1106 | | Scheduled |
| Post Conviction Relief Act | 09/19/2005 | 8:30 am | 1106 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Post Conviction Relief Act | 09/22/2005 | 8:30 am | 601 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Post Conviction Relief Act | 10/17/2005 | 8:30 am | 601 | | Scheduled |
| Post Conviction Relief Act | 10/18/2005 | 8:30 am | 601 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Post Conviction Relief Act | 10/31/2005 | 8:30 am | 601 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Post Conviction Relief Act | 11/21/2005 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 12/05/2005 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 12/05/2005 | 8:30 am | 1106 | | Scheduled |
| Post Conviction Relief Act | 01/23/2006 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 03/06/2006 | 8:30 am | 705 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Post Conviction Relief Act | 03/06/2006 | 8:30 am | 601 | | Scheduled |
| Post Conviction Relief Act | 03/06/2006 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 04/10/2006 | 8:30 am | 1106 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Post Conviction Relief Act | 04/10/2006 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 04/17/2006 | 8:30 am | 1106 | Administrative Judge James J. Fitzgerald III | Scheduled |

Printed: 03/08/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.



**Docket Number: CP-51-CR-1108001-1986**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Post Conviction Relief Act | 05/15/2006 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 06/05/2006 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 07/10/2006 | 8:30 am | 705 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Post Conviction Relief Act | 07/17/2006 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 08/21/2006 | 8:30 am | 200 | | Scheduled |
| Post Conviction Relief Act | 09/25/2006 | 2:00 pm | 705 | Administrative Judge James J. Fitzgerald III | Scheduled |
| PCRA Initial Review Status | 10/23/2006 | 9:00 am | 200 | | Continued |
| PCRA Initial Review Status | 11/20/2006 | 9:00 am | 705 | Administrative Judge James J. Fitzgerald III | Continued |
| Status Listing | 11/27/2006 | 9:00 am | 705 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Status Listing | 12/04/2006 | 9:00 am | 705 | Administrative Judge James J. Fitzgerald III | Continued |
| Status Listing | 12/11/2006 | 9:00 am | 705 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Status Listing | 12/18/2006 | 9:00 am | 705 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Status Listing | 01/22/2007 | 9:00 am | 200 | Administrative Judge James J. Fitzgerald III | Continued |
| Status Listing | 01/22/2007 | 9:00 am | 705 | | Scheduled |
| Status Listing | 02/26/2007 | 2:00 pm | 808 | Administrative Judge James J. Fitzgerald III | Scheduled |
| Status Listing | 03/28/2007 | 9:00 am | 1106 | Judge D. Webster Keogh | Scheduled |
| Status Listing | 05/31/2007 | 9:00 am | 1101 | Judge Peter F. Rogers | Continued |
| Status Listing | 07/13/2007 | 9:30 am | 1101 | Judge Peter F. Rogers | Continued |
| Status Listing | 09/27/2007 | 9:00 am | 1101 | Judge Peter F. Rogers | Continued |
| Status Listing | 10/18/2007 | 9:00 am | 1101 | Judge Peter F. Rogers | Continued |
| Status Listing | 11/08/2007 | 9:00 am | 1101 | Judge Peter F. Rogers | Scheduled |
| PCRA | 01/28/2009 | 9:00 am | 304 | Judge Peter F. Rogers | Continued |
| PCRA | 02/25/2009 | 9:00 am | 304 | Judge Peter F. Rogers | Continued |
| PCRA | 03/25/2009 | 9:00 am | 304 | Judge Peter F. Rogers | Continued |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| PCRA | 04/22/2009 | 9:00 am | 602 | Judge Peter F. Rogers | Continued |
| PCRA | 05/20/2009 | 9:00 am | 305 | Judge Peter F. Rogers | Continued |
| PCRA | 06/17/2009 | 9:00 am | 305 | Judge Peter F. Rogers | Scheduled |
| PCRA | 07/15/2009 | 9:00 am | 200 | Judge Peter F. Rogers | Scheduled |
| PCRA | 01/21/2016 | 9:00 am | 206 | | Cancelled |
| PCRA | 04/21/2016 | 9:00 am | 206 | | Moved |
| PCRA | 07/28/2016 | 9:00 am | 206 | | Moved |
| PCRA | 09/21/2016 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 10/26/2016 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 12/14/2016 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 01/19/2017 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 02/28/2017 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 03/03/2017 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Scheduled |
| PCRA | 07/16/2020 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 09/24/2020 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 10/08/2020 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 01/07/2021 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 02/10/2021 | 10:00 am | 1107 | Judge Rose DeFino-Nastasi | Moved |
| PCRA | 03/11/2021 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 03/11/2021 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 05/03/2021 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 07/14/2021 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Continued |
| PCRA | 09/09/2021 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Scheduled |
| Video-Other | 09/17/2021 | 9:00 am | 1107 | Judge Rose DeFino-Nastasi | Scheduled |

## CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still in Custody |
|---|---|---|---|---|
| 02/21/2012 | State Correctional Institution | SCI Mahanoy | | Yes |

## DEFENDANT INFORMATION

| Date Of Birth: | 01/11/1961 | City/State/Zip: PHILA., PA 19100 |
|---|---|---|

Alias Name
Johnson, Kevin
Johnston, Kevin

Printed: 03/08/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kevin F Johnson

## CASE PARTICIPANTS

| Participant Type | Name |
| --- | --- |
| Defendant | Johnson, Kevin F. |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
| --- | --- | --- | --- | --- | --- | --- |
| 1 | 1 | | 18 § 903 | CRIMINAL CONSPIRACY | 10/08/1986 | M 286519-2 |
| 2 | 2 | M1 | 18 § 907 | Possessing Instruments of a Crime | 10/08/1986 | M 286519-2 |
| 5 | 5 | | 18 § 2502 | MURDER-1ST DEGREE | 10/08/1986 | M 286519-2 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
| --- | --- | --- | --- |
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |

**Migrated Disposition**

| Migrated Dispositional Event | 07/01/1988 | Final Disposition | |
| --- | --- | --- | --- |
| 1 / CRIMINAL CONSPIRACY | Guilty | | 18 § 903 |
| Stiles, Michael R. | 07/01/1988 | | |
| Confinement | Min of 5.00 Years | | |
| | Max of 10.00 Years | | |
| 2 / Possessing Instruments of a Crime | Guilty | M1 | 18 § 907 |
| Stiles, Michael R. | 07/01/1988 | | |
| Confinement | Min of 2.00 Years 6.00 Months | | |
| | Max of 5.00 Years | | |
| 5 / MURDER-1ST DEGREE | Guilty | | 18 § 2502 |
| Stiles, Michael R. | 07/01/1988 | | |
| Confinement | LIFE | | |

## COMMONWEALTH INFORMATION

| | |
| --- | --- |
| Name: | Philadelphia County District Attorney's Office |
| | Prosecutor |
| Supreme Court No: | |
| Phone Number(s): | |
| 215-686-8000 | (Phone) |
| Address: | |
| 3 South Penn Square | |
| Philadelphia, PA 19107 | |

## ATTORNEY INFORMATION

| | |
| --- | --- |
| Name: | David Rudovsky |
| | Private |
| Supreme Court No: | 015168 |
| Rep. Status: | Active |
| Phone Number(s): | |
| Address: | |

## ENTRIES

Printed: 03/08/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1108001-1986**

# CRIMINAL DOCKET

**Court Case**

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 11/06/1986 | | Unknown Filer |
| Held for Court | | | |
| 1 | 07/01/1988 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 07/01/1988 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 07/01/1988 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 02/04/2003 | | Migrated, Filer |
| APPEAL FILED | | | |
| 1 | 07/23/2003 | | Migrated, Filer |
| DOCKET CREATED AS OF 07/23/03 | | | |
| 1 | 03/05/2004 | | Migrated, Filer |
| APPL FILE MAINT  SUFFIX C | | | |
| D41/1 | 05/12/2004 | | Migrated, Filer |
| APPL DISP POSTING SUFFIX C | | | |
| D42/1 | 06/29/2004 | | Fitzgerald, James J. III |
| PCRA Order | | | |
| D42A/2 | 06/29/2004 | | Fitzgerald, James J. III |
| Proof of Service | | | |
| D43/1 | 08/03/2004 | | Johnson, Kevin F. |
| PET. TO SUPP. THE REC. W/ORIG. PRO SE PCRA PET. | | | |
| 1 | 03/24/2005 | | Migrated, Filer |
| APPL FILE MAINT  SUFFIX C | | | |
| D44/D45/2 | 03/24/2005 | | Migrated, Filer |
| APPL DISP POSTING SUFFIX C | | | |

Printed:  03/08/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.



Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 04/18/2005 | | Migrated, Filer |
| APPL DISP POSTING SUFFIX C | | | |
| 1 | 04/18/2005 | | Migrated, Filer |
| Post-Conviction Relief Act Petition Filed | | | |
| 2 | 04/20/2005 | | Migrated, Filer |
| PCRA CASE ENTRY SUFFIX C | | | |
| 3 | 04/20/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 1 | 04/26/2005 | | Migrated, Filer |
| PCRA ATTORNEY MAINTENANCE | | | |
| 2 | 04/26/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 1 | 04/27/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 2 | 04/27/2005 | | Migrated, Filer |
| PCRA ATTORNEY MAINTENANCE | | | |
| 3 | 04/27/2005 | | Migrated, Filer |
| PCRA ATTORNEY MAINTENANCE | | | |
| 2 | 05/02/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 2 | 06/13/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 2 | 09/19/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| D46/3 | 09/19/2005 | | Migrated, Filer |
| COURT APPOINTMENTS | | | |

Printed: 03/08/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.



**Docket Number: CP-51-CR-1108001-1986**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 09/20/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| D47/2 | 09/22/2005 | | Fitzgerald, James J. III |
| ORDER FILED | | | |
| 3 | 09/22/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 4 | 09/22/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 1 | 09/30/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 2 | 10/17/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 1 | 10/25/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 1 | 10/27/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 2 | 10/31/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 1 | 11/03/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 3 | 12/05/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 4 | 12/05/2005 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |
| 2 | 01/23/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP  SUFFIX C | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

## DOCKET



**Docket Number: CP-51-CR-1108001-1986**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 01/27/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 1 | 02/13/2006 | | Migrated, Filer |
| VENDOR CRIMINAL PAYMENT | | | |
| 1 | 03/03/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 4 | 03/06/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 1 | 03/08/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 3 | 04/10/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 2 | 04/17/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 1 | 04/20/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 2 | 06/05/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 1 | 06/16/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 2 | 07/17/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 2 | 08/21/2006 | | Migrated, Filer |
| PCRA NEXT ACT/DISP SUFFIX C | | | |
| 1 | 02/26/2007 | | Fitzgerald, James J. III |
| PCRA | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| D48/1 | 03/21/2007 | | Fitzgerald, James J. III |
| PCRA Order | | | |
| D48A/2 | 03/21/2007 | | Fitzgerald, James J. III |
| Proof of Service | | | |
| 1 | 03/28/2007 | | Keogh, D. Webster |
| PCRA | | | |
| 1 | 05/14/2007 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 2 | 05/15/2007 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 05/24/2007 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 2 | 05/31/2007 | | Rogers, Peter F. |
| PCRA - Continued | | | |
| 1 | 07/13/2007 | | Rogers, Peter F. |
| PCRA - Status Listing | | | |
| 2 | 09/27/2007 | | Rogers, Peter F. |
| PCRA Status Listing | | | |
| 2 | 10/18/2007 | | Rogers, Peter F. |
| PCRA Status Listing | | | |
| D49/1 | 11/08/2007 | | Rogers, Peter F. |
| PCRA Continued | | | |
| D50/1 | 01/09/2008 | | Philadelphia County District Attorney's Office |
| Post-Hearing Motion to Dismiss | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.



**Docket Number: CP-51-CR-1108001-1986**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 03/25/2009 | | Rogers, Peter F. |
| PCRA | | | |
| 1 | 06/17/2009 | | Rogers, Peter F. |
| PCRA - Dismissal Notice Under Rule 907 To Be Sent | | | |
| D51/1 | 07/15/2009 | | Rogers, Peter F. |
| Order Dismissing PCRA Petition | | | |
| D52/1 | 07/23/2009 | | Greenblatt, Ronald |
| Notice of Appeal to the Superior Court | | | |
| Philadelphia County District Attorney's Office | | | |
| 07/23/2009 | First Class | | |
| Rogers, Peter F. | | | |
| 07/23/2009 | First Class | | |
| 1 | 08/05/2009 | | Superior Court of Pennsylvania - Eastern District |
| Docketing Statement from Superior Court | | | |
| D53/1 | 08/18/2009 | | Rogers, Peter F. |
| Order Issued Pursuant to Pa.R.A.P. 1925(b) | | | |
| D53A/2 | 08/18/2009 | | Rogers, Peter F. |
| Proof of Service | | | |
| D54/1 | 09/14/2009 | | Greenblatt, Ronald |
| Statement of Matters Complained on Appeal | | | |
| 1 | 09/23/2009 | | Court of Common Pleas - Philadelphia County |
| Preliminary Docket Entries Prepared | | | |
| 1 | 02/26/2010 | | Rogers, Peter F. |
| Appeal Record Sent to Judge | | | |
| D55/1 | 07/07/2010 | | Rogers, Peter F. |
| Opinion | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.



Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 07/07/2010 | | Court of Common Pleas - Philadelphia County |
| Appeal Docket Entries and Served | | | |
| 3 | 07/07/2010 | | Court of Common Pleas - Philadelphia County |
| Certificate and Transmittal of Record to Appellate Court | | | |
| 1 | 04/19/2011 | | Court of Common Pleas - Philadelphia County |
| Transcript from Lower Court | | | |
| 2 | 04/19/2011 | | Court of Common Pleas - Philadelphia County |
| Certificate and Transmittal of Notes of Testimony to Appellate Court | | | |
| 1 | 08/15/2012 | | Superior Court of Pennsylvania - Eastern District |
| Affirmed - Superior Court | | | |
| 2 | 08/15/2012 | | Superior Court of Pennsylvania - Eastern District |
| Superior Court Opinion | | | |
| 1 | 09/12/2012 | | Supreme Court of Pennsylvania - Eastern District |
| Petition for Allowance of Appeal Filed - Supreme Court | | | |
| 1 | 04/03/2013 | | Supreme Court of Pennsylvania - Eastern District |
| Petition for Allowance of Appeal Denied - Supreme Court | | | |
| 1 | 05/15/2013 | | Superior Court of Pennsylvania - Eastern District |
| Record Returned Date to Appeal Unit | | | |
| 1 | 07/02/2014 | | Johnson, Kevin F. |
| Post-Conviction Relief Act Petition Filed | | | |
| 1 | 04/21/2015 | | Sanghvi, Nilam Ajit |
| Entry of Appearance | | | |

Printed: 03/08/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

## DOCKET



**Docket Number: CP-51-CR-1108001-1986**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 04/29/2015 | | Rudovsky, David |
| Entry of Appearance | | | |
| 2 | 10/29/2015 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 01/21/2016 | | Sanghvi, Nilam Ajit |
| PCRA - Amended PCRA Petition Filed | | | |
| 2 | 01/21/2016 | | Sanghvi, Nilam Ajit |
| Miscellaneous Motion Filed | | | |
| 1 | 07/22/2016 | | Philadelphia County District Attorney's Office |
| Commonwealth Motion to Dismiss PCRA Petition | | | |
| 1 | 09/20/2016 | | Sanghvi, Nilam Ajit |
| Answer/Response | | | |
| 1 | 09/21/2016 | | DeFino-Nastasi, Rose |
| Order Granting Motion for Continuance | | | |
| 1 | 10/26/2016 | | DeFino-Nastasi, Rose |
| Order Granting Motion for Continuance | | | |
| 1 | 12/14/2016 | | DeFino-Nastasi, Rose |
| Order Granting Motion for Continuance | | | |
| 1 | 01/19/2017 | | DeFino-Nastasi, Rose |
| PCRA - Dismissal Notice Under Rule 907 Filed | | | |
| 2 | 01/19/2017 | | DeFino-Nastasi, Rose |
| Order Granting Motion for Continuance | | | |
| 1 | 02/28/2017 | | DeFino-Nastasi, Rose |
| Order Granting Motion for Continuance | | | |

Printed: 03/08/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.



**Docket Number: CP-51-CR-1108001-1986**
## CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 03/03/2017 | | DeFino-Nastasi, Rose |
| Order Dismissing PCRA Petition | | | |
| 1 | 03/06/2017 | | DeFino-Nastasi, Rose |
| Order Dismissing PCRA Petition | | | |
| 1 | 03/09/2017 | | Sanghvi, Nilam Ajit |
| Notice of Appeal to the Superior Court | | | |
| 1 | 03/15/2017 | | DeFino-Nastasi, Rose |
| Order Issued Pursuant to Pa.R.A.P. 1925(b) | | | |
| Johnson, Kevin F. | | | |
| 03/15/2017 | First Class | | |
| Philadelphia County District Attorney's Office | | | |
| 03/15/2017 | Interoffice | | |
| Rudovsky, David | | | |
| 03/15/2017 | First Class | | |
| Sanghvi, Nilam Ajit | | | |
| 03/15/2017 | First Class | | |
| 1 | 04/10/2017 | | Sanghvi, Nilam Ajit |
| Statement of Matters Complained on Appeal | | | |
| 1 | 04/11/2017 | | Court of Common Pleas - Philadelphia County |
| Preliminary Docket Entries Prepared | | | |
| D56/1 | 04/27/2017 | | Court of Common Pleas - Philadelphia County |
| Transcript of Proceedings Filed | | | |
| 1 | 05/03/2017 | | Superior Court of Pennsylvania - Eastern District |
| Docketing Statement from Superior Court | | | |
| 1 | 05/22/2017 | | DeFino-Nastasi, Rose |
| Opinion | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.



**Docket Number: CP-51-CR-1108001-1986**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 07/17/2017 | | Court of Common Pleas - Philadelphia County |
| Appeal Docket Entries and Served | | | |
| 2 | 07/17/2017 | | Court of Common Pleas - Philadelphia County |
| Certificate and Transmittal of Record to Appellate Court | | | |
| 1 | 05/21/2018 | | Superior Court of Pennsylvania - Eastern District |
| Superior Court Decision | | | |
| 2 | 05/21/2018 | | Superior Court of Pennsylvania - Eastern District |
| Superior Court Opinion | | | |
| 3 | 05/21/2018 | | Superior Court of Pennsylvania - Eastern District |
| Affirmed - Superior Court | | | |
| 1 | 05/04/2020 | | Sanghvi, Nilam Ajit |
| Post-Conviction Relief Act Petition Filed | | | |
| 1 | 07/16/2020 | | DeFino-Nastasi, Rose |
| PCRA Continued For Further Filings By Defense | | | |
| 1 | 09/24/2020 | | DeFino-Nastasi, Rose |
| PCRA Continued For Further Filings By Defense | | | |
| 1 | 10/05/2020 | | Sanghvi, Nilam Ajit |
| PCRA - Amended PCRA Petition Filed | | | |
| 2 | 10/05/2020 | | Sanghvi, Nilam Ajit |
| Motion for Leave | | | |
| 1 | 10/08/2020 | | DeFino-Nastasi, Rose |
| PCRA Continued for Further Investigation by Defense | | | |
| 4 | 01/07/2021 | | DeFino-Nastasi, Rose |
| PCRA Continued For Further Filings By Defense | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kevin F Johnson

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 01/08/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 01/11/2021 | | Johnson, Kevin F. |
| Inmate Document Request | | | |
| 3 | 02/10/2021 | | DeFino-Nastasi, Rose |
| Case Listed in Error | | | |
| 1 | 02/23/2021 | | Johnson, Kevin F. |
| Inmate Document Request | | | |
| 1 | 03/11/2021 | | DeFino-Nastasi, Rose |
| PCRA Continued for Status | | | |
| 1 | 04/05/2021 | | Johnson, Kevin F. |
| Inmate Document Request | | | |
| 1 | 05/03/2021 | | DeFino-Nastasi, Rose |
| PCRA Continued For Further Filings By Commonwealth | | | |
| 1 | 05/10/2021 | | Johnson, Kevin F. |
| Inmate Document Request | | | |
| 1 | 09/09/2021 | | DeFino-Nastasi, Rose |
| PCRA Continued for Status | | | |
| 2 | 09/14/2021 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 09/17/2021 | | Sanghvi, Nilam Ajit |
| Motion to Withdraw PCRA Petition | | | |
| 2 | 09/17/2021 | | DeFino-Nastasi, Rose |
| Order Granting Motion to Withdraw PCRA Petition | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



Commonwealth of Pennsylvania

v.

Kevin F Johnson

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# EXHIBIT 2

| | |
|---|---|
| **From:** | Samuel Ritterman <Samuel.Ritterman@Phila.Gov> |
| **Sent:** | Tuesday, May 07, 2019 9:27 AM |
| **To:** | Arianna Freeman |
| **Cc:** | Samuel Ritterman |
| **Subject:** | Fw: Johnson photos |

Hello Arianna:

Attached are the photos you requested.

Samuel Ritterman
Assistant District Attorney
Philadelphia District Attorney's Office, Federal Litigation Unit
(215) 686-5693



PHILA.
POLICE NO.
DEPT.          584615





# EXHIBIT 3


FILED

JUL 0 7 2010

Criiminal Appeals Unit
First Judicial District of PA

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | COUNTY OF PHILADELPHIA |
| –v– | : | NOVMEBER TERM, 1986 |
| KEVIN JOHNSON | : | NOS. 0800, 0801, 0803 |

## OPINION

ROGERS, J.

The defendant was tried by a jury, presided over by the Honorable Michael R. Stiles, for a murder that had occurred on October 8, 1986. He had killed one Lyndon Morris in southwest Philadelphia during the course of a robbery where he and his accomplice confiscated the decedent's drugs and drug proceeds. He was arrested on October 10, 1986, and charged with capital murder.

The trial court appointed counsel, Stephen Gallagher, for the defendant, and Mr. Gallagher represented him during the preliminary hearing, arraignment, trial, and sentencing phases of his case. The trial commenced on January 27, 1988. At the conclusion of the trial, after both the Commonwealth

and defense had offered numerous witnesses and exhibits, the jury returned a verdict of first-degree murder on February 4, 1988. On the following day, Judge Stiles concluded that the Commonwealth had failed to establish the aggravating circumstance of endangering another person, and he ruled, as a matter of law, that the consideration of the death penalty by the trial jury would be unlawful. On July 1, 1988, the defendant was formally sentenced to life imprisonment for the murder conviction and concurrent sentences for the other related convictions.

Mr. Gallagher remained as court-appointed counsel for post-verdict motions and for the defendant's direct appeal. Because of trial counsel's failure to file a 1925(b) statement or a brief with the Superior Court of Pennsylvania, defendant's appeal was dismissed by the Superior Court on March 29, 1989. The trial court subsequently granted defendant another direct appeal *nunc pro tunc*, and new counsel was appointed to represent him. Ultimately, the Superior Court of Pennsylvania affirmed the judgment of sentence, COMMONWEALTH -v- JOHNSON, 610 A.2d 65 (Pa.Super. 1992). Thereafter, the defendant's petition for *allocatur* was denied by the Supreme Court of Pennsylvania.

The defendant filed a timely *pro se* petition for post-

conviction relief on December 23, 1996. His first court-appointed counsel was subsequently relieved for failure to file an amended petition or otherwise pursue this matter. His second court-appointed counsel ultimately filed an amended petition on June 12, 2002. This PCRA petition was heard by the Honorable James J. Fitzgerald who granted the Commonwealth's motion to dismiss on January 15, 2003.

The defendant filed a *pro se* appeal to the Superior Court of Pennsylvania of the dismissal of his PCRA petition in which he reiterated various claims of ineffective assistance of counsel. In a memorandum opinion, the Superior Court remanded the matter for an evidentiary hearing on the issue of whether trial counsel was ineffective for his failure to consult with the defendant prior to trial. COMMONWEALTH -v- JOHNSON, No. 467 EDA 2003 (Pa.Super. 2005).

The defendant received new court-appointed counsel for his PCRA petition remand, and evidentiary hearings were held on March 6, 2006 and on April 17, 2006. Following these hearings before Judge Fitzgerald, the PCRA court permitted both parties to file post-hearing briefs and supplements to the original pleadings. This Court was subsequently assigned to this case due to the fact that Judge Fitzgerald no longer was sitting on the Court of Common Pleas of Philadelphia County.

The defendant was formally advised by this Court on June 17, 2009 that an order denying his request for PCRA relief would be entered on July 15, 2009, without any further proceedings because the issues raised in his petition were "without merit". His court-appointed PCRA counsel filed a timely notice of appeal from that order to the Superior Court of Pennsylvania on July 23, 2009.

**FACTS:**

There is no question that the evidence against the defendant at trial was overwhelming. In their slip opinion (Page 1), the Superior Court summarized it as follows.

> On February 4, 1988, a jury convicted Appellant of first-degree murder, possession of an instrument of crime, and criminal conspiracy. The charges arose from an incident at approximately 10:00 p.m. on October 8, 1986, where Appellant and an accomplice participated in the killing of Lyndon Morris, a drug dealer. Three eyewitnesses (James Smith, Opal Nickson, and Elijah Bennett) positively identified Appellant as one of the perpetrators. The accomplice was never found. Appellant maintains that he had an alibi, and that Keith Nickson (Opal Nickson's brother) and/or his Nickson's cohorts committed the killing.

The details of the trial testimony further reveal the strength of the Commonwealth's case, and leave little doubt as to the defendant's culpability in this brutal homicide.

The decedent, Lyndon "Cowboy" Morris, was selling cocaine from a second-floor bedroom that he rented in a home in Southwest Philadelphia. He was assisted by one James Smith who would answer the door at the residence, collect money from the prospective purchasers, give the money to the defendant who was positioned in the second-floor bedroom, and then deliver the cocaine to the buyers who were waiting on the first floor.

The owner of the residence, Opal Nickson, arrived home that night and joined Angelo Smith, Elijah Bennett, and James Smith in another second-floor bedroom where they were all smoking marijuana and cocaine. In response to a knock on the door, James Smith went downstairs and encountered the defendant who was armed with a revolver and his accomplice who was carrying a sawed-off shotgun. The defendant demanded to see the decedent, and when the three of them reached the second floor, the defendant ordered Nickson, Angelo Smith, and Bennett to lie on the floor. Both Nickson and Bennett (along with the Smiths) identified the defendant at trial, and testified that they recognized him "from the neighborhood".

With the accomplice standing by, the defendant banged on the decedent's door. When he unlatched the door and saw the shotgun, he attempted to slam the door shut. He was

unsuccessful in that effort, and the accomplice fired through the open door and struck the decedent in the lower abdomen. The defendant then rushed into the bedroom, fired his gun a number of times, and shot the decedent in the chest while he was lying on the ground. After scooping up the decedent's cash and drugs, the defendant and his accomplice ran out of the house and fled.

The defendant's trial counsel called a number of alibi witnesses, Douglas Yancy, James Lawrence, and Wanda Johnson, in his effort to establish that the defendant was selling clothes from the back of a car at various locations in West Philadelphia. His mother and a family member gave testimony that contradicted the Commonwealth witnesses who had described what he was wearing and the vehicle in which he was riding. The defendant also testified at trial on his own behalf. He denied being involved in the shooting or robbery of the decedent, and recounted his actions that evening as he traveled around the neighborhood with a friend while attempting to sell clothes.

**ARGUMENT:**

This Court's dismissal of the instant amended PCRA petition was entirely proper because the defendant did not present anything in his pleadings that raised the possibility

of any issues of material fact, and the law governing this situation is clear and unambiguous. Section 4 of Pa.R.Crim.P. 907 goes on in its wording to mandate the procedure that is to be followed in the event that a PCRA petition is dismissed without a hearing.

> (4) When the petition is dismissed without a hearing, the judge shall issue an order to that effect and shall advise the defendant by certified mail, return receipt requested, of the right to appeal from the final order disposing of the petition and of the time within which the appeal must be taken.

That is the exact procedure that was followed in this case, so that the only issue is whether the PCRA petition was properly dismissed.

Despite the seemingly numerous arguments that the defendant poses in this appeal, it is essentially one issue that is articulated in a number of variations. The issue in the instant case and the one that is the basis of the remand order by the Superior Court of Pennsylvania is whether the defendant was denied his Sixth Amendment right to counsel for his trial because of trial counsel's failure to communicate, contact, and consult with him during the course of the trial.

There seems to be little question that from a *professional* or *ethical* standpoint, defendant's trial counsel was wanting in his representation of the defendant. However, that does not mandate that there is a *legal* basis for relief

for this defendant in light of the extremely minimal standards that the appellate courts have established for pre-trial preparation and communication by defense counsel.

The defendant's arguments in support of his PCRA petition are raised in the context of his claim of ineffective assistance of counsel. The well-established law relative to ineffective assistance of counsel is wholly applicable to this case. For example, in COMMONWEALTH -v- SCOTT, 752 A.2d 871 (Pa. 2000), the Supreme Court of Pennsylvania held that to establish a claim of ineffective assistance of counsel, an appellant must show that: (1) the claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *See*, STRICKLAND -v- WASHINGTON, 466 U.S. 668 (1984); COMMONWEALTH -v- DOUGLAS, 737 A.2d 1188, 1199 (Pa. 1999).

It is also important to note that counsel is presumed to have rendered effective assistance, and an appellant has the burden of proving otherwise. COMMONWEALTH -v- BALODIS, 747 A.2d 341, 343 (Pa. 2000). As was stated in COMMONWEALTH -v- PETERKIN, 513 A.2d 373, 382 (Pa. 1986).

> Failure of trial counsel to conduct a more
> intensive investigation or to interview
> potential witnesses does not constitute
> ineffective assistance of counsel, unless
> there is some showing that such investigation
> or interview would have been helpful in
> establishing the asserted defense, or would
> have developed more than was already known by
> trial counsel. *Commonwealth v. Wade*, 501 Pa.
> 331, 461 A.2d 613 (1983); *Commonwealth v.*
> *Wallace*, 495 Pa. 295, 433 A.2d 856 (1981).

When the defendant appealed from the dismissal of his first PCRA petition, he alleged that trial counsel was ineffective because he failed to personally meet with or consult with him at any time prior to trial. Applying the precedent articulated by the Supreme Court of Pennsylvania in COMMONWEALTH -v- BROOKS, 839 A.2d 245 (Pa. 2003), the Superior Court remanded this matter for an evidentiary hearing on the "no consultation" claim.

In *Brooks*, the defendant stabbed a fellow inmate and was sentenced to death. On appeal, he claimed that trial counsel was ineffective for failing to meet with him face-to-face at any time prior to his trial. At the evidentiary hearing, trial counsel conceded that he never once met personally with the defendant and could only recall one twenty or thirty-minute telephone conversation with the defendant prior to trial.

The Supreme Court in *Brooks* held that "the very nature of a capital case, typically quite involved and always subjecting the defendant to the possibility of death, clearly necessitates at least one in-person meeting between a lawyer and his client before trial begins". *Id* at 249. In reference to the telephone conversation, they also stated that "no lawyer, no matter how talented and efficient, can possibly forge a meaningful relationship with his client and obtain adequate information to defend that client against first-degree murder charges in a single thirty-minute conversation". *Id* at 249.

It would appear that *Brooks* established what could be characterized as a *per se* "one face-to-face" meeting minimum for capital cases. The necessary element of prejudice under *Strickland* and COMMONWEALTH -v- PIERCE, 527 A.2d 973 (Pa. 1987) is presumed by the *Brooks* court where trial counsel fails to conduct at least one in-person meeting with his client prior to a capital trial. If that is a correct interpretation of their holding and its reasoning, then *Brooks* would not afford the defendant any relief, because of the undisputed facts in the instant case.

This defendant conceded at the evidentiary hearing that his trial counsel did, in fact, have a face-to-face meeting

with him at his preliminary hearing, and again when he traveled to Holmesburg Prison to talk to him about his upcoming trial.

Q. When you entered the courtroom, how much after you entered the courtroom did the preliminary hearing begin?
First, was it held that day?

A. The preliminary hearing was held on October the 29th, 1986.

Q. This was the day you met Mr. Gallagher?

A. Yes, Sir.

Q. As you stated, you met him in the courtroom, right?

A. Yes. Yes I did.

Q. How long after you entered the courtroom did the preliminary hearing begin?

A. Within about five minutes.
[N.O.T., Evidentiary Hearing, March 6, 2006 pp. 38-39]

Q. Mr. Gallagher, did he come to see you the the night before trial?

A. It was approximately 7 o'clock in the evening. Mr. Gallagher came to Holmesburg Prison to visit with me.

Q. Prior to his coming to see you at 7 p.m. the night before trial, did you know when your trial was scheduled for?

A. No, Sir.

Q. And when Mr. Gallagher---could you explain to Judge Fitzgerald, and for the record, the nature of that interview the

night before trial?

A.   Well, I received a pass for a visit.   I
come out to the visiting area, and they told
me that my attorney is here.   So I was a bit
stunned.
I come out.   I met with Mr. Gallagher.   Mr.
Gallagher says...

Q.   How long did you meet with Mr. Gallagher for?

A.   Maybe fifteen, 20 minutes, tops.

Q.   What did you discuss?
A.   Mr. Gallagher says, "The Commonwealth
wants to try your case tomorrow."   He said
that, "They're going to put on three
witnesses to say that you were over here
at this house during the time of the
shooting.   We're going to put on our
witnesses to say that you were elsewhere,
selling clothing.   The jury is going to
deliberate, and, hopefully, they'll say
you're not guilty.
[N.O.T., Evidentiary Hearing, March 6, 2006,
 pp. 48-49]

It should be noted that trial counsel, Stephen Gallagher,
was deceased at the time of the evidentiary hearings, and was
thus unable to provide any details about the substance or
duration of the above two meetings. The defendant contends
that neither of these meetings was substantive in nature, and
that trial counsel basically informed him that his capital
murder trial was scheduled to begin the next day during the
"twenty-minute" prison meeting conversation.   However, the
testimony from the evidentiary hearings does answer the
question posed by the Superior Court as to "whether Attorney

Gallagher conducted a substantive, face-to-face pretrial consultation with Appellant". COMMONWEALTH –v– JOHNSON, slip opinion at p. 11.

In light of the challenges that exist in applying *Brooks* to his case and the fact that demonstrating prejudice under *Strickland* is difficult given the overwhelming evidence of guilt in his case, the defendant offers an alternative argument for legal relief. He invokes UNITED STATES –v– CRONIC, 466 U.S. 648 (1984), which was decided by the United States Supreme Court on the same day as *Strickland*. Unlike *Strickland*, which only generates a basis for relief where there is both ineffective assistance of counsel *and* demonstrable prejudice, *Cronic* addresses situations in which a Sixth Amendment violation may be established without any showing of actual prejudice.

The *Cronic* court identified three specific situations involving circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified". The first is where there is "complete denial of counsel". As limited as Mr. Gallagher may have arguably been with his pre-trial preparation, the fact that he called five witnesses, put on a vigorous defense, and was able to spare the defendant the death penalty would seem to

negate the notion that there was a "complete denial of counsel".

The second situation listed by the *Cronic* court would occur when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing". Though the defendant alleges a number of instances in which trial counsel failed to follow up on his requests to investigate leads, subpoena and interview witnesses, and collaborate to devise trial strategy, there is simply no evidence that trial counsel did not "subject" the prosecution's case against the defendant to "meaningful adversarial testing".

The record in this case establishes unequivocally that trial counsel retained an investigator who testified at the evidentiary hearings that he had interviewed numerous witnesses prior to trial---presumably at Mr. Gallagher's request---and that five of those witnesses ending up testifying at trial for the defense. Even the alleged alibi witness, Ronald Crawford, who did not appear to testify at trial, was the subject of extensive efforts on the part of the investigator to secure him as a defense witness. In addition, the record clearly establishes that trial counsel subjected all of the Commonwealth witnesses to meaningful and effective scrutiny and cross-examination.

The third *Cronic* scenario is the situation where counsel is appointed under circumstances that make it virtually impossible for even a competent attorney to provide effective assistance of counsel. The *Cronic* court used the infamous "Scottsboro Boys" case as an example of the magnitude of "impossibility" that a lawyer would have to be laboring under in order to find a Sixth Amendment violation without the need to show actual prejudice. The Supreme Court noted in the *Cronic* opinion that "only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial".

Despite the admittedly meager consultation with the defendant, the record simply does not support the defendant's contention that there was a complete absence of a face-to-face meeting that would entitle him to relief under the *Brooks* doctrine without the need for showing actual prejudice. It is equally clear that nothing that he was deprived of relative to his Sixth Amendment rights could come close to rising to the level of deprivation necessary for *Cronic* relief. The defendant certainly has not proven that his "circumstances justify a presumption of ineffectiveness" as articulated by the *Cronic* court. *Id* at 659.

**CONCLUSION:**

Based upon all of the foregoing facts and applicable law, the defendant's PCRA petition was properly denied. Trial counsel was not ineffective in this jury trial where the evidence against the defendant was overwhelming, and the pre-trial preparation that was done was sufficient to allow the defendant to present a viable defense to the jury. This PCRA Court's order should be affirmed.

BY THE COURT:

_____ J.

# EXHIBIT 4

J. S69001/04

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KEVIN JOHNSON, | : | |
| | : | |
| Appellant | : | No. 467 EDA 2003 |

Appeal from the PCRA Order entered on January 15,
2003, in the Court of Common Pleas of Philadelphia County, Criminal
Division, at No(s). 0800, November Term, 1986.

BEFORE:  LALLY-GREEN, OLSZEWSKI, and TAMILIA, JJ.

MEMORANDUM:                                    Filed: January 31, 2005

Appellant, Kevin Johnson, appeals from the order entered on January 15, 2003, denying his first petition under the Post Conviction Relief Act (PCRA)[1] without a hearing.  We reverse and remand for an evidentiary hearing.

The factual and procedural history of the case is as follows.  On February 4, 1988, a jury convicted Appellant of first-degree murder, possession of an instrument of crime, and criminal conspiracy.  The charges arose from an incident at approximately 10:00 p.m. on October 8, 1986, where Appellant and an accomplice participated in the killing of Lyndon Morris, a drug dealer.  Three eyewitnesses (James Smith, Opal Nickson, and Elijah Bennett) positively identified Appellant as one of the perpetrators.

------------------------------
[1]  42 Pa.C.S.A. §§ 9541-9546.

The accomplice was never found. Appellant maintains that he had an alibi, and that Keith Nickson (Opal Nickson's brother) and/or his Nickson's cohorts committed the killing. After the verdict, the trial court imposed a life sentence. Stephen P. Gallagher, Esq., represented Appellant at trial.

Appellant filed a direct appeal. He raised the following issues: (1) ineffectiveness of trial counsel for failing to object to the court's alibi instruction; (2) trial court error for failing to grant Appellant's motion for a mistrial, after the prosecutor told the jury in his opening statement that Appellant was a hired killer for a rival drug dealer; and (3) prosecutorial misconduct by making references to prior uncharged criminal activity and for commenting on the credibility of witnesses.

This Court affirmed the judgment of sentence in an unpublished memorandum dated March 4, 1992. The Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on September 30, 1992. Appellant was represented by Janice Smarro, Esq., during the direct appeal process.

On December 23, 1996, Appellant filed a *pro se* PCRA petition. Appellant raised the following issues:

1.        Ineffectiveness of trial counsel for failing to investigate and call Evette Debose, Lindell Joyner, and Marsha Wooten as defense witnesses;

2.            Ineffectiveness of trial counsel for failing to communicate with Appellant until the day before jury selection;

3.            Ineffectiveness of counsel for failing to obtain or request exculpatory statements by Keith Nickson;

4.            Prosecutorial misconduct for failing to disclose exculpatory statements by Keith Nickson;

5.            Prosecutorial misconduct and trial court error relating to an inadmissible hearsay statement by John Spencer at trial;

6.            Trial court error for providing only weak curative instructions following prosecutorial misconduct;

7.            Trial court error and ineffectiveness of counsel with respect to the trial court's instructions on conspiracy and first-degree murder; and

8.            Trial court error for failing to grant a mistrial after the prosecutor failed to inform the court that John Spencer participated as a Commonwealth witness in another murder case.

Appellant added boilerplate assertions of ineffectiveness to all of these claims. Appellant developed the first four claims in an attached memorandum of law, but did not do so with the remaining claims.

Appellant attached a number of documents to his petition. Appellant included a letter dated July 6, 1989, from the Office of Disciplinary Counsel

to Appellant. The letter states that the Office investigated Appellant's complaint of misconduct against trial counsel (Steven Gallagher). According to the Office, Attorney Gallagher violated Rules of Professional Conduct 1.3 (attorney shall act with reasonable diligence and promptness); 1.4(a) (attorney shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information); and 8.4(d) (it is professional misconduct to engage in conduct that is prejudicial to the administration of justice). The Office did not list the factual basis for the disciplinary action. The Office noted that the discipline imposed was of a private nature. Appellant also presented an affidavit dated November 22, 1996, stating that Attorney Gallagher failed to communicate with him until the day before jury selection.[2]

Appointed counsel (Andrew G. Gay, Esq.), filed an amended PCRA petition on June 12, 2002. The amended petition incorporated the original petition by reference, and asserted six additional claims.[3] On January 15,

---

[2] Appellant also included an affidavit from Ms. Debose dated September 24, 1993. In the affidavit, she stated that at approximately 10:00 p.m. on the night in question, she saw Appellant and another man selling clothes in front of 5422 Woodland Avenue in Philadelphia.

[3] The additional claims in Appellant's counseled petition were as follows: (1) ineffectiveness for failing to call and investigate character witnesses, and for failing to advise Appellant about the importance of character witnesses; (2) ineffectiveness for failing to present alibi testimony from Ronald Crawford, Conchetta Parks, and Evette Debose; (3) after-discovered recantation evidence from John Spencer; (4) after-discovered recantation evidence from Commonwealth witness James Smith; (5) ineffectiveness for failing to discover and use "the extensive history of Detective Bittenbender's investigative misconduct" during trial; and (6) ineffectiveness for failing to argue that Keith Nickson was an accomplice to the murder. Counsel also filed a motion for discovery. Docket Entry 27.

2003, after giving notice, the PCRA court dismissed the petition without a hearing. This timely *pro se* appeal followed.[4]

Appellant raises four issues on appeal:

1. Did the PCRA court err in failing to address the substantive issues raised by Johnson in his original (*pro se*) PCRA petition?

2. Did PCRA counsel render ineffective assistance of counsel by failing to properly plead and prove appellate counsel's ineffectiveness for failing to raise on direct appeal trial counsel's ineffectiveness for:

   a. Failing to call or even consider calling numerous available good character witnesses to testify on Johnson's behalf at trial;

   b. Failing to present the testimony of alibi witness Ronald Crawford, Evette Debose and Conchetta Parks;

   c. Failing to properly preserve and establish that the Commonwealth violated Johnson's rights to due process of law and confrontation by improperly introducing the hearsay statement of John Spencer at trial and in failing to timely disclose said statement;

   d. Failing to discover and utilize on cross-examination the extensive history of detective Michael Bittenbender's investigative misconduct;

---

[4] The trial court did not order Appellant to file a Concise Statement of Matters Complained of on Appeal under Pa.R.A.P. 1925. On April 9, 2003, the PCRA court filed a Rule 1925 opinion. On May 6, 2003, Appellant filed a petition to proceed *pro se* on appeal. On June 18, 2003, this Court remanded for a hearing to determine whether Appellant's request to proceed *pro se* was knowing, intelligent, and voluntary. On February 4, 2004, the PCRA court granted Appellant's petition to proceed *pro se*. On the same date, Appellant volunteered a *pro se* Concise Statement of Matters Complained of on Appeal under Pa.R.A.P. 1925. It does not appear that the court filed a new opinion in response to this Concise Statement.

      e. Failing to argue that Keith Nickson was an accomplice to the murder?

3.     Did PCRA counsel render ineffective assistance of counsel in filing a motion for discovery that failed to comply with Pa.R.Crim.P. 902(E)(1)?

4.     Did the PCRA court abuse its discretion in failing to conduct a hearing on the recantation affidavit of prosecution witness James Smith?

Appellant's Brief at 4.

Our standard of review for an order denying PCRA relief is whether the record supports the PCRA court's determination, and whether the PCRA court's determination is free of legal error. *Commonwealth v. Allen*, 732 A.2d 582, 586 (Pa. 1999). The PCRA court may dismiss a petition without a hearing if "there are no genuine issues concerning any material fact[,] the defendant is not entitled to relief, and no purpose would be served by any further proceedings." Pa.R.Crim.P. 907. There is no absolute right to an evidentiary hearing on a PCRA petition. *Commonwealth v. Jordan*, 772 A.2d 1011, 1014 (Pa. Super. 2001). We review the court's decision on whether to hold a hearing for an abuse of discretion. *Commonwealth v. Rush*, 838 A.2d 651, 659 (Pa. 2003).

First, Appellant argues that the PCRA court erred by failing to address the issues set forth in his original, *pro se* PCRA petition. Specifically, Appellant claims that the court erred by failing to address his *pro se* claim that trial counsel was ineffective for failing to consult with him at any time before trial. Appellant's Brief at 17-21.

6

The record reflects the following facts. Appellant raised this consultation issue in his original, *pro se* PCRA petition. Appellant included an affidavit dated November 22, 1996, stating that Attorney Gallagher failed to have any meaningful communication with him until trial began. *See*, *Pro Se* PCRA Petition, Exhibit C. According to Appellant, the only pre-trial communication he had with counsel was on the day before jury selection. *Id.* At that meeting, Attorney Gallagher "merely informed [Appellant] that they would be choosing a jury and that trial would begin thereafter." Appellant's *Pro Se* PCRA Petition, Brief at 7, Issue "B". Appointed PCRA counsel incorporated this claim by reference in his amended petition.

Preliminarily, we must determine whether the issue is waived because appointed counsel incorporated it by reference. Incorporation by reference is not a preferred practice. *Commonwealth v. Dodge*, 859 A.2d 771, 774 (Pa. Super. 2004). Nevertheless, it is not prohibited. *See*, *id.*; *Commonwealth v. Wallace*, 724 A.2d 916, 923 n.9 (Pa. 1999).[5] Importantly, the record does **not** reflect that PCRA counsel **abandoned** this issue in an exercise of professional judgment. Rather, counsel adopted Appellant's *pro se* argument into his own amended petition. Moreover, the PCRA court indicated that it reviewed the *pro se* petition before dismissing it.

---

[5] *Compare*, *Moses Taylor Hosp. v. White*, 799 A.2d 802 (Pa. Super. 2002) (an appellate brief which merely incorporates by reference arguments contained elsewhere in the record, and arguments contained in other appeals, impedes meaningful appellate review), *appeal denied*, 808 A.2d 572 (Pa. 2002).

Docket Entry 31; PCRA Court Order, 1/15/2003. Under these circumstances, we cannot conclude that this issue is waived.[6]

We now turn to the merits of this claim. In a PCRA proceeding, we presume that counsel is effective. *Commonwealth v. Brooks*, 839 A.2d 245, 248 (Pa. 2003). Appellant has the burden of proving otherwise. *Id.* To establish that counsel was ineffective, Appellant must establish that: (1) the claim is of arguable merit; (2) counsel had no reasonable basis for his actions; and (3) but for the act or omission in question, the outcome would have been different. *Id.*

In *Brooks*, our Supreme Court granted a new trial where the defendant successfully established that he was facing the death penalty, and counsel failed to have any meaningful, face-to-face consultation with him before trial began. The Court explained its position as follows:

> It should go without saying that no lawyer, no matter how talented and efficient, can possibly forge a meaningful relationship with his client and obtain adequate information to defend that client against first-degree murder charges in a single thirty-minute telephone conversation. Although a lawyer can always learn certain information from his client over the telephone, we simply would be discounting the gravity of a death penalty case were we to say that a lawyer representing a defendant in such a case has done his job effectively when he has spent only limited time on the telephone with his client. Indeed, the very nature of a capital case, typically quite involved and always subjecting the defendant

---

[6] We note that the PCRA court did not address this claim in its opinion. Rather, the court addressed only the new issues set forth in counsel's amended petition. Thus, we do not have the benefit of a trial court opinion on this issue.

> to the possibility of death, clearly necessitates at least one in-person meeting between a lawyer and his client before trial begins. Without such a meeting, there is little to no hope that the client will develop a fundamental base of communication with his attorney, such that the client will freely share important information and work comfortably with the lawyer in developing a defense plan. Moreover, only a face-to-face meeting allows an attorney to assess the client's demeanor, credibility, and the overall impression he might have on a jury. This is of particular importance in cases in which the client may take the stand in his defense or at the penalty phase in an attempt to establish the existence of particular mitigating circumstances. As Appellant was deprived of the benefits of a face-to-face meeting here, it is clear that Appellant's ineffectiveness claim has arguable merit.

*Id.* at 249.

As in **Brooks**, Appellant faced the death penalty in this first-degree murder case.[7] As in **Brooks**, Appellant is claiming that counsel failed to have any substantive face-to-face meetings with him. Given the rationale of **Brooks**, we conclude that Appellant's claim does have arguable merit.

Next, without an evidentiary hearing, it is impossible to determine whether Attorney Gallagher would have had any reasonable basis for failing to meet with his client. Indeed, the **Brooks** Court strongly suggested that there can be **no** excuse for such conduct in a death penalty case. *Id.* at 250.

---

[7] After the jury rendered its verdict, the trial court determined as a matter of law that one particular aggravating factor was not present in the case. N.T., 2/5/1988, at 940. As a result, the Commonwealth chose not to pursue the death penalty. *Id.* Despite these events, the record clearly reflects that Appellant did face the death penalty during trial.

Finally, the **Brooks** Court held that in a capital case, failing to meet with a client face-to-face constitutes sufficient prejudice under the traditional three-part ineffectiveness test for granting a new trial. The Court explained:

> [I]t is also clear that Appellant was prejudiced by [counsel's] failure to meet with him in person prior to trial. [**Commonwealth v. Perry**, 644 A.2d 705, 709 (Pa. 1994) (failure to consult in person is "simply an abdication" of the most basic expectations of defense counsel in a capital case)]. As we have highlighted above, in order to prepare a defense to a charge of murder in the first degree, it is essential that at the very least, counsel meet with his client in person to, *inter alia*, gather information from the client, evaluate the client's demeanor, and try to establish a working relationship. Accordingly, we agree with Appellant that he was denied effective assistance of counsel when [counsel] failed to meet with him even once before his trial on capital charges. Appellant's judgment of sentence is reversed, and we remand this case to the trial court for a new trial.

*Id.* at 250.[8]

---

[8] We have considered the issue of retroactivity in the instant case. We employ a retroactivity analysis where the court announces a **new** rule of law. **Commonwealth v. Grant**, 813 A.2d 726, 738 (Pa. 2002). In concurring opinions, Justices Castille and Eakin described the Majority's approach in **Brooks** as a (presumably new) "*per se* rule." **Brooks**, 839 A.2d at 255 n.8 (Castille, J., concurring); *id.* at 256 (Eakin, J., concurring). Nevertheless, the language of the Majority opinion itself hews to the traditional three-part ineffectiveness test. *Id.* at 248, 250. In other words, **Brooks** does not purport to announce a new *per se* rule, or indeed any distinct break with prior precedent. Rather, the **Brooks** Court applied a given set of facts to an existing body of law, and came to a result which the Court implied is a mere continuation of prior precedent. *Id.* at 250.

Even if the Court did impliedly announce a *per se* rule (*i.e.*, a rule which does not require an individualized showing of prejudice), we would be inclined to follow the reasoning of Justice Castille's concurrence in **Brooks**. In that concurrence, Justice Castille suggested that an unexplained failure to meet with a client before a death penalty trial constitutes a constructive, complete denial of counsel requiring no individualized showing of prejudice under **United States v. Cronic**, 466 U.S. 648 (1984). **Brooks**, 839 A.2d at 255 (Castille, J., concurring). **Cronic** predates Appellant's trial in 1988. Thus, again, we cannot conclude that the **Brooks** Court announced a "new" rule of law for retroactivity purposes. In short,

Turning to the instant case, we conclude that the trial court abused its discretion when it failed to hold an evidentiary hearing on Appellant's claim. If Appellant can establish that his claim is true, he has a significant likelihood of obtaining relief. ***Brooks***. The question of whether Attorney Gallagher conducted a substantive, face-to-face pretrial consultation with Appellant remains a genuine issue of material fact. Thus, this is **not** a case where "there are no genuine issues concerning any material fact[,] the defendant is not entitled to relief, and no purpose would be served by any further proceedings." Pa.R.Crim.P. 907.

Accordingly, we vacate the PCRA court's order dismissing Appellant's petition without a hearing. We remand for an evidentiary hearing on the consultation issue. At this hearing, the PCRA court is free to take evidence and rule on any other outstanding issues in this case, in addition to the consultation issue. Finally, to the extent that Appellant is required to layer his claim of ineffectiveness, this remand will provide him the opportunity to do so. ***See***, ***Commonwealth v. Rush***, 838 A.2d 651, 657 (Pa. 2003). We express no opinion on the merits of any other issues.

Reversed and remanded for further proceedings. Jurisdiction relinquished.

Olszewski, J.: Concurs in Result.

---

we see no basis for employing a retroactivity analysis, and no basis for denying Appellant the benefit of the ***Brooks*** decision.

# EXHIBIT 5

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KEVIN JOHNSON, | : | |
| | : | |
| Appellant | : | No. 2187 EDA 2009 |

Appeal from the PCRA Order July 15, 2009,
Court of Common Pleas, Philadelphia County,
Criminal Division at Nos. Nov. Term 1986 No. 0800
and CP-51-CR-1108001-1986

BEFORE: DONOHUE, LAZARUS and MUNDY, JJ.

MEMORANDUM: **FILED JUNE 27, 2011**

Kevin Johnson ("Johnson") appeals from the order entered by the Court of Common Pleas, Philadelphia County, denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. After careful review, we reverse the order of the PCRA court, vacate the judgment of sentence, and remand the case for a new trial.

We previously summarized the facts of this case as follows:

> The evidence at trial established that decedent Lyndon Morris, a twenty-seven year old male, also known as 'Cowboy', had rented a room at 1226 South 5th Street in Philadelphia from an Opal Nickson and was selling cocaine therefrom. On October 8, 1986, at approximately 10:00 p.m., Morris was in his upstairs room providing cocaine to his 'runner' James Smith[,] who would take orders downstairs, bring money upstairs, and take the cocaine back down.

On this night, [Johnson] knocked on the door, gave a false name, and at point of a .38 caliber gun to the head of James Smith, entered the house. A co-conspirator (who was never apprehended) then put a shotgun to the back of Smith and told him to get 'Cowboy's' door open.

At that time, on the second floor of this house in the back room were Opal Nickson, Angelo Smith, and Elijah Bennett.

After going upstairs, the accomplice with the shotgun proceeded to the front room where the deceased, 'Cowboy' was. [Johnson] went to the back room and, at gunpoint, directed Nickson, Smith, and Bennett to get on the floor.

The accomplice, meanwhile, caused the deceased to open his door and immediately shot him in the chest with the shotgun. [Johnson] then came running from the back room and began firing his handgun in the general direction of the front room door. When [Johnson] got to the door, he went into the room after being told by his accomplice to 'grab the shit.' Both perpetrators then fled.

Lyndon Morris was pronounced dead at 2:10 a.m. on October 9, 198[6]. The medical examiner's testimony at trial established the cause of death as a .38 caliber gunshot wound of the thorax and a shotgun wound of the pelvis. Three persons, James Smith, Opal Nickson, and Elijah Bennett, positively identified [Johnson] as one of the two perpetrators of these crimes.

*Commonwealth v. Johnson*, 1050 Philadelphia 1991 (unpublished memorandum, March 4, 1992), at 1-2 (quoting Trial Court Opinion, 11/15/88, at 2-3) (record citations omitted).

The trial court appointed Attorney Stephen P. Gallagher to represent Johnson. Prior to trial, Attorney Gallagher filed a motion to suppress identification evidence, which the trial court denied. Attorney Gallagher further petitioned the trial court for the appointment of an investigator, which the trial court granted, and submitted notice to the court of an alibi defense, namely that Johnson was selling clothing with a man named Ronald Crawford ("Crawford") between the hours of 8:00 p.m. and 12:00 a.m. on the night of the murder.

A jury trial ensued, at which the Commonwealth presented the aforementioned evidence. In defense, Johnson called several witnesses – Douglas Yancey, James Lawrence, and Wanda F. Johnson – all of whom testified that they saw Johnson on the night of the murder selling clothes with another man out of the trunk of a car in various locations in Philadelphia around 9:00 p.m. and 11:00 p.m., respectively.

Two impeachment witnesses also testified in Johnson's defense. Johnson's mother impeached testimony provided by Nickson that she saw Johnson earlier in the day in his mother's car. Johnson's brother testified that the leather jacket removed from the house by police, which the perpetrator allegedly wore at the time of the murder, belonged to a friend who had left it at the house and not to Johnson.

Lastly, Johnson testified in his own defense. He denied being present at the scene of the murder or having committed the crime. He testified that

he was with Crawford from approximately 8:00 p.m. until 12:00 a.m. on the night of the murder, selling clothes out of the trunk of Crawford's vehicle in various neighborhoods in Philadelphia. He went through the timeline of the night, testifying to his whereabouts and the people he saw at each location. In relevant part, Crawford testified that he saw "Jim and Evette" at approximately 9:45 p.m. at the intersection of Conestoga and Woodland. N.T., 2/2/88, at 704. He then saw individuals he referred to as "Chedda," "Miss Johnson," "Lou," and "Rock" at approximately 10:00 p.m. at the intersection of Cecil and Greenway. *Id.* at 706. From there he testified that he and Crawford drove to "Foxy's Lounge," approximately 15 to 20 minutes away from his last location, where he spoke with a barmaid. *Id.* at 706-07.

Attorney Gallagher informed the trial court that although his investigator had made contact with and taken a corroborating statement from Crawford, he was now unable to locate Crawford to secure his testimony. On the final day of trial, Attorney Gallagher called his investigator to testify regarding his contact with Crawford and subsequent attempts he made to locate him to testify. The investigator stated he had been given a list of approximately 20 people to interview, many of whom he successfully contacted. One of the individuals on the list was Crawford, with whom he had spoken on the phone and in person. The investigator testified that when he went to serve Crawford with a subpoena, he was unable to locate him at the various numbers and addresses he had been provided.

- 4 -

The jury convicted Johnson of first-degree murder, possessing an instrument of crime, and criminal conspiracy.[1] The trial court sentenced him to an aggregate term of life in prison. Attorney Gallagher filed post-sentence motions, which the trial court denied. Attorney Gallagher then filed a direct appeal on Johnson's behalf, but this Court dismissed the appeal on March 29, 1989 because of Attorney Gallagher's failure to submit an appellate brief.

On March 25, 1991, the trial court granted Johnson's request to reinstate his direct appeal rights *nunc pro tunc*. Represented by new counsel, Johnson argued that trial court error, prosecutorial misconduct, and several issues of ineffective assistance of trial counsel entitled him to an arrest of judgment or a new trial. This Court affirmed his judgment of sentence on March 4, 1992.

On December 23, 1996, Johnson filed a timely *pro se* PCRA petition.[2] The PCRA court appointed Attorney Jeremy Gelb to represent Johnson, but he was removed as counsel on March 25, 2002. Attorney Andrew Gay was appointed in his place and filed an amended petition on June 12, 2002. The

---

[1] 18 Pa.C.S.A. §§ 2502(a), 907(b), 903(a).

[2] "The 1995 amendments to the PCRA provided that a first-time PCRA petitioner whose judgment of sentence became final on direct appeal on or before the effective date of the amendments could file a first PCRA petition within one year of the effective date of the amendments (January 16, 1996). Thus, as a 'Grandfather Clause,' every prisoner who had not previously brought a petition for collateral relief, could file a first petition by January 16, 1997, and said petition would be timely without regards to the date of final judgment." ***Commonwealth v. Gamboa-Taylor***, 562 Pa. 70, 74 n.2, 753 A.2d 780, 782 n.2 (2000). Therefore, although Johnson filed his first PCRA petition four years after his judgment of sentence became final, it was nonetheless timely.

PCRA court filed a notice of its intention to dismiss Johnson's PCRA petition pursuant to Pa.R.Crim.P. 907,[3] and dismissed the petition without a hearing on January 14, 2003.

Attorney Gay filed an appeal on Johnson's behalf. Subsequently, Johnson filed a request to proceed *pro se*. This Court remanded the record to the PCRA court with instructions to conduct a ***Grazier***[4] hearing. The PCRA court complied, and determined that Johnson's waiver of his right to counsel was knowing, intelligent, and voluntary, and permitted Attorney Gay to withdraw.

On collateral appeal, this Court addressed only one of the issues raised: Johnson's contention that Attorney Gallagher was ineffective for failing to consult with him prior to trial. We found, pursuant to our Supreme Court's holding in ***Commonwealth v. Brooks***, 576 Pa. 332, 839 A.2d 245 (2003), that the PCRA court erred by dismissing Johnson's petition without an evidentiary hearing, as "[t]he question of whether Attorney Gallagher

---

[3] Rule 907 states, in relevant part:

> [T]he judge shall promptly review the petition, any answer by the attorney for the Commonwealth, and other matters of record relating to the defendant's claim(s). If the judge is satisfied from this review that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings, the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal.

Pa.R.Crim.P. 907(1).

[4] ***Commonwealth v. Grazier***, 552 Pa. 9, 713 A.2d 81 (1998).

conducted a substantive, face-to-face pretrial consultation with [Johnson] remains a genuine issue of material fact." ***Commonwealth v. Johnson***, 467 EDA 2003 (unpublished memorandum, January 31, 2005), at 11. The prior panel concluded that if Johnson was able to establish this fact, he was likely entitled to a new trial because of the necessity of a face-to-face meeting. ***Id.*** at 11. The prior panel stated that the PCRA court was free to take evidence on any additional issues it deemed fit, but expressed no opinion about the merits of the remaining issues raised in Johnson's *pro se* and amended, counseled PCRA petitions.

On remand, Attorney Ronald Greenblatt was appointed to represent Johnson. The PCRA court held evidentiary hearings on March 6, 2006 and April 17, 2006 on the issue of Attorney Gallagher's in-person consultation with Johnson. By that time, Attorney Gallagher had passed away.[5] At the hearings, Johnson presented testimony from Kelly Lynam of the trial court's counsel fee unit, which revealed that there were no records that Attorney Gallagher ever submitted a petition for fees in association with his representation of Johnson.

He also presented evidence that in 1989, in response to a complaint submitted by Johnson, the Disciplinary Board found that Attorney Gallagher had breached the Code of Professional Responsibility and Rules of Professional Conduct. The testifying Disciplinary Board representative had

---

[5] Attorney Gallagher reportedly died in 2005. N.T., 3/6/06, at 71.

no information about the content of the complaint or the reason Attorney Gallagher was found in breach, *i.e.*, whether it was as a result of Attorney Gallagher's failure to consult with Johnson prior to trial, his failure to file an appellate brief on direct appeal, or both. When asked by the Commonwealth, however, the Disciplinary Board representative stated "as a general rule, if someone complains of lack of preparedness, communication at trial, we don't open a file until there's been a finding by a court of competent jurisdiction of ineffectiveness; either PCRA[] or, in federal court, *habeas corpus*." N.T., 3/6/06, at 31.

Johnson testified about the lack of pretrial consultation by Attorney Gallagher. Johnson indicated that he saw Attorney Gallagher at the preliminary hearing, at which time Johnson quickly told him of his alibi. There was no "consultation" at that time, as Attorney Gallagher told Johnson to send him a letter with the relevant information. Subsequently, Johnson sent him several letters providing names and some contact information for alibi witnesses, but never received any response from Attorney Gallagher. Johnson wrote a letter to the trial court in May of 1987 regarding his dissatisfaction with Attorney Gallagher's lack of communication, which the trial court forwarded to Attorney Gallagher. Both letters were admitted into evidence. According to Johnson, Attorney Gallagher continued to fail to communicate with him.

Johnson testified that he might have had a brief phone conversation with Attorney Gallagher, but that they did not discuss anything of substance. He stated that Attorney Gallagher did not visit him in prison until the night before the trial began. The meeting lasted approximately 20 minutes, at which time Attorney Gallagher informed Johnson that trial would start the following day; the Commonwealth would call three witnesses to testify that he was the assailant; and that he would put on witnesses in defense saying that Johnson was elsewhere at the time selling clothing. Prison records admitted into evidence corroborated Johnson's testimony that Attorney Gallagher's sole visit to the prison was on the eve of trial.

Prior to issuing a ruling, the Honorable James J. Fitzgerald, who had been sitting as the PCRA judge, left the Court of Common Pleas to serve by appointment to the Pennsylvania Supreme Court, and the case was reassigned to the Honorable Peter Rogers. The parties submitted post-hearing memoranda. On June 17, 2009, Judge Rogers issued a notice of its intention to dismiss the petition pursuant to Pa.R.Crim.P. 907. On July 15, 2009, Judge Rogers dismissed the petition without conducting any further hearings on the remaining issues in Johnson's PCRA petition.

This timely appeal followed, wherein Johnson raises the following issues for our review:

> 1. Was [Johnson] denied effective assistance of counsel where trial counsel failed to meet face-to-face with [Johnson] in advance of trial, and

otherwise failed to meaningfully consult with his client?

2. Did the PCRA court abuse its discretion in denying [Johnson] a full evidentiary hearing?

3. Due to court error, ineffectiveness of prior counsel, and prosecutorial misconduct, was [Johnson] denied a fair trial in violation of the Sixth and Fourteenth Amendments?

   a. Was [Johnson] denied the effective assistance of counsel where trial counsel failed to investigate and present good character testimony relating to [Johnson's] reputation as peaceful and non-violent [sic]?

   b. Was [Johnson] denied his constitutional right to effective assistance of counsel where trial counsel failed to present known alibi evidence?

   c. Was [Johnson] denied his rights to due process of law and confrontation by the improper introduction of hearsay statements?

   d. Was [Johnson] denied his constitutional rights to due process and the effective assistance of counsel where trial counsel failed to expose and cross-examine on police misconduct?

   e. [Johnson] was denied his constitutional rights to due process and the effective assistance of counsel where trial counsel failed to argue that another suspect was culpable? [sic]

   f. Was [Johnson] denied his constitutional rights to due process because a key witness's testimony was fabricated due to coercion by the police?

Johnson's Brief at 5.[6]

We begin by announcing our standard of review:

> Our standard of review for a decision of a PCRA court in dismissing a PCRA petition is well-settled: In reviewing the propriety of a PCRA court's order, we are limited to determining whether the court's findings are supported by the record and whether the order in question is free of legal error. The PCRA court's findings will not be disturbed if there is any support for the findings in the certified record.

*Commonwealth v. Grant*, 992 A.2d 152, 156 (Pa. Super. 2010) (internal quotations and citations omitted).

As his first issue on appeal, Johnson asserts that trial counsel was ineffective for failing to meaningfully consult with him prior to trial pursuant to the Supreme Court's holding in *Brooks*. Johnson's Brief at 11, 17-18. Although the PCRA court agreed that Attorney Gallagher's representation "was wanting," it found that Johnson failed to prove that he was entitled to relief under the law. PCRA Court Opinion, 6/7/10, at 7-8. We are constrained to disagree.

As we have already stated, this case previously came before this Court on collateral appeal after the PCRA court dismissed Johnson's petition without a hearing. At that time, a panel of this Court found, pursuant to *Brooks*, that Johnson's claim of Attorney Gallagher's ineffectiveness for failing to consult with him prior to trial had arguable merit. *Johnson*, 467

---

[6] As a result of our disposition of Johnson's first issue on appeal, we do not address the remaining issues.

EDA 2003, at 9. We remanded the case to the PCRA court for a hearing to determine "whether Attorney Gallagher conducted a substantive, face-to-face pretrial consultation with [Johnson][.]" *Id.* at 11.

The uncontested facts adduced at the remand hearing reveal that, but for a single 15 to 20 minute meeting at approximately 7:00 p.m. on the night before trial, Attorney Gallagher never came to meet with Johnson. N.T., 3/6/06, at 49. The only evidence of what they discussed at that meeting came from Johnson:

> Q. What did you discuss?
>
> A. Mr. Gallagher says, 'the Commonwealth wants to try your case tomorrow.' He said that, 'they're going to put on three witnesses to say you were over here at this house during the time of the shooting. We're going to put on our witnesses to say that you were elsewhere, selling clothing. The jury is going to deliberate; and, hopefully they'll say you're not guilty.'
>
> Q. Did you have any in-depth discussion with him about which witnesses were being called and notified, anything like that?
>
> A. No. I never even know [sic] the witnesses that he had contacted on my behalf. He didn't tell me then.
>
> Q. After – did you discuss trial procedure, jury selection, anything like that?
>
> A. No, we never spoke about it.
>
> Q. Did you ever go over, in depth, the discovery in this case; that is, the police reports involved in this case?

A. No, sir.

Q. Did you discuss demeanor, and your decision whether or not to testify in this case?

A. No, sir.

Q. What was the discussion about for that [15], 20 minutes?

A. Mr. Gallagher simply said, 'we're going to first start by selecting a jury. After we're done selecting the jury,' the Commonwealth was going to put on their three witnesses to say that they saw me at a particular house during the time of the shooting. And then we were going to put on our witnesses to say that I was selling clothing elsewhere. After that, the jury would deliberate; and from there, he was hoping that I was going to be found not guilty. That's what he told me.

Q. Did he ever tell you which witnesses had been interviewed?

A. No, sir.

Q. Did you know which witnesses had been interviewed?

A. No, sir.

Q. Had you seen the notices, either the alibi notices, or any other notices, that Mr. Gallagher had filed in this case?

A. No, sir.

Q. When the trial began, during the trial, itself, did Mr. Gallagher come to see you during the night to discuss the case, your testimony, anything like that?

\*     \*     \*

A. No.

*Id.* at 49-52.

The PCRA court recognized Attorney Gallagher's **professional and ethical failings** in his representation of Johnson. PCRA Court Opinion, 6/7/10, at 7, 11-12 (emphasis in the original). It nonetheless found that Johnson failed to establish trial counsel's ineffectiveness pursuant to **Brooks** based upon the fact that Johnson "conceded" that counsel conducted a single face-to-face meeting, despite the lack of substantive content discussed at that meeting. *See id.* at 10.

In **Brooks**, our Supreme Court granted the capital defendant a new trial after he successfully proved that counsel failed to meet with him at any time prior to trial. **Brooks**, 576 Pa. at 339, 839 A.2d at 250. The **Brooks** Court broadly held that a capital defendant who establishes that his counsel failed to conduct a face-to-face meeting with him prior to trial is entitled to a new trial under the rule of **Commonwealth v. Pierce**, 515 Pa. 153, 158-59, 527 A.2d 973, 975 (1987).[7] *Id.*; *see also id.* at 340, 839 A.2d at 230

---

[7] The **Pierce** test was adopted in Pennsylvania pursuant to the U.S. Supreme Court's holding in **Strickland v. Washington**, 466 U.S. 668 (1984). In order to overcome the presumption that counsel is effective, a claimant is required to establish the following three prongs: (1) that the underlying claim is of arguable merit; (2) that counsel's action or inaction was not based on a reasonable trial strategy; and (3) that counsel's action or inaction prejudiced the claimant. **Pierce**, 515 Pa. at 158-59, 527 A.2d at 975.

The attorney in **Brooks** failed to meet with his client at all prior to his first-degree murder trial, and instead had only a single 20 to 30 minute telephone conversation with his client. **Brooks**, 576 Pa. at 337, 839 A.2d at 248. The Supreme Court applied the **Pierce** test and held that trial counsel was ineffective. First, it found that an attorney's failure to consult face-to-face with a capital defendant was an issue of arguable merit, because in the absence of a face-to-face meeting, "there is little to no hope that the client will develop a fundamental base of communication with his attorney, such that the client will freely share

(Castille, J., concurring) (disagreeing with the Majority's establishment of a *per se* rule for instances where a lawyer fails to meet a capital client face-to-face prior to trial).[8]

The prior panel of this Court that reviewed Johnson's first collateral appeal interpreted ***Brooks*** as not only requiring a general in-person

---

important information and work comfortably with the lawyer in developing a defense plan." *Id.* at 337-38, 839 A.2d at 249.

Our Supreme Court also found that counsel had no reasonable strategic basis for failing to meet with Brooks in person prior to trial. At the post-trial hearing, defense counsel testified that he understood Brooks was a "contentious" person, and thought it best to limit in-person contact prior to trial to avoid a potential conflict in their relationship. *Id.* at 339, 839 A.2d at 249-50. Counsel also testified that he had a "full schedule" and was too busy to meet with the defendant prior to trial. *Id.* at 339, 839 A.2d at 250. Both of these excuses were rejected and the Court concluded that the failure "to have personal contact with a client prior to that client's trial on capital charges is simply an abdication of the most basic expectations of defense counsel in a capital case." *Id.* (quotation and citation omitted).

The ***Brooks*** Court likewise found that the defendant was prejudiced by the attorney's failure to consult with him in person prior to trial, as "it is essential that, at the very least, counsel meet with his client in person to, *inter alia*, gather information from the client, evaluate the client's demeanor, and try to establish a working relationship." *Id.* at 250, 839 A.2d at 339.

[8] In his concurring opinion, then-Justice (now Chief Justice) Castille found error in the Majority's use of ***Strickland/Pierce*** in determining that counsel's performance was deficient. *Id.* at 250, 339 A.2d at 340 (Castille, J., concurring). Rather, Justice Castille stated that, although a close call, because of the specific circumstances presented in ***Brooks***, the case was more properly governed by ***United States v. Cronic***, 466 U.S. 648 (1984). ***Cronic***, which was decided the same day as ***Strickland***, set forth circumstances wherein counsel is ineffective *per se*, including, *inter alia*, the complete denial of counsel at a critical stage of trial. *Id.* at 659-60. Justice Castille stated that the record reflects that Brooks represented himself for several portions of the trial solely because of a "total breakdown in the attorney-client relationship" based upon counsel's failure to meet with Brooks or return Brooks' letters and phone calls. ***Brooks***, 576 Pa. at 346, 839 A.2d at 254 (Castille, J., concurring). This effectively led to Brooks being "unrepresented by counsel" during the critical pretrial stage of the proceeding. *Id.* at 346, 839 A.2d at 254. Thus, under ***Cronic***, Brooks would not have been required to prove "actual prejudice in the sense of proving the unreliability of the guilt-phase verdict," and the result would have been the same – the grant of a new trial because of counsel's ineffectiveness. *Id.* at 347, 839 A.2d at 255. Justice Castille disagreed, however, with the Majority's suggestion that the failure of an attorney to conduct a face-to-face meeting with a client prior to trial is itself constitutionally ineffective assistance under ***Strickland/Pierce***. *Id.*

meeting, but a "**substantive**, face-to-face meeting[.]" **Johnson**, 467 EDA 2003, at 9.[9] The panel was aware that Attorney Gallagher did, in fact, visit Johnson once prior to trial, but did not have any information regarding the **content** of that meeting, and thus remanded the case for a hearing on that issue. **See id.** at 7, 11. As Johnson observed, we are bound by the decision of the prior panel in this case pursuant to the law of the case doctrine.[10] **See** Johnson's Brief at 27-28.

---

[9] We do not disagree with the prior panel's interpretation of **Brooks**. Our review of **Brooks** leads us to the conclusion that the policy behind the Supreme Court's decision is to emphasize the importance of a developed attorney-client relationship, at least in the context of a capital murder case. **See id.** at 339, 839 A.2d at 250. The **Brooks** Court was unanimous on this issue. It is clear from Johnson's testimony that Attorney Gallagher made no effort to establish a working relationship with Johnson. Moreover, we fail to see how the non-substantive meeting that took place on the eve of trial in any way informed Attorney Gallagher about the case, or Johnson's demeanor. This is particularly significant where, as here, Johnson testified in his own defense at trial. **See** N.T., 2/2/88, at 678-748; **Brooks**, 576 Pa. at 338, 839 A.2d at 249.

Because of the broad rule announced in **Brooks**, we are precluded from considering the fact that counsel arguably otherwise provided Johnson with effective representation pretrial and at trial, as well as the volume of evidence of Johnson's guilt.

[10] The law of the case doctrine has been defined by our Supreme Court as follows:

> This doctrine refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. Among the related but distinct rules which make up the law of the case doctrine are that: (1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

**Commonwealth v. Starr**, 541 Pa. 564, 574, 664 A.2d 1326, 1331 (1995).

The only question left outstanding by the prior panel of this Court was whether Attorney Gallagher conducted a **substantive** face-to-face interview with Johnson prior to trial.[11]  As the uncontested evidence of record reflects, the answer to that question is no.  Prison records and pretrial letters sent by Johnson to the trial court and to Attorney Gallagher corroborate Johnson's uncontroverted testimony regarding Attorney Gallagher's lack of communication with Johnson and failure to visit Johnson other than on the eve of trial.  **See** PCRA Exhibits P-8, P-10, P-11, P-12.  To the extent that an eleventh-hour visit could ever qualify as substantive or be considered effective representation under **Brooks**, it clearly was not in this case, as the record reflects that the meeting was not used to "gather information from the client, evaluate the client's demeanor, and try to establish a working relationship."  **Brooks**, 576 Pa. at 339, 839 A.2d at 250; **Johnson**, 467 EDA 2003, at 10.

---

[11]  The prior panel noted that Johnson was entitled to a hearing on the issue of trial counsel's failure to meet with him, indicating that without a hearing, it would be impossible to determine whether counsel's failing was unreasonable. **Johnson**, 467 EDA 2003, at 9. However, the prior panel limited its remand to the question of the substantive nature of the meeting. **Id.** at 11.  The prior panel further emphasized its reliance on the **Brooks** Court's focus on the essential nature of a face-to-face interview between attorney and client under the circumstances presented: "[I]n order to prepare a defense to a charge of murder in the first degree, it is essential that at the very least, counsel meet with his client in person to, *inter alia*, gather information from the client, evaluate the client's demeanor, and try to establish a working relationship." **Id.** at 10 (quoting **Brooks**, 576 Pa. at 339, 839 A.2d at 250).

In its untimely filed responsive brief,[12] the Commonwealth asserts that Johnson's claim is barred by 42 Pa.C.S.A. § 9543(b). Commonwealth's Brief at 8. Specifically, the Commonwealth argues that because Attorney Gallagher was deceased at the time the remand hearing took place, "the Commonwealth was necessarily prejudiced in its ability to respond to this specific claim," as it was effectively prevented from presenting any witnesses who could rebut Johnson's testimony regarding the nature of the pretrial consultations between Johnson and Attorney Gallagher. *Id.* at 9-10. The Commonwealth asserts that it is "entitled to a hearing to demonstrate prejudice" if this Court should reverse the decision of the PCRA court on this issue. *Id.* at 10.

Section 9543(b) states:

> Even if the petitioner has met the requirements of subsection (a), the petition shall be dismissed if it appears at any time that, because of delay in filing the petition, the Commonwealth has been prejudiced either in its ability to respond to the petition or in its ability to re-try the petitioner. **A petition may be dismissed due to delay in the filing by the petitioner only after a hearing upon a motion to dismiss.** This subsection does not apply if the petitioner shows that the petition is based on grounds of which the petitioner could not have discovered by the exercise of reasonable diligence before the delay became prejudicial to the Commonwealth.

---

[12] The record reflects that the Commonwealth requested and was granted an extension of time to file its responsive brief on August 5, 2010. Its brief was due on October 18, 2010. Order, 8/5/10. The Commonwealth did not file its brief until nearly six months beyond its extended deadline.

42 Pa.C.S.A. § 9543(b) (emphasis added).

The Legislature added the emphasized portion of the statute to the PCRA in 1995, effective January 16, 1996. **See** 1995 Pa. ALS 32, 1. Prior to this addition, subsection 9543(b) was a "hurdle" the defendant had the burden of overcoming. **See, e.g., Commonwealth v. Weinder**, 577 A.2d 1364, 1375 (Pa. Super. 1990). Since the adoption of the 1995 amendments, however, section 9543(b) explicitly requires that the Commonwealth raise the argument that it was prejudiced in its ability to respond to the PCRA petition and/or to retry the defendant in a motion to dismiss. **See Commonwealth v. Jones**, 590 Pa. 202, 240, 912 A.2d 268, 290-91 (2006).

We have reviewed the record and observe that the Commonwealth failed to raise this argument in any of its motions to dismiss filed throughout the PCRA proceedings, including the post-hearing motion to dismiss filed in 2008. **See generally** Commonwealth's Post-Hearing Motion to Dismiss, 1/9/08. Indeed, the Commonwealth does not cite to any portion of the record in support of this claim or otherwise contend that it properly preserved this issue for appeal. As such, we find that this potentially meritorious argument is waived.[13] **Id.** at 240, 912 A.2d at 291.

---

[13] The Commonwealth was arguably prejudiced in its ability to respond to Johnson's "failure to consult" argument because of Attorney Gallagher's death prior to the hearing. We cannot say whether this prejudice was the result of Johnson's delay in filing his *pro se* PCRA petition, or the lengthy delays that seemed to encumber this case at almost every stage. **See** *supra* pp. 5-7, 9.

In sum, we conclude that the PCRA court erred by dismissing Johnson's petition on this issue, as Attorney Gallagher was ineffective in his representation of Johnson for failing to adequately consult with him prior to trial. ***See Brooks***, 576 Pa. at 339, 839 A.2d at 250; 42 Pa.C.S.A. 9543(a)(2)(ii). We therefore reverse the order of the PCRA court, vacate the judgment of sentence, and remand the case for a new trial.

Order reversed. Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

Mundy, J. files a Dissenting Statement.

Judgment Entered.

Prothonotary

Date: JUN 2 7 2011

---

Furthermore, we are cognizant of the fact that the new trial will take place 23 years after Johnson's initial conviction. We note, however, that the Commonwealth never raised the argument – even on appeal – that it would be prejudiced in its ability to retry Johnson.

| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KEVIN JOHNSON, | : | |
| | : | |
| Appellant | : | No. 2187 EDA 2009 |

Appeal from the PCRA Order entered July 15, 2009
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s): CP-51-CR-1108001-1986; November Term 1986, No. 0800

BEFORE: DONOHUE, MUNDY, and FITZGERALD,* JJ.

DISSENTING STATEMENT BY MUNDY, J.:            **FILED JUNE 27, 2011**

Because I conclude the facts of the instant case differ significantly

from those in **Commonwealth v. Brooks**, 839 A.2d 245 (Pa. 2003), relied

on by the Majority, I respectfully dissent. Therein, counsel never met with

defendant face to face prior to trial, where defendant was found guilty of

first-degree murder and was subsequently sentenced to death. In the case

*sub judice*, the evidence establishes that Attorney Gallagher represented

Johnson at his preliminary hearing and criminal arraignment, conducted a

face to face meeting at the prison with Johnson prior to trial, and performed

at least one telephone consultation.

While more contact may have been advisable, I do not believe the

length and frequency of the consultations can itself support a finding of

ineffectiveness. More significant to determining the substantive impact of

the consultations is the fact that Attorney Gallagher presented a cogent trial

* Former Justice specially assigned to the Superior Court

strategy, which included presenting three alibi witnesses, two character witnesses, and Johnson's testimony supportive of his alibi defense. Although the jury convicted Johnson of first-degree murder, it declined to impose the death penalty in light of the defense presented. The PCRA court aptly noted the following.

> As limited as Mr. Gallagher may have arguably been with his pre-trial preparation, the fact that he called five witnesses, put on a vigorous defense, and was able to spare the defendant the death penalty would seem to negate the notion that there was a "complete denial of counsel[."]

PCRA Court Opinion, 7/7/10, at 13-14.

To determine that counsel was ineffective, Appellant has the burden to establish that: (1) the claim is of arguable merit; (2) counsel had no reasonable basis for his actions; and (3) but for the act or omission in question, the outcome would have been different. ***Commonwealth v. Pierce***, 527 A.2d 973 (Pa. 1987). The ***Pierce*** test is applicable to our analysis in these proceedings.

On Appellant's first collateral appeal, a prior panel of this Court interpreted the Supreme Court's decision in ***Brooks*** in the following manner.

> "[T]he language of the Majority opinion itself hews to the traditional three-part ineffectiveness test. In other words, ***Brooks*** does not purport to announce a new *per se* rule, or indeed any distinct break with prior precedent. Rather, the ***Brooks*** Court applied a given set of facts to an existing body of law, and came to a result which the Court implied is a mere continuation of prior precedent.

***Commonwealth v. Johnson***, 873 A.2d 768 (Pa. Super. 2005) (unpublished memorandum); 467 EDA 2003 at 10, fn8 (citations omitted). The Panel's remand for a hearing on the content of counsel's consultations with Johnson did not, in my view, preclude consideration of the circumstances expressed above in determining the substantive impact of that content.

Thus, I disagree with the majority's conclusion that "[b]ecause of the broad rule announced in ***Brooks***, we are precluded from considering the fact that counsel arguably otherwise provided Johnson with effective representation pretrial and at trial, as well as the volume of evidence of Johnson's guilt." Majority Memorandum at 16, fn.9. Rather, I agree with the PCRA court's finding that the prejudice prong of the ***Pierce*** test has not been met in this case.

For these reasons, I respectfully dissent from the Majority and would affirm the PCRA court.