IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN F. JOHNSON,                    :
                                     :    CIVIL ACTION
          Petitioner,                :    NO. 13-03197
                                     :
          v.                         :
                                     :
JOHN W. KERESTES, et al.,            :
                                     :
          Respondents.               :

M E M O R A N D U M

EDUARDO C. ROBRENO                              JULY 24, 2023

**CONTENTS**

Prologue................................................... 2
I.   Introduction ......................................... 2
II.  Background ........................................... 7
III. Legal Standard ...................................... 10
IV.  Discussion .......................................... 14
     A.   Procedural Default and Waiver .................. 14
     B.   Brady Claims ................................... 16
          1.   Legal Standard Under Brady ................ 17
          2.   Effect of Procedural Default .............. 22
          3.   The Arrest Photo .......................... 34
     C.   Ineffective Assistance of Counsel Claims ....... 39
          1.   Legal Standard ............................ 40
          2.   Discussion ................................ 43
     D.   Prosecutorial Misconduct ....................... 58
     E.   Cumulative Prejudice ........................... 59
          1.   Legal Standard ............................ 59
          2.   Discussion ................................ 62
     F.   Actual Innocence ............................... 65
          1.   Legal Standard ............................ 65
          2.   Discussion ................................ 67
V.   Conclusion .......................................... 71

**PROLOGUE**

This is a § 2254 petition seeking habeas corpus relief.
Kevin Johnson ("Petitioner") was convicted of first-degree
murder in the Philadelphia Court of Common Pleas in 1988. Before
the Court is a stipulation and settlement agreement entered into
by Petitioner, John W. Kerestes, and the District Attorney of
the County of Philadelphia ("Respondents"), which, if approved,
would vacate the state court conviction and allow Petitioner to
plead no contest to charges of third-degree murder, criminal
conspiracy, and possession of an instrument of crime, and be
resentenced to a cumulative sentence of no greater than 10 to 20
years imprisonment including credit for time served.

For the reasons that follow, the stipulation and settlement
agreement will not be approved and the request for habeas relief
will be denied.

**I. INTRODUCTION**

On the evening of October 8, 1986, Lyndon "Cowboy" Morris,
a known drug dealer, was shot to death by two people inside the
home of Opal Nickson. Aside from the two shooters, at least four
other people were in the house at the time: Opal Nickson, Angelo
Smith, James Smith, and Elijah Bennett.[1] Those four people--

---

[1] The witnesses' statements to the police and at trial are
inconclusive as to whether another person, "Abdullah" or
"Abdul," was also in the house at the time.

Nickson, Angelo Smith, James Smith, and Bennett, were all under the influence of alcohol, cocaine, and or marijuana at the time of the shooting. In the hours shortly after the shooting, each of these four witnesses identified Petitioner as one of the shooters, based on an array of photographs. No other person was identified as the other shooter. Petitioner was arrested on October 10, 1986, charged with capital murder on October 29, 1986, and ultimately proceeded to trial in late 1987. On February 4, 1988, in the Philadelphia County Court of Common Pleas, Petitioner was convicted by a jury of first-degree murder, possession of an instrument of crime, and criminal conspiracy.

Since then, Petitioner has repeatedly challenged his conviction. After unsuccessfully appealing his conviction, he filed his first PCRA petition in 1996 raising several issues, including ineffective assistance of counsel. The PCRA court denied the petition in 2003, but the Superior Court reversed on appeal in 2005 and remanded for an evidentiary hearing, addressing only the ineffective assistance of counsel claim contained within the PCRA petition.[2] After a hearing, in 2009,

_____

[2] As discussed in greater detail below, at this point in time, Petitioner was aware of the recantation of one eyewitness, James Smith. Petitioner presented this recantation to the court, but the PCRA court found that one recantation, in light of the other evidence, would not have affected the result of the trial.

the PCRA court denied the claim. In 2011, on appeal, the
Superior Court granted Petitioner a new trial on the basis of
his ineffectiveness of counsel claim. However, following
rehearing en banc in 2012, the Superior Court vacated its
decision and affirmed the PCRA court's prior denial of relief.
Petitioner then filed a federal habeas petition in 2013.

During the pendency of Petitioner's federal habeas
petition, Petitioner obtained several pieces of new evidence,
including the 2014 affidavits of Opal Nickson, Angelo Smith,
James Smith, and Elijah Bennett. In these new affidavits, all
four eyewitnesses stated that they were coerced into identifying
Petitioner as the man with the pistol. After requesting and
being granted a stay of the federal habeas proceedings,
Petitioner filed another PCRA petition on the basis of newly
discovered evidence. The PCRA court rejected this claim, finding
that (1) Petitioner did not act with the requisite diligence in
uncovering this new evidence to trigger equitable tolling of the
statute of limitations, (2) the government interference
exception did not apply, and (3) Pennsylvania does not recognize
an "actual innocence" equitable exception to the PCRA statute of
limitations. The Superior Court affirmed denial of the PCRA
petition in 2018.

At this point, the parties resumed litigating the federal
habeas claims, engaging in limited discovery. In May 2019,

Respondents produced the arrest photos taken of Petitioner on October 10, 1986. Petitioner then requested and was granted another stay to present this newly discovered evidence to the state courts in a third PCRA petition.[3]

In 2021, Petitioner and Respondents submitted a settlement agreement for the Court's review, describing Petitioner's assertions and Respondents' concessions that there were sufficient constitutional errors at trial to undermine the legitimacy of the jury's verdict. The Court then held a hearing to consider whether to approve the settlement agreement.

At the conclusion of the hearing, the Court requested that the parties supplement their original briefing regarding (1) the Court's power to grant relief in the form of approving a settlement agreement of a writ for habeas corpus and (2) the legal and factual basis supporting the requested relief. Because both parties agreed that Petitioner's claims warrant habeas relief, and therefore the proceeding was no longer adversarial, the Court sought input from the Pennsylvania Attorney General as amicus curiae.[4]

_____

[3] This petition was withdrawn in 2021 before the PCRA court could address the merits.

[4] The Court would like to thank then-Attorney General Josh Shapiro and then-Deputy Attorney General Michelle Henry and their staff, for their thorough briefing as amicus in this non-adversarial petition, which assisted the Court greatly in understanding and coming to judgment on the complex factual and

At this point, with the benefit of input from amicus, Petitioner's petition for a writ of habeas corpus (including the numerous amendments and supplements), the settlement agreement, and the briefing in support are ripe for review.[5]

Respondents urge the Court to approve the settlement agreement, arguing that Court possesses the power to "dispose of the habeas petition as law and justice require." Resp'ts' Suppl. Br. at 1, ECF No. 85 (quoting 28 U.S.C. § 2243). The Court certainly possesses "broad discretion in conditioning a judgment granting habeas relief." Hilton v. Braunskill, 481 U.S. 770, 775 (1987) (describing a habeas court's discretion as broad in the context of a stay of relief pending appeal).

But the Court does not possess unfettered discretion to order a state prisoner released without assuring itself that the

_____

legal issues present in this case. The District Attorney's office did not object to the participation of the Office of the Attorney General. Hr'g Tr. at 32:2-10, ECF No. 86.

[5] The documents referenced herein are: Pet. for Writ of Habeas Corpus, ECF No. 1 (filed June 12, 2013); Am. Pet. for Writ of Habeas Corpus, ECF No. 17 (filed Nov. 8, 2013); Suppl. & Am. to Pet. for Writ of Habeas Corpus, ECF No. 36 (filed Oct. 6, 2014); Suppl. Appendix, ECF No. 37 (filed Oct. 6, 2014); Third Am. & Suppl. to Pet. for Writ of Habeas Corpus, ECF No. 68 (filed May 22, 2020); Settlement Agreement, ECF No. 77 (filed Oct. 14, 2021); Pet'r's Suppl. Br. in Support of Habeas Relief, ECF No. 84 (filed Oct. 11, 2022); Resp'ts' Suppl Br. in Support of Habeas Relief (ECF No. 85); Brief of Pa. Att'y Gen. as Amicus Curiae, ECF No. 91 (filed Jan. 23, 2023); Pet'r's Reply Brief, ECF No. 92 (filed Mar. 9, 2023); Fourth Am. & Suppl. to Pet. for Writ of Habeas Corpus, ECF No. 93-1 (filed Mar. 9, 2023); Resp'ts' Reply Brief, ECF No. 94 (filed Mar. 9, 2023).

petitioner's claims have merit. See Wharton v. Vaughn, 371 F. Supp. 3d 195, 198-99 (E.D. Pa. Mar. 4, 2019) (Goldberg, J.); accord Vando v. Clark, No. 21-724, 2023 WL 329422, at *4 (E.D. Pa. Jan. 20, 2023) (Robreno, J.) (quoting Wharton, 371 F. Supp. 3d at 199); cf. Commonwealth v. Brown, 196 A.3d 130, 145 (Pa. 2018) ("[T]he PCRA requires judicial merits review favorable to the petitioner before any relief may be granted. A confession of error by the Commonwealth does not constitute a judicial ruling in Brown's favor, and thus is insufficient for any grant of relief under the PCRA."). And although this is not a review of a federal conviction, the principle that "federal prisoners seeking postconviction relief via § 2255 cannot resolve their claim outside the courthouse," Brown v. United States, 748 F.3d 1045, 1066 (11th Cir. 2014), is equally applicable to habeas review of a state conviction. The Court finds, therefore, that it must review the merits of Petitioner's claims, not merely rubber stamp them, before determining whether the proposed stipulation and settlement agreement may be approved.

## II.  BACKGROUND

Petitioner's claims for relief are spread out across a number of supplements and amendments to his original petition. As summarized in the Settlement Agreement, ECF No. 77, Petitioner currently claims that the following constitutional violations undermine the validity of his sentence:

7

(1) Respondents' failure to disclose material, exculpatory evidence; (2) ineffective assistance of trial counsel; and (3) prosecutorial and police misconduct which denied Petitioner due process of law. Petitioner further brings an actual innocence claim, arguing that his conviction and sentence represent a fundamental miscarriage of justice as a result of the Commonwealth's misconduct and ineffective assistance of counsel. He brings the actual innocence claim as a freestanding claim, or, in the alternative, as a gateway claim to review any procedurally barred constitutional claims.

First, Petitioner claims that three <u>Brady</u> violations undermine his conviction. Respondents suppressed the arrest photograph of Petitioner, taken approximately two days after the shooting. Petitioner argues that this photograph would have been favorable and material had it been disclosed at the time of trial, as Petitioner's appearance shortly after the shooting occurred is not consistent with the witnesses' descriptions of the man with the pistol. Petitioner also argues that Respondents wrongfully suppressed eyewitness Angelo Smith's readiness to testify and inability to positively identify Petitioner in person. Petitioner states that, had this information been disclosed at trial, he would have been able to call Angelo Smith as a defense witness to support the misidentification and police coercion theory of defense. Lastly, Petitioner claims that

Respondents wrongfully suppressed Opal Nickson's statements to police and or the prosecutor that, while Petitioner looked somewhat like the man with the pistol, his skin color was significantly lighter than the man with the pistol. Petitioner argues that this statement would have been favorable as it would have further undercut the prosecution's identification case.

Second, Petitioner argues that trial counsel was ineffective for failing to (1) substantively meet and consult with him before trial; (2) obtain and use the arrest photographs at trial; (3) interview and present testimony from Angelo Smith or request a missing witness instruction; (4) present a complete alibi defense on the basis of known alibi witnesses; (5) inculpate any other person; (6) investigate and expose police misconduct; and (7) present good character testimony.

Third, Petitioner contends, based on witnesses' statements in the 2001 and 2014 affidavits, that (1) the witnesses' identifications to police and at trial were coerced; (2) the prosecutor improperly fabricated a motive for the murder, calling Petitioner a hitman for a rival drug dealer; (3) the prosecutor engaged in highly improper cross-examination of Petitioner; and (4) the prosecutor affirmatively misrepresented Angelo Smith's ability to testify.

Fourth, Petitioner claims that he is actually innocent. In support of this argument, Petitioner points to (1) the general

9

unreliability of eyewitness identifications; (2) the
circumstances of the identifications in this case; (3) the
subsequent recantations; and (4) Petitioner's adamance over the
past thirty plus years that he is innocent and was selling
clothes at the time of the shooting.

The Court will address each claim seriatim.

## III. LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of
1996 (AEDPA),

> An application for a writ of habeas corpus on behalf
> of a person in custody pursuant to the judgment of a
> State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "For reasons of finality, comity, and
federalism, habeas petitioners 'are not entitled to habeas
relief based on trial error unless they can establish that it
resulted in actual prejudice.'" Davis v. Ayala, 576 U.S. 257,
267 (2015) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637
(1993)). As the Third Circuit has noted,

> Consistent with Supreme Court precedent, we read
> § 2254(d) to require three distinct legal inquiries.
> See, e.g., Harrington v. Richter, --- U.S. ----, 131 S.
> Ct. 770, 785, 178 L. Ed. 2d 624 (2011). First, we "must

> inquire whether the state court decision was 'contrary
> to' clearly established federal law, as determined by
> the Supreme Court of the United States; second, if it
> was not, [we] must evaluate whether the state court
> judgment rests upon an objectively unreasonable
> application of clearly established Supreme Court
> jurisprudence." Matteo v. Superintendent, SCI Albion,
> 171 F.3d 877, 880 (3d Cir. 1999) (en banc). Third, we
> must ask whether the state court decision "was based on
> an unreasonable determination of the facts in light of
> the evidence presented" to the state court. 28 U.S.C.
> § 2254(d)(2).

Blystone v. Horn, 664 F.3d 397, 417 (3d Cir. 2011). In

addition, "a determination of a factual issue made by a

State court shall be presumed to be correct. The applicant

shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence." 28 U.S.C.

§ 2254(e)(1).

Importantly, a federal district court sitting in habeas

does not have jurisdiction to "review a question of federal law

decided by a state court if the decision of that court rests on

a state law ground that is independent of the federal question

and adequate to support the judgment." Coleman v. Thompson, 501

U.S. 722, 729 (1991). This is because of "concerns of comity and

federalism," and thus applies regardless of whether the state

law ground is substantive or procedural. Id. at 729, 730.

Similarly, a district court sitting in habeas generally cannot

review a petitioner's claim that was never presented to a state

court. See, e.g., Preiser v. Rodriguez, 411 U.S. 475, 492 (1973)

(describing as "strong" the "considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors"); Shinn v. Ramirez, 142 S. Ct. 1718, 1732 (2022) ("Ordinarily, a state prisoner satisfies [AEDPA's] exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures."). Thus, a petitioner's failure to properly present all his federal claims of error to a state court "will bar federal habeas unless the petitioner demonstrates cause and actual prejudice." Coleman, 501 U.S. at 748 (citing Engle v. Isaac, 456 U.S. 107, 129 (1982)).

But, where a "prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," a federal habeas court may review the defaulted claims. Coleman, 501 U.S. at 750. "Cause" typically refers to circumstances outside of a petitioner's control. Id. at 753 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)). Attorney error will only constitute "cause" where such error constitutes ineffective assistance of counsel. Id. at 753-54. The "miscarriage of justice" exception requires a showing of actual innocence, i.e., "new reliable evidence," such as "scientific evidence, trustworthy eyewitness accounts, or critical physical

evidence" that would make it more likely than not that no juror, acting reasonably, would have voted to find a petitioner guilty beyond a reasonable doubt. House v. Bell, 547 U.S. 518, 536-38 (2006) (quoting Schlup v. Delo, 513 U.S. 298, 324, 329 (1995)).

Respondents to habeas petitions can elect to waive procedural defaults. This is so because "[e]xhaustion is not a jurisdictional limitation." Munchinski v. Wilson, 807 F. Supp. 2d 242, 269 (W.D. Pa. 2011) (citation omitted). As relevant to this case, the Pennsylvania Postconviction Relief Act statute of limitations is jurisdictional. See, e.g., Commonwealth v. Brown, 143 A.3d 418, 420 (Pa. Super. 2016) ("This time requirement is mandatory and jurisdictional in nature, and the court may not ignore it in order to reach the merits of the petition.").[6]

But, as amicus urges, the Court can reject a waiver of exhaustion. See, e.g., Hull v. Freeman, 932 F.2d 159, 164 (3d Cir. 1991), overruled on other grounds by Coleman v. Thompson, 501 U.S. 722 (1991) (addressing exhaustion of state remedies and procedural default sua sponte); Christy v. Horn, 115 F.3d 201, 207 n.3 (3d Cir. 1997) ("We point out that the Commonwealth may waive exhaustion . . . thereby permitting the district court to

---

[6] By contrast, "[t]he AEDPA 'statute of limitations defense . . . is not jurisdictional.' It does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" Holland v. Florida, 560 U.S. 631, 645 (2010) (quoting Day v. McDonough, 547 U.S. 198, 205, 208 (2006)). Equitable tolling is thus available under AEDPA. Id. at 649.

review the petition as filed. The district court is not required, however, to accept a waiver and may require state court exhaustion."). When a state court does not reach the merits of a petitioner's claim--either those claims properly presented to a state court but not ruled upon, or those claims not presented to a state court but where the defenses of exhaustion and procedural default are waived by the respondent-- the Court reviews the claims de novo. See, e.g., Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

## IV.  DISCUSSION

### A.  Procedural Default and Waiver

As a preliminary matter, the Court must address its jurisdiction to consider the habeas petition, given Petitioner's mix of claims that were (1) presented to the state court and adjudicated on the merits; (2) presented to the state court but rejected on procedural grounds; and (3) not presented to the state court.

The Attorney General, as amicus, contends that "virtually all of the constitutional claims listed in the [settlement] agreement are procedurally defaulted, because petitioner chose to wait too long to raise them in state court, and then intentionally withdrew even those that were timely." Att'y Gen. Amicus Br. at 27, ECF No. 91. Moreover, amicus argues, Petitioner "blocked the state courts from developing the facts,

14

let alone from reaching the merits," in an act of forum shopping. Id. Amicus thus urges the Court to exercise its discretion in reviewing the petition and disregard the waivers invoked by Respondents.

Respondents, on the other hand, contend that the Court does not have the discretion to ignore an intentional waiver of all non-jurisdictional defenses and address defenses such as exhaustion and timeliness sua sponte. See ECF No. 94-1 at 8 (discussing Wood v. Milyard, 566 U.S. 463 (2012)).

Given that Petitioner was convicted in 1988, the original federal habeas petition has been pending since 2013, the parties represent that the eyewitnesses and Petitioner's former attorneys are either dead or unavailable, and that further delay will not serve the interest of justice, the Court will accept Respondents' waiver of potential timeliness and nonexhaustion defenses to those of Petitioner's claims that have not been properly presented either to the state courts or to this Court. Under these circumstances, the Court will review the unexhausted claims de novo. Appel, 250 F.3d at 210. However, given the interests in finality and comity, the Court will not accept the waiver as to claims that were presented to, but rejected by, the state courts on procedural grounds.[7]

---

[7] As discussed below, given that Pennsylvania does not recognize an equitable exception to the PCRA statute of limitations

B.   **Brady Claims**

Petitioner claims that his right to a fair trial was violated by the prosecution's failure to produce exculpatory evidence. The allegedly suppressed pieces of evidence are (1) the October 10, 1986, arrest photographs of Petitioner; (2) Angelo Smith's inability to identify Petitioner; and (3) Opal Nickson's statement that the shooter had darker skin than Petitioner.

The first of these claims is unexhausted; the second and third[8] have been rejected by the state court below for a failure of diligence in seeking new evidence.[9] Given that the decisions

---

(unlike the equitable exception to the AEDPA statute of limitations recognized by the Supreme Court in McQuiggin v. Perkins, 569 U.S. 383 (2013)), the Court finds that the interests in federalism and justice require the standard cause and prejudice analysis as to certain claims. Furthermore, the cases that Petitioner and Respondents cite to support their arguments that the Court does not have discretion to review any defenses that have been waived do not address the specific issue of a petitioner's failure to comply with a state court's statute of limitations, as is pertinent here.

[8] Opal Nickson stated in a 2014 affidavit as well as a 2019 deposition that she believed the shooter to have darker skin than Kevin Johnson. Although the state courts have not had occasion to review Ms. Nickson's 2019 deposition, the central facts supporting Petitioner's claim of actual innocence are the same as those in the 2014 affidavit. Thus, the Court considers them jointly.

[9] The state court found that Petitioner did not exercise the requisite diligence to qualify for equitable tolling of the statute of limitations under the Pennsylvania Post-Conviction Relief Act. Commonwealth v. Johnson, No. 1368 EDA 2017, at 10 (Pa. Ct. Com. Pl. May 22, 2017), App. 1136, ECF No. 91-5

of the state courts below rested on adequate and independent state law grounds--the PCRA statute of limitations and associated equitable tolling rules--the Court only has jurisdiction to review the alleged Brady violations presented to the PCRA court in 2016 if Petitioner can demonstrate cause and prejudice for the default, or establish that the Court's failure to consider his federal claims would result in a miscarriage of justice. Coleman, 501 U.S. at 750. A colorable Brady claim can satisfy the requisite showing of cause and prejudice. Banks v. Dretke, 540 U.S. 668, 698-99 (2004) (finding that a showing of suppression of evidence supports a finding of "cause," and that a petitioner must show the suppressed evidence was favorable and material to excuse the procedural default).

## 1.   **Legal Standard Under Brady**

Brady and its progeny protect the due process rights of criminal defendants by requiring the prosecution to disclose evidence that may exculpate the defendant. "[T]he suppression by

---

("Certainly, a reasonable investigation in the close to three decades since this murder could have uncovered these newly made recantations and allegations of coercion sooner."). Although some of these claims were styled as Sixth Amendment ineffective assistance of counsel and Brady claims, the Court of Common Pleas never reached the merits of the federal law claims, instead finding that neither statutory nor equitable tolling of the PCRA statute of limitations applied. The Superior Court affirmed. Commonwealth v. Johnson, No. CP-51-CR-1108001-1986, 2018 WL 2295655 (Pa. Super. Ct. May 21, 2018). The Superior Court's decision similarly rested on state law grounds.

the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). "[T]o establish a Brady violation requiring relief, a defendant must show that (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material." Lambert v. Blackwell, 387 F.3d 210, 252 (3d Cir. 2004) (citing Banks v. Dretke, 540 U.S. 668 (2004)).

First, the prosecution has a duty to disclose information to defense counsel that is exculpatory or impeaching, regardless of whether counsel has specifically requested that information. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). Where defense counsel does not request specific information from a prosecutor, or makes no request at all, or generally requests "anything exculpatory," the prosecution must produce such information "if the omitted evidence creates a reasonable doubt that otherwise did not exist . . . in the context of the entire record." United States v. Agurs, 427 U.S. 97, 112 (1976). "Impeachment evidence . . . as

18

well as exculpatory evidence, falls within the Brady rule."
United States v. Bagley, 473 U.S. 667, 676 (1985) (citing Giglio
v. United States, 405 U.S. 150, 154 (1972)).

Similarly, a defendant's due process rights are violated
"when the State, although not soliciting false evidence, allows
it to go uncorrected when it appears." Napue v. Illinois, 360
U.S. 264, 269 (1959); see also Haskell v. Superintendent Green
SCI, 866 F.3d 139, 146-47 (3d Cir. 2017) (finding that the
prosecution's failure to correct false testimony regarding
cooperation with the prosecution affected the judgment of the
jury where the witness at issue was the only witness who had not
been impeached and provided strong inculpatory testimony). By
that logic, "a conviction obtained by the knowing use of
perjured testimony is fundamentally unfair, and must be set
aside if there is any reasonable likelihood that the false
testimony could have affected the judgment of the jury." Agurs,
427 U.S. at 103 (footnote omitted).

Second, evidence is favorable if it is exculpatory or
impeaching; there is no distinction between the two. And, just
because a witness has been impeached in one manner does not mean
that withheld evidence cannot further impeach a witness; a Brady
violation may still occur where the additional impeaching
evidence carries a reasonable probability that the proceeding

19

would have been different. See <u>Dennis v. Sec'y, Pa. Dep't of Corr.</u>, 834 F.3d 263, 279 (3d Cir. 2016).

Third, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Bagley</u>, 473 U.S. at 682. A petitioner's due process rights are violated "where the evidence is material either to guilt or punishment." <u>Brady</u>, 373 U.S. at 87. For instance, where "[t]he evidence at trial overwhelmingly showed that [defendant] had the motivation" to commit the crime and had taken steps in preparation, the evidence would be sufficient to convict even if the withheld evidence implicated another person in the crime. <u>Lambert</u>, 387 F.3d at 254; <u>see also</u> <u>Johnson v. Folino</u>, 705 F.3d 117, 129 (3d Cir. 2013) ("The materiality of <u>Brady</u> material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." (quoting <u>Rocha v. Thaler</u>, 619 F.3d 387, 396 (5th Cir. 2010))).

The Court must thus consider whether purported <u>Brady</u> material would be cumulative, or, on the other hand, would "undermine the testimony of a key witness" especially where such "testimony lacks strong corroboration." <u>Johnson</u>, 705 F.3d at 129. Although "admissibility is a consideration that bears on

Brady materiality. . . . inadmissible evidence may be material
if it could have led to the discovery of admissible evidence."
Id. at 129-30. For example, undisclosed evidence is material
where a witness's testimony "was the only evidence linking [a
defendant] to the crime" and the "undisclosed statements
directly contradict [the witness's] testimony." Smith v. Cain,
565 U.S. 73, 76 (2012). In Smith, the eyewitness contradicted
himself when he told police on the night of the crime that he
was unable to see the face of any perpetrator and would not know
them if he saw them, but, at trial, testified that he was
certain that the defendant was one of the perpetrators as they
stood "face to face." Id.

On the other hand, in Turner v. United States, the Supreme
Court found that favorable, suppressed evidence, was not
material. There, "virtually every witness to the crime itself
agreed as to a main theme: that [the victim] was killed by a
large group of perpetrators." 582 U.S. 313, 326 (2017). Thus,
suppressed evidence that raised an inference that fewer
perpetrators were involved was not enough to have led to a
different result at trial in the face of overwhelming evidence
that the victim was killed by a group. Id. at 326-27 (finding
that the petitioners' alleged claim of materiality failed
because the jury would have had to make too many attenuated
inferences from the undisclosed evidence).

21

2.   **Effect of Procedural Default**

The Court initially considers, in turn, whether Petitioner has demonstrated cause and prejudice for failing to timely present his Brady claims to the PCRA court as to Angelo Smith's inability to recognize Petitioner and Opal Nickson's statements about skin color. In light of Banks, the Court assesses the viability of these Brady claims to determine whether cause (suppression) and prejudice (favorability and materiality) exist to allow consideration of these claims on the merits along with the non-defaulted claim.

(a) Angelo Smith

In 2014, Angelo Smith attested, in two separate affidavits, that he was prepared to testify at trial for the Commonwealth but was told by someone affiliated with the prosecution or police that he was no longer needed at trial, after he stated that he could not affirmatively identify Petitioner in the courtroom at trial. However, the prosecutor stated during trial that he was unable to secure Angelo Smith's attendance and requested a bench warrant to facilitate his attendance.

First, it is true that if Angelo Smith's statements in his 2014 affidavits are to be believed, then the prosecution certainly suppressed his availability and inability to identify Petitioner in court, as the prosecutor affirmatively represented that Angelo Smith was simply unavailable to testify.

22

Second, it is also true that if Angelo Smith's 2014 affidavit is to be believed, then his statement that he could not identify Petitioner in the courtroom was favorable. According to Angelo Smith:

> I was subpoenaed to the trial of Kevin Johnson. The police asked me if I saw the man who pointed the pistol at us that night in the court room. I did not recognize anyone in the court room as the person who pointed the pistol at me, Elijah and Opal. I told them that I really did not get a good look at the guys face because I was high on crack and was just staring at the gun in the guys hand. I told the police this same thing when they interviewed me on October 9th, 1986. The police then told me that they did not need me to testify that day in court.

Suppl. App. Ex. H (June 10, 2014 Affidavit), ECF No. 37 at 29-30.[10] This information would have been useful to the defense, especially given the misidentification and alibi theories that had been presented at trial.

Third, however, the Court cannot conclude that the failure to disclose Angelo Smith's availability would have been material. Angelo Smith's inability to identify Petitioner may have undercut the credibility of the other three witnesses. But Petitioner's trial counsel was on notice that Angelo Smith could

---

[10] He elaborated in another affidavit on August 14, 2014, that he was not sure whether it was the police or the prosecutor that had asked him if he recognized the defendant in the courtroom. But he reiterated that he could not identify the man with the pistol in the courtroom and was then told he did not have to testify. Suppl. App. Ex. K (Angelo Smith Aug. 14, 2014 Affidavit), ECF No. 37 at 25.

have been an exculpatory witness, in light of his statement to the police, and failed to compel his attendance. At the time of Petitioner's trial, there could be no Brady violation where defense counsel, with reasonable diligence, could have obtained the information. Bracey v. Superintendent Rockview SCI, 986 F.3d 274, 289-90 & 290 n.14 (3d Cir. 2021) (noting that the "due diligence exception to Brady" remained valid Third Circuit precedent up until the en banc opinion in Dennis v. Secretary, Pennsylvania Department of Corrections, 834 F.3d 263 (3d Cir. 2016)). Thus, Petitioner has not demonstrated that both cause and prejudice exist to excuse procedural default as to Angelo Smith's inability to recognize Petitioner.

Petitioner has also failed to demonstrate that the "miscarriage of justice" exception to Coleman should apply. Petitioner has not shown, based on Angelo Smith's inability to recognize him at trial, that "no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt." Schlup, 513 U.S. at 329. Other eyewitnesses positively and unequivocally identified Petitioner at trial, and the jury accepted their testimony in light of factors that may have affected their credibility (i.e., lighting, drug use).

(b) Opal Nickson

The Court next considers whether the alleged Brady violation underlying the failure to disclose Opal Nickson's

statements on skin color support a finding of cause and prejudice or actual innocence to excuse the procedural default.

First, if Opal Nickson's affidavits are to be believed, this evidence was suppressed. <u>See, e.g.</u>, Suppl. App. Ex. I, ECF No. 37, at 31. There were no notes in her initial statement to the police, nor at the preliminary hearing, that indicate that she identified the wrong person on the basis of his skin color.

Second, if believed, this evidence may have been weakly favorable to Petitioner: Opal Nickson attested that Petitioner looked similar to the man with the pistol but had lighter skin than him. Ms. Nickson has not stated, however, that Petitioner had significantly different facial features from the man with the pistol. So, the evidence is slightly exculpatory; but, given that the shooting occurred in her residence, at night, with limited lighting, it is as likely as not likely that the skin of the man with the pistol looked darker than it actually was.

Third, Petitioner has not demonstrated that Opal Nickson's testimony as to the skin color of the man with the pistol would have been material, as it would have opened the door for the introduction of her initial identification of Petitioner. The jury then would have been left to decide which of her identifications they believed. Accordingly, Petitioner has not demonstrated cause and prejudice for his failure to timely present this <u>Brady</u> claim to the PCRA court.

As with Angelo Smith's statement, Petitioner has not sufficiently shown that Opal Nickson's statement are grounds for the "miscarriage of justice" exception. Opal Nickson's statement is much less exculpatory than Angelo Smith's: she has stated that Petitioner and the man with the pistol looked exactly the same except for their skin color. Thus, it is not reasonably probable that no reasonable juror would have voted to convict Petitioner had they been presented with Opal Nickson's statements that the man with the pistol had darker skin.

And, to the extent that Petitioner argues that Opal Nickson's testimony was false and the prosecutor "allow[ed] it to go uncorrected," Napue, 360 U.S. at 269, Petitioner has not sufficiently shown that her trial testimony was false.

For instance, when interviewed in 2016 by police investigators, Opal Nickson did not mention that James Smith was also in the room with her, Angelo Smith, and Elijah Bennett, despite testifying at trial that James Smith was present. But, Opal Nickson reaffirmed in 2016 that she had seen Petitioner driving a green car earlier in the day, and affirmed she was "absolutely sure" that Petitioner had the pistol. She even admitted in that same 2016 interview that she told Petitioner's investigators in 2014 that she had not seen Petitioner with the pistol because she "was still mad at the district attorney for screaming at me." Given Opal Nickson's changing testimony over

26

the years, the Court cannot conclude that the prosecution
allowed knowingly false testimony to go uncorrected at trial
when she positively identified Petitioner as the man with the
pistol.

> (c) Ineffective Assistance of Counsel as Cause and
> Prejudice for Failing to Timely Present Brady Claims

Petitioner has also argued that the cause of his delay in
presenting the recantation evidence (and the resulting prejudice
by the PCRA court's failure to review his claim on the merits)
was the ineffective assistance of his initial PCRA counsel.[11] As
stated above, attorney error will only constitute "cause" where
such error constitutes ineffective assistance of counsel; any
negligence by postconviction counsel is imputed to a petitioner
under principles of agency law. Coleman, 501 U.S. at 753-54.

"Inadequate assistance of counsel at initial-review
collateral proceedings may establish cause for a prisoner's
procedural default of acclaim of ineffective assistance at
trial." Martinez v. Ryan, 566 U.S. 1, 9 (2012); see also Trevino
v. Thaler, 569 U.S. 413, (2013) (expanding the Martinez
exception to Coleman in cases where "state procedural framework,
by reason of its design and operation, makes it highly unlikely

---

[11] Petitioner made some form of this argument before the PCRA
court in 2016. The PCRA court construed his claim of ineffective
assistance of counsel as a "newly discovered fact," for which he
could not demonstrate the requisite diligence.

in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal").

In Davila v. Davis, the Supreme Court recognized these exceptions as narrow, holding that a claim of ineffective assistance of postconviction counsel, as cause for procedural default, did not apply where the claim that postconviction counsel failed to raise was the ineffective assistance of appellate counsel. 582 U.S. 521, 524-25 (2017).[12] Relief for this narrow set of ineffective assistance of postconviction counsel claims arises only because (1) the claims involved are claims that, dictated implicitly or explicitly by state law, must be raised in a collateral proceeding and (2) there is no constitutional right to counsel in postconviction proceedings. Id. at 534-35.

The Third Circuit has applied Martinez to claims that ineffective assistance of postconviction counsel serves as "cause" for failing to raise the ineffectiveness of post-sentencing counsel--that is, any counsel that a petitioner claims was constitutionally defective up until the point that a

---

[12] Petitioners are further limited in their relief on the basis of ineffective assistance of postconviction counsel in that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." Shinn, 142 S. Ct. at 1734.

notice of appeal is filed. <u>Richardson v. Superintendent Coal Township SCI</u>, 905 F.3d 750, 761-62 (3d Cir. 2018).

Although narrow, the exception in <u>Martinez</u> was created out of the concern that "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim" and that "if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims." <u>Martinez</u>, 566 U.S. at 10-11. Petitioner's claim of ineffective assistance of postconviction counsel as "cause" for procedural default is thus analogous in some sense to the exceptions set forth in <u>Martinez</u> and <u>Trevino</u>: Petitioner could not have presented these <u>Brady</u> claims until he brought his first collateral proceeding because the proceeding was instituted in part on the basis of newly discovered evidence.

In order to prove ineffectiveness of counsel under <u>Strickland v. Washington</u>, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness." 466 U.S. 668, 688 (1984). He must also demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at 694. "A court considering a claim of ineffective assistance must apply a 'strong

29

presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Harrington v. Richter</u>, 562 U.S. 86, 104 (2011) (quoting <u>Strickland</u>, 466 U.S. at 689). A decision by counsel that "was not mere oversight or neglect but was instead the result of a deliberate decision to focus on other defenses" is a strategic decision that is entitled to deference. <u>Wood v. Allen</u>, 558 U.S. 290, 302-03 (2010). Petitioner "bears the burden of rebutting this presumption 'by showing either that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound.'" <u>United States v. Schneider</u>, 852 F. App'x 690, 693 (3d Cir. 2021) (quoting <u>Thomas v. Varner</u>, 428 F.3d 491, 499-500 (3d Cir. 2005)).

It is true that postconviction counsel's failure to investigate the other eyewitnesses and fully assess Petitioner's case after receiving notice of James Smith's recantation may have prejudiced petitioner. The 2003 PCRA court rejected James Smith's recantation, in part because recantation evidence is generally unreliable, but also in part because he was the only witness to have recanted--there were two other eyewitnesses at trial who had positively identified Petitioner and had not recanted. <u>See</u> 2003 PCRA Ct. Op. at 8-9. As Respondents contend, had counsel investigated the other eyewitnesses at that time, additional recantations (allegedly) would have been discovered.

See, e.g., Suppl. App. Ex. H to L, 29-37, ECF No. 37 (2014 affidavits of Angelo Smith, Opal Nickson, James Smith, and Elisha Bennett). The PCRA court at that time, presented with recantations from all eyewitnesses, may have reached a different conclusion, despite viewing the recantations with suspicion.

Moreover, Petitioner was also prejudiced in subsequent PCRA proceedings by initial postconviction counsel's failure to adequately investigate the eyewitnesses: the 2017 PCRA court found that Petitioner could not present the 2014 affidavits to the court for merits review because he was on notice of potential infirmity of the other identifications since James Smith's 2001 recantation. 2017 PCRA Ct. Op. at 10.

However, and notwithstanding any prejudice caused by counsel, Petitioner has not demonstrated that "no sound strategy . . . could have supported" his postconviction counsel's performance.[13] Schneider, 852 F. App'x at 693 (quoting Thomas, 428 F.3d at 500). In addition to James Smith's recantation, PCRA counsel also obtained (1) affidavits of Conchetta Parks and

---

[13] Although Petitioner at one point presented affidavits from his PCRA counsel stating that there was no strategic reason for failing to include all grounds for relief in a Rule 1925(b) statement which was submitted to the Superior Court following the PCRA court's denial of his petition after the evidentiary hearing, Petitioner has not provided any affidavit from any counsel stating that it was or was not a strategic choice for PCRA counsel not to investigate the eyewitnesses further when originally presenting the amended PCRA petition.

Evette DeBose, whose statements generally corroborated Petitioner's alibi defense; (2) affidavits of ten character witnesses who attested that they had known Petitioner for some time and knew him to be peaceful and nonviolent; and (3) the affidavit of John Spencer, a witness who gave a statement to the prosecutor that Petitioner had confessed to Cowboy's murder, in exchange for a leniency deal with the Prosecutor. <u>See</u> Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus App. 2, ECF No. 19-2 at 49-76. Although the record does not reflect that PCRA counsel investigated the other eyewitnesses, it is clear that PCRA counsel diligently pursued and presented a number of the alibi and character witnesses that Petitioner sought to have testify on his behalf at trial. <u>See</u> Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus App. 4, ECF No. 19-4 at 24-25 (Petitioner's alibi statement sent to trial counsel dated February 23, 1987); <u>id.</u> at 41-43 (Petitioner's letter to PCRA counsel enclosing a list of the alibi witnesses he gave to trial counsel after the preliminary hearing).

Petitioner's PCRA counsel could have made a number of strategic choices, all of which fall within the range of reasonable assistance. For instance, PCRA counsel could have reasonably believed that Petitioner's case would be best supported by additional alibi and character witnesses, rather than an investigation of the witnesses who previously testified

at trial. This is especially so in light of the suspicion with
which courts view recantations.[14] Alternatively, PCRA counsel may
have made a strategic choice that James Smith's statement was
not sufficiently "trustworthy" to warrant investigating the
other eyewitnesses. On the other hand, PCRA counsel could have
made the strategic choice not to investigate the other
eyewitnesses because the allegations of police and prosecutorial
misconduct laid out in James Smith and John Spencer's affidavits
were sufficient to cast doubt on the fairness of Petitioner's
trial. A number of possible strategic reasons for PCRA counsel's
decisions exist.

---

[14] A trial witness's recantation, "essentially admitting that the
bulk of such testimony was perjury," is "suspicious and
untrustworthy" and "does not, in the absence of additional
corroborating evidence or circumstances, meet the standard of
reliability contemplated by Schlup." Teagle v. Diguglielmo, 336
F. App'x 209, 213 (3d Cir. 2009) (citing Landano v. Rafferty,
856 F.2d 569, 572 (3d Cir. 1988); Schlup, 513 U.S. at 324 ("To
be credible, such a claim requires petitioner to support his
allegations of constitutional error with new reliable evidence--
whether it be exculpatory scientific evidence, trustworthy
eyewitness accounts, or critical physical evidence--that was not
presented at trial."); see also Arnold v. Dittmann, 901 F.3d
830, 838-41 (7th Cir. 2018) (discussing the general
unreliability of recantation evidence as found by other Circuits
and explaining that recantation evidence is only sufficiently
"reliable" to demonstrate actual innocence under Schlup where
the recantations are subject to adversarial testing). But see
Howell v. Superintendent SCI, 978 F.3d 54, 60 (3d Cir. 2020)
("As a general matter, a recantation in the absence of
corroborating evidence or circumstances will probably fall short
of the standard of reliability contemplated by Schlup. But that
does not mean that recantation evidence is to be categorically
rejected.").

Petitioner has thus not shown that the decisions of PCRA counsel were not strategic decisions or were objectively unreasonable; therefore, Petitioner has not shown that he was denied effective assistance of counsel during his initial-review proceeding such that PCRA counsel's failure could act as "cause and prejudice" and allow the Court to review the defaulted claims on the merits.

### 3.   **The Arrest Photo**

The Court now addresses Petitioner's <u>Brady</u> claim as to the arrest photographs on the merits. Petitioner states that he did not receive any of his arrest photographs (including the one used by the police for his identification by eyewitnesses) until May 2019, during the course of discovery in this federal habeas matter. <u>See, e.g.</u>, ECF No. 84, at 5. He argues that this evidence was withheld because (1) it was available to the prosecution; (2) there is no indication that his trial counsel ever received it; and (3) photographic evidence used for identification is the type of evidence that the prosecution would normally provide to a criminal defendant. Given that Petitioner has not brought this issue before the state court and Respondents have waived any nonjurisdictional defenses, the Court's review of this claim is <u>de novo</u>.

Where the disclosure of arrest photographs is at issue, there is no <u>Brady</u> violation where the photographs are disclosed,

albeit delayed, such that defense counsel either can use the evidence or has a meaningful opportunity to do so. Hooper v. Shinn, 985 F.3d 594, 620 (9th Cir. 2021). But, the disclosure of an arrest photo alone is not always sufficient: where an arrest photograph is disclosed, but certain exculpatory features of the photo such as a defendant's clothing have been cropped out, there could be a plausible Brady violation. Cf. United States v. Ortiz, No. 92-592-01, 1993 WL 131329, at *7 (E.D. Pa. Apr. 23, 1993) (finding that the government's failure to produce the entirety of the arrest photo, which was exculpatory, was grounds for a new trial).

First, under Brady, and under the circumstances, there may be an obligation to disclose these photographs. See Hooper, 985 F.3d at 620; Ortiz, 1993 WL 131329, at *7. Here, it is not clear whether the October 10, 1986 arrest photographs were ever disclosed. A number of references were made to photographs at trial, as the eyewitnesses testified that they identified him on the basis of photographs.[15] But the arrest photographs were never

---

[15] Petitioner's trial counsel may have generally known that there were arrest photographs in existence, as he filed a motion to suppress the identifications. See Mot. to Suppress Identification ¶ 2, App. 85, ECF No. 91-1 ("Kevin Johnson was arrested on a warrant which issued as the result of alleged identifications by witnesses who were shown photos by the Philadelphia Police Department); id. at 2, App. 86 (seeking suppression of "[a]ll identification evidence"); see also Amicus Br. 29, ECF No. 91. The notes of testimony are not available, so the Court cannot determine whether trial counsel also sought to

introduced (or attempted to be introduced) into evidence. And, it appears that all references to photographs at trial were with regard to arrest photographs from Petitioner's previous offenses; the materials provided by Amicus indicate that the photograph used in the array was from August 8, 1985, taken approximately a year before the murder. App. 26-27, 35, ECF No. 91-1. Thus, the trial record appears consistent with the claim that Petitioner's counsel did not have access to the October 10, 1986 arrest photos.

Second, the arrest photographs are somewhat, but not strongly favorable to Petitioner. In the arrest photograph, taken approximately thirty-six hours after the murder, Petitioner is depicted with a thin mustache, and no other facial hair. As the record indicates, Petitioner seems to have maintained a similar thin mustache for approximately five years prior to his arrest in 1986. See App. 27-37, ECF No. 91-1. Yet, both James Smith and Angelo Smith initially described the man with the pistol as having no facial hair. See App. 5, ECF No.

---

suppress evidence on the basis of the photo taken after Petitioner's arrest. However, given that the arrest photographs were taken after Petitioner was identified by the eyewitnesses, the mention of arrest photographs at the suppression hearing more likely pertains to the actual photographs that the witnesses were shown at the police station. This argument thus is more relevant to Petitioner's ineffective assistance of counsel claim than the Brady claim: counsel was on notice that arrest photographs existed and should have requested the photograph taken after Petitioner's arrest for this offense.

91-1 (initial statement of James Smith); id. at 21-22 (initial

statement of Angelo Smith). Petitioner thus argues that the

photographs taken shortly after the murder would be exculpatory

because the witnesses saw a clean-shaven man and Petitioner was

not clean-shaven.[16]

This argument is plausible but not particularly strong.

Petitioner's mustache was thin. He also had a barely perceptible

goatee but was otherwise clean-shaven--according to the

photograph taken on October 10, 1986. Given the thinness of the

mustache, the Court cannot conclude that the photograph is

exculpatory, as (1) much of the encounter with the man with the

pistol occurred in partial darkness and (2) Petitioner could

have grown out some of the mustache in the two days between the

shooting and his arrest. However, this photograph could also be

slightly impeaching, as both James and Angelo Smith (if Angelo

Smith had testified) could have been questioned about their

statements that the man with the pistol was clean-shaven. To the

extent that witnesses described the man with the pistol as

having a dark complexion (i.e., darker than Petitioner), the

photographs could have been exculpatory. See, e.g., App. 21, ECF

---

[16] Two of the witnesses, however--Elijah Bennett and Opal
Nickson--did not provide any statement to the police or
testimony at trial as to facial hair; therefore, it is possible
that these witnesses did not notice whether or not the shooter
had a mustache or even believed he did have a mustache.

No. 91-1 (initial statement of Angelo Smith to police; Suppl. App. Ex. I ¶ 5 (2014 statement of Opal Nickson). But see App. 5, ECF No. 91-1 (initial statement of James Smith describing the man with the shotgun as "dark complexion" but describing the man with the pistol as "Brown skin").

Third, standing alone, the arrest photograph is not material. According to the photographs of Petitioner provided by amicus, Petitioner looked very similar in the photograph shown to the eyewitnesses at the police station and the photograph taken after his arrest. Nothing in the initial statements to the police indicate that any witness had difficulty identifying Petitioner on the basis of his mustache; or otherwise commented on Petitioner's appearance in the photograph.[17] And, at trial, three eyewitnesses (James Smith, Opal Nickson, and Elijah Bennett) positively identified Petitioner as the man with the pistol. These in-court identifications also belie a claim of actual innocence, as Petitioner's appearance at the time of his arrest was consistent in part with the descriptions given by the

---

[17] This is not dispositive, however, given the numerous allegations of police misconduct in this case. For instance, the eyewitnesses all now allege that they were coerced into pointing out Petitioner's photograph, but no such interaction is memorialized in the police statement or any other documentation. The prosecution's entire theory of the case was that the identifications were all independent. So, it is plausible that any sort of statements by the witnesses that tended not to inculpate Petitioner might not have been included in the police statements.

witnesses immediately after the shooting. Petitioner's trial counsel certainly could have cross examined these witnesses as to their identifications and the Petitioner's facial hair. But, Petitioner has not shown on the basis of the arrest photo alone that there is a "reasonable probability" that "the result of the proceeding would have been different" had counsel been given the arrest photograph, and been able to question the witnesses about the photograph. See Bagley, 473 U.S. at 682.

Given that there is only one piece of newly discovered, suppressed evidence that can be reviewed, i.e., the arrest photograph, the cumulative Brady error analysis set forth in Kyles v. Whitley is unnecessary.

### C.    Ineffective Assistance of Counsel Claims

Petitioner asserts that his trial counsel was ineffective in a number of ways. First, he argues that trial counsel failed to meaningfully consult with him prior to trial. This claim was fully litigated before the state courts below. Second, Petitioner argues that trial counsel failed to properly investigate and present an alibi defense. This issue was similarly presented to the state courts and reviewed on the merits. Third, Petitioner claims that trial counsel was ineffective for failing to secure the October 10, 1986, arrest photographs. This claim has not been reviewed by a state court. Fourth, Petitioner asserts that counsel was ineffective for

39

failing to interview Angelo Smith or request a missing witness instruction at trial. This claim has similarly not been fully presented to the state court.[18]

### 1. Legal Standard

In order to prove ineffectiveness under Strickland, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness." 466 U.S. at 688. He must also demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694.[19] The "reasonable probability" standard is less stringent than the preponderance standard, and only requires the Court to find by such probability that at least one juror would not have convicted a petitioner in the absence of error. See Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001); Bey v. Superintendent Greene SCI, 856 F.3d 230, 242 (3d Cir. 2017); Massey v.

---

[18] At one point, Petitioner argued that the ineffectiveness of postconviction counsel was a standalone basis for relief. It is not clear whether this early argument remains part of Petitioner's current claim for relief. To the extent petitioner argues that ineffective assistance of his postconviction counsel forms grounds for relief, such relief is barred by statute. 28 U.S.C. § 2254(i); see also Martinez, 566 U.S. at 17 (distinguishing between "grounds for relief" and "cause" for procedural default).

[19] This standard for "prejudice" or "materiality" under Strickland is the same as that under Brady. See, e.g., Bagley, 473 U.S. at 681-82.

Superintendent Coal Township SCI, No. 19-2808, 2021 WL 2910930,

at *6 (3d Cir. July 12, 2021). As the Supreme Court has

explained,

> Representation of a criminal defendant entails certain
> basic duties. Counsel's function is to assist the
> defendant, and hence counsel owes the client a duty of
> loyalty, a duty to avoid conflicts of interest. From
> counsel's function as assistant to the defendant derive
> the overarching duty to advocate the defendant's cause
> and the more particular duties to consult with the
> defendant on important decisions and to keep the
> defendant informed of important developments in the
> course of the prosecution. Counsel also has a duty to
> bring to bear such skill and knowledge as will render
> the trial a reliable adversarial testing process.

Strickland, 466 U.S. at 688 (citations omitted). The Court

reviews trial counsel's strategy with deference. Id. at 689.

"[T]he failure to investigate a critical source of

potentially exculpatory evidence may present a case of

constitutionally defective representation." United States v.

Baynes, 622 F.2d 66, 69 (3d Cir. 1980). In Baynes, the defendant

was implicated in a drug conspiracy solely on the basis of

wiretap evidence, in which the speaker only uttered twelve

words. The Third Circuit found that the defendant's claim for

ineffective assistance of counsel was not clearly frivolous

where his trial counsel made "no attempt to obtain the voice

exemplar, a copy of the Government's intercepted telephone

conversation implicating [the defendant], or make any comparison

of the two to determine if [the defendant] was the speaker on

41

the tape. Given the centrality of the identification of [defendant] to the Government's case, the failure of counsel even to investigate the possibility that comparison of the tape with the exemplar might exculpate [defendant] significantly calls into question the adequacy of counsel's representation." Id.[20]

And, in Sims v. Livesay, a petitioner argued that his trial counsel was ineffective for failing to investigate an FBI report provided during discovery and realize the significance of a particular piece of evidence--a quilt with gunpowder residue that supported the defendant's theory that he was not guilty of first-degree murder. 970 F.2d 1575 (6th Cir. 1992). The Sixth Circuit agreed with the petitioner in Sims, finding that it was unreasonable for counsel to fail to investigate a known piece of evidence that would contest the state's "easily refutable" theory of the case. Id. at 1580-81. Similarly, in a case where eyewitness testimony was the only form of evidence inculpating a defendant, counsel's failure to interview any of the eyewitnesses was unreasonable, even where counsel ultimately subjected the witnesses to extensive cross examination at trial. Bryant v. Scott, 28 F.3d 1411, 1418 (5th Cir. 1994); cf.

---

[20] This was a § 2255 case that was remanded for an evidentiary hearing. The Third Circuit did not determine whether or not the petitioner's claim merited collateral relief.

Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990)
("Similarly, trial counsel's assertion that she intended to
defend [defendant] on a theory of misidentification does not
excuse her failure to investigate all potential alibi
witnesses. . . . A tactical decision to rely on a
misidentification defense in no way forecloses the concurrent
use of alibi witnesses.").

       2.   Discussion

     Petitioner's first amended PCRA petition was ultimately
denied in 2003. He presented the following issues to the PCRA
court for review: (1) ineffectiveness of trial counsel for
failure to present character witnesses; (2) ineffectiveness of
trial counsel for failure to give "alibi" notice and present
additional alibi witnesses; (3) ineffectiveness of trial counsel
for failure to discover and utilize on cross examination the
extensive history of police misconduct; (4) ineffectiveness of
trial counsel for failing to implicate another person in the
murder; (5) ineffectiveness of appellate counsel for failing to
properly argue the ineffectiveness of trial counsel;
(6) recantation of a prosecution witness whose statements were
ultimately not used at trial; and (7) recantation of James
Smith's identification. The PCRA court's decision rested
primarily on state law grounds and assessments of the evidence
adduced at trial.

Petitioner's claim of ineffective assistance of trial counsel again reached the PCRA court in 2010 after remand by the Superior Court for an evidentiary hearing. There, in considering both state and federal law, the PCRA court found (and the Superior Court affirmed) that, while certainly deficient in some regard, Petitioner's trial counsel provided at least the constitutional minimum required assistance of counsel. Petitioner at that time also presented evidence that his trial attorney was disciplined by the Disciplinary Board of the Supreme Court of Pennsylvania after Petitioner brought a complaint to the Board following his conviction.

Although an attorney's violation of a rule of ethics or professional conduct may weigh in favor of a finding of ineffective assistance of counsel, such a violation does not constitute per se ineffective assistance of counsel. See Nix v. Whiteside, 475 U.S. 157, 165 (1986) ("Under the Strickland standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel."); Government of Virgin Islands v. Weatherwax, 77 F.3d 1425, 1431 (3d Cir. 1996) ("[W]hile professional standards provide guidance in evaluating the performance of counsel, they do not define the boundary between constitutionally acceptable and constitutionally unacceptable performance."); United States v. Nickerson, 556 F.3d 1014, 1019 (9th Cir. 2009); cf. Royster

44

v. Mahally, No. 19-2126, 2020 WL 13598928, at *2 (E.D. Pa. May 20, 2020) ("Attorney disciplinary action, however, does not convert Strickland claims into Cronic claims.").

The Court's review of these ineffective assistance of trial counsel claims is thus deferential. See 28 U.S.C. § 2254(d).

(a) Failure to Meaningfully Consult

Petitioner's claim that his trial counsel was ineffective for failing to meaningfully consult with him before trial has been reviewed by the state courts. The decision of the Superior Court on this issue appears to have rested at least in part on federal law--namely Strickland v. Washington and United States v. Cronic. Thus, the Court reviews this claim deferentially, looking to whether the state court's decision was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

Under Cronic, ineffective assistance of counsel and resulting prejudice to a defendant are presumed where there is (1) a complete denial of counsel; (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) where "the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair." United States v. Cronic, 466 U.S. 648, 659-61 (1984).

45

First, the Pennsylvania Superior Court found that
Petitioner was not completely denied counsel, as trial counsel
met with Petitioner "at his preliminary hearing, again at the
prison before trial, and performed at least one telephone
consultation." Commonwealth v. Johnson, 51 A.3d 237, 245 (Pa.
Super. Ct. 2012). And, the Superior Court agreed with the PCRA
court in that these meetings must have been substantive to some
extent, as counsel presented five alibi witnesses and made a
good faith attempt to secure the appearance of a sixth alibi
witness. Id. at 244.

Second, counsel subjected the prosecution's case to
meaningful adversarial testing by (1) presenting several alibi
witnesses, (2) attentively objecting to certain elements of the
prosecution's case, and (3) cross-examining the prosecution's
witnesses. Petitioner's trial counsel filed a motion to suppress
"any identification testimony" because "[t]he photo line-up
shown to the witnesses by Philadelphia Police Detectives was a
line-up which was unduly suggestive." Def.'s Mot. to Suppress,
App. 85-86, ECF No. 91-1. The motion was denied.[21] See Criminal
Docket at 3, App. 92, ECF No. 91-1.

---

[21] As the Attorney General points out, there is not a record of
the trial court's reasoning for denying the motion to suppress.
It is thus not clear from the face of the attached state-court
materials whether or not Petitioner's trial counsel had access
to the photographs used for identification.

46

At trial, counsel was fairly involved during the presentation of prosecution's case and objected to numerous lines of questioning. Counsel moved for a demurrer at the close of the prosecution's case, as to both the murder and conspiracy charges. When the prosecution implied that Petitioner possessed a gun, defense counsel objected and moved for a mistrial. <u>See</u> Feb. 2, 1988, Trial Tr. 612:13-16, App. 711, ECF No. 91-3.

It is true that in retrospect, trial counsel could have done more to exculpate petitioner. For instance, the arrest warrant notes there was a stab wound, and a detective testified about a steak knife placed atop the TV in Cowboy's room.[22] Jan. 28, 1988, Trial Tr. at 351:1-3, App. 446, ECF No. 91-3. It is not clear whether this lead was investigated at all, to attempt to cast doubt on the cause of death or the potential involvement of another person. Similarly, some of the eyewitnesses mentioned the presence of "Abdul" or "Abdullah," in Cowboy's room in the time leading up to the shooting, but the witnesses were not questioned about this other person extensively, and it does not appear that this other person was investigated. Yet, Petitioner's trial counsel, on cross examination of the

---

[22] Detective Hanlon testified that there was not evidence that Cowboy was stabbed and he was not told that Cowboy was stabbed. Jan. 29, 1988, Trial Tr. at 405:22-25, App. 501, ECF No. 91-2. Petitioner's trial counsel did not cross examine him extensively on this point or otherwise attempt to show that something other than a gunshot wound was the cause of death.

prosecution's ballistics expert, created doubt about which of the bullets found in or near Cowboy could have come from a pistol, could have come from the same gun, or could have been fired at different times. Jan. 28, 1988, Trial Tr. at 458:2-459:11, App. 554-55, ECF No. 91-3.

On balance, and regardless of what more counsel could have done at trial, Petitioner has not demonstrated that the trial was inherently unfair because of the remote likelihood that counsel performed as an effective adversary. Thus, the state court did not improperly apply Cronic to Petitioner's claim for ineffective assistance of counsel vis-à-vis a de facto denial of counsel.

> (b) Failure to Properly Investigate and Present Alibi Witnesses

Petitioner next argues that trial counsel was ineffective for failing to properly present an alibi defense. This claim was exhausted and properly reviewed by the state courts below. Thus, the Court's review is limited to whether the state courts' decisions were contrary to, or involved an unreasonable application of, clearly established federal law, or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

As the Pennsylvania Superior Court reasoned in finding that Petitioner was not completely denied counsel,

> Attorney Gallagher managed to secure five witnesses for Appellant's trial. In addition, Attorney Gallagher hired a private investigator in an effort to track down Appellant's alibi witness, Ronald Crawford. The only way Attorney Gallagher and the private investigator could have known to look for these witnesses was by information obtained from Appellant. Based on the record in this case, we find that "at least one in-person meeting" did occur between Attorney Gallagher and Appellant before trial.

Johnson, 51 A.3d at 244 (footnote omitted). Given the investigation and presentation of the alibi defense before the trial court, the Superior Court found that the prosecution's case was subject to meaningful adversarial testing under Cronic. Id. at 245.

Upon review of the trial record, the Court agrees with the Pennsylvania Superior Court that Petitioner's counsel was diligent in presenting multiple alibi witnesses.[23] Even if trial

---

[23] Trial counsel called Douglas Yancy, James Lawrence, Wanda Johnson, Theresa Johnson, and Lidel Johnson. Yancy, Lawrence, and Wanda Johnson all testified that they saw Petitioner selling clothes with another man on the evening of the shooting. Lawrence and Petitioner testified that Petitioner was wearing green pants and a blue shirt on the night of the shooting. Further, Theresa and Lidel Johnson testified that Petitioner did not own a black leather jacket and the jacket found in Petitioner's mother's home belonged to another person. Theresa Johnson testified that she had been using her car all day, to rebut the testimony of Opal Nickson that she had seen Petitioner using Theresa Johnson's car (a light green vehicle) earlier in the day. It also appears that Petitioner's counsel made all attempts to secure Ronald Crawford--the man who was in the car with Petitioner--as a final alibi witness. Defense counsel told

counsel failed to meet with Petitioner sufficiently in terms of the frequency and duration of meetings, the Pennsylvania Superior Court's reasoning was neither contrary to nor an unreasonable application of federal law when it concluded that Petitioner suffered no prejudice as to trial counsel's presentation of an alibi defense. See Johnson, 51 A.3d at 253-54 (Wecht, J., concurring).

(c) Failure to Secure Arrest Photographs

Petitioner argues that, if the prosecution's failure to produce the arrest photographs could not be considered a Brady violation, then counsel was ineffective for failing to specifically request the photographs or use them during trial. This issue was not properly presented to the state courts below but Respondents have waived exhaustion; thus, the Court assesses this claim de novo.

Petitioner states that competent counsel "would have secured the photographs before trial" and "immediately

---

the trial court that he had been trying to find the witness "Since last Monday. . . I had them out all weekend and they have been going on every day. We have right now, we're trying to find a girlfriend if we can find her to get in. This is the guy that was driving around with him all night." Feb. 2, 1988, Trial Tr. 663:3-14, App. 761, ECF No. 91-4. The following day of trial, defense counsel stated that Mr. Crawford was still not located, but that he intended to call his investigator as witness "just to say when I gave him this name he tried to go out and find these people." Feb. 3, 1988, Trial Tr. 759:5-12, App. 859, ECF No. 91-4.

understand how they impeached the Commonwealth case." Pet'r's Suppl. Br. at 11, ECF No. 84. Not only would competent counsel use the arrest photo to impeach Commonwealth witnesses at trial, Petitioner argues, but competent counsel would also use the arrest photograph in the litigation of a motion to suppress identification testimony. See Pet'r's Reply Br. to Amicus at 26-27, ECF No. 92-1. Further, Petitioner argues that "[t]here is simply no strategic reason why defense counsel would not seek this discovery in a case that turns entirely on identification testimony." Id. at 27. Respondents agree that the use of the arrest photograph at trial would have undermined the strength of the prosecution's identification case, and thus trial counsel's deficient performance "was sufficiently prejudicial to constitute a constitutional violation." Resp'ts' Suppl. Br. 5, ECF No. 85.

Respondents contend that competent counsel would have been on notice that arrest photos from October 10, 1986, were in existence. Trial counsel filed a motion to suppress prior to trial, which focused on photographic identifications. See Mot. to Suppress, ECF No. 91-1, App. 84-86. These identifications occurred on the basis of a photo array, which included an arrest photo of Petitioner from August of 1985. Therefore, trial counsel should have known that the police would have taken an arrest photo of Petitioner on or about October 10, 1986, and he

should have requested the photograph in order to test the witnesses' identifications and challenge their credibility. This is especially true where a primary theory of the defense's case at trial was misidentification.

However, Petitioner has not demonstrated that he was prejudiced by counsel's error: he has not shown that trial counsel's actions were not a product of any sound strategy. See Thomas, 428 F.3d at 499-500. It was reasonable for trial counsel to make a strategic decision to attempt to discredit the witnesses' ability to perceive and recall the events of October 8, 1986, rather than to attack each element of their identifications of Petitioner.[24]

First, trial counsel elicited on cross examination that James Smith had been drinking a wine cooler before the gunmen entered but was not substantially impaired. Jan. 27, 1988, Trial Tr. 116:2-17, ECF No. 91-1, App. 210. To challenge the identification of Petitioner, trial counsel cross examined James Smith about the man with the pistol's height and determined that that man was shorter than James Smith, approximately 5'6" or 5'7". Id. at 139:9-19, ECF No. 91-1, App. 233. That statement of

---

[24] Trial counsel moved to suppress all photo identifications, arguing that the photo arrays were unduly suggestive. The trial court denied the motion; thus, it is probable that counsel elected not to pursue this line of questioning to avoid opening the door to evidence which would confirms the accuracy of the identifications. See Mot. to Suppress, ECF No. 91-1, App. 84-85.

James Smith was inculpatory. So, trial counsel then extensively cast doubt on James Smith's ability to have seen the man with the pistol. Id. at 141:9-146:8, ECF No. 91-1, App. 235-40.

Second, as to Opal Nickson, counsel on cross examination elicited testimony about the shooter's build--"[b]etween 5/6, 5/7, small build . . . ." Jan. 28, 1988, Trial Tr. 220:2-3, ECF No. 91-2, App. 315. Opal Nickson also testified that, shortly before the gunmen entered the residence, James Smith was smoking cocaine, Angelo Smith and Elijah Bennett were smoking marijuana and cocaine, and she was smoking marijuana. Jan. 28, 1988 Trial Tr. 238:2-239:7, ECF No. 91-2, App. 333-34. As with James Smith, trial counsel challenged Opal Nickson's ability to see the man with the pistol or differentiate between the shots from the shotgun and the pistol, especially given that Opal Nickson had identified someone approximately the same height as Petitioner. Id. at 246:19-262:7, ECF No. 91-2, App. 341-57.

Third, on cross examination of Elijah Bennett, trial counsel elicited that the witness had been smoking marijuana just before the gunmen entered. Jan. 28, 1988, Trial Tr. 474:10-11, ECF No. 91-3, App. 570. Trial counsel then similarly cast doubt on Elijah Bennett's ability to observe the man with the pistol. Id. at 489:7-494:25, ECF No. 91-3, App. 585-90.

Trial counsel thus appears to have sufficiently attempted to make the following points with regard to each witness:

53

(1) the witness was under the influence of drugs and or alcohol which may have impaired their ability to perceive or recall the events; (2) the witness was not able to clearly see the man with the pistol because of the man's position, the witness's position in the room, and the lighting; and (3) the witness has not always testified consistently, by reference to their statements to the police.

It is true that trial counsel did not explicitly challenge the witnesses' identifications of Petitioner by reference to his height, weight, skin color, or facial hair.[25] Whether this was a strategic choice, or whether trial counsel only chose not to question the witnesses about their specific recollections or statements as to the man with the pistol's appearance because he did not have access to the arrest photos is not apparent from the record. Regardless, given the unequivocal in-court identifications of Petitioner, it is not likely that detailed questions directed to the witnesses about the man with the pistol's facial hair (or lack thereof) would have had more than a minimal impeaching impact on their testimony.

---

[25] Two of the witnesses, James Smith and Opal Nickson, testified that the man with the pistol was 5'6" or 5'7"--consistent with Petitioner's height as recorded on October 10, 1986. Thus, some of the testimony that came out on cross tended to inculpate Petitioner on the basis of his height.

In any event, Petitioner looks nearly the same in the photos taken on August 8, 1985--which were used to identify Petitioner--and the photos taken on October 10, 1986, after his arrest. Compare App. 35 (August 8, 1985 photo), with App. 36 (October 10, 1986 photo).[26] Thus, if a witness recognized Petitioner as the man with the pistol on the basis of the August 8, 1986 photograph, they likely would have also recognized Petitioner in the October 10, 1986 photograph. Under these circumstances, it is not reasonably probable that a different result would have occurred had trial counsel been able to cross examine the witnesses with the arrest photograph.

(d) Failure to Interview Angelo Smith

Petitioner also claims that trial counsel's failure to interview Angelo Smith prior to trial was constitutional error. Petitioner presented this claim to the PCRA court in 2016. The PCRA court did not address the issue directly, instead focusing on Petitioner's claims pertaining to the 2014 recantations. The

---

[26] Although Petitioner argued in his 2014 supplement that he was clean shaven in the arrest photo that was used as part of the photo array, the materials provided by amicus indicate that Petitioner's August 8, 1985 photograph, which depicts Petitioner with a mustache, was used in the array. Petitioner has a thin mustache in all of the arrest photographs provided by amicus. See ECF No. 91-1, App. 26-37. It is not clear, however, whether there is yet another arrest photograph of Petitioner that shows him without a mustache and that has not yet been produced in the course of his federal habeas petition.

Court thus reviews this claim de novo, in light of Respondents'
waiver of nonjurisdictional defenses.

According to a letter sent to trial counsel on December 19,
1986, trial counsel received from the Commonwealth, among other
discovery, the arrest warrant and the statement of Angelo Smith.
Suppl. Mem. Ex. C, ECF No. 85-1 at 8. Both of these documents
indicate that Angelo Smith was not certain in his identification
of Petitioner. Thus, Petitioner argues, reasonable trial counsel
would have sought to call Angelo Smith as a witness to test the
reliability of his identification.

Petitioner states,

When the Commonwealth failed to present Angelo Smith at
trial, competent defense counsel would have had reason
to suspect that Angelo had information favorable to the
defense. Given Mr. Johnson's insistence that he was
wrongfully arrested and charged in this matter, and
given the prosecutor's discussion of Angelo in his
opening statement, competent counsel would have
interviewed Angelo.

Suppl. & Am. to Pet. ¶ 82, ECF No. 36.

On the other hand, amicus argues that counsel was not
ineffective for failing to call Angelo Smith because Angelo
Smith's testimony would not have been exculpatory. Rather,
Angelo Smith's testimony that he could not identify Petitioner
would open the door to his initial statements to the police and
generally corroborate the statements of the other eyewitnesses.
Amicus Br. at 32, ECF No. 91.

56

However, the prosecution represented that Angelo Smith was unavailable to testify at trial, despite the court's issuance of a bench warrant. If the prosecutor was to be believed, then trial counsel may reasonably have believed that any independent efforts to secure Angelo Smith's appearance at trial would be futile. Thus, the central issue was whether counsel was ineffective for failing to interview Angelo Smith upon reviewing his statement to the police.

Baynes, as well as Sims and Bryant, discussed supra, lend support to Petitioner's argument that reasonable defense counsel, in an identification case, would interview all eyewitnesses to the crime, even if counsel also intended to cross examine the witnesses at trial. Reasonable defense counsel should further investigate any evidence that has a possibility of being exculpatory. This holds true even where defense counsel also intends to present an alibi defense, as any inconsistent testimony from the eyewitnesses in support of the misidentification theory would "bolster rather than detract" from the alibi defense. Lawrence, 900 F.2d at 130. Counsel thus acted unreasonably in failing to interview Angelo Smith.[27]

---

[27] As discussed in subsection IV.B.2.a, supra, the prevailing interpretation of Brady in the Third Circuit prior to 2016 required counsel to act with due diligence in obtaining exculpatory information. Thus, the fact that the state courts below found no Brady violation with regard to Angelo Smith's statement, in part because of trial counsel's failure to

In light of the record, it is probable that defense counsel acted unreasonably in failing to secure the police reports for witnesses who could support the misidentification and alibi defense. Nevertheless, there is not a reasonable probability of a different result had Angelo Smith been interviewed by defense counsel or presented as a defense witness at trial. Three other witnesses recognized Petitioner as the man with the pistol at trial. And, unlike the other three witnesses, Angelo Smith had never met Petitioner before--thus, he may have been less likely to remember his face. Therefore, any error by counsel was not prejudicial to Petitioner.

**D.   Prosecutorial Misconduct**

Petitioner argues that he was denied a fair trial because of the pervasive misconduct of the prosecutor and police in his case. Petitioner claims that the prosecutor at trial made a number of comments and statements that, while not grounds for a mistrial, were unprofessional and may have affected the jury's assessment of the case, despite the trial judge's numerous limiting instructions. This claim of prosecutorial misconduct

---

interview Angelo Smith prior to trial or call him as a witness at trial, supports the Court's current finding that counsel was not reasonably diligent.

was raised and rejected in post-trial motions, on appeal, and in his PCRA petitions. This issue thus has been fully exhausted.[28]

Petitioner has not demonstrated that the state courts' rejection of his prosecutorial misconduct claims were contrary to or an unreasonable application of clearly established federal law. Rather, the state court decisions regarding prosecutorial misconduct (rather than counsel's failure to challenge the investigation) rested entirely on state law. Thus, the Court has no jurisdiction to consider the merits of this claim.

### E.   Cumulative Prejudice

#### 1.   Legal Standard

The Third Circuit has recognized that "errors that individually do not warrant habeas relief may do so when combined." Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007) (citing Marshall v. Hendricks, 307 F.3d 36, 94 (3d Cir. 2002)); see also Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008) ("Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process." (citing Albrecht v. Horn, 471 F.3d 435, 468 (3d Cir. 2006), vacated and

---

[28] The issue of prosecutorial misconduct as discussed herein applies only to the statements made by the prosecutor during the trial and do not include any of the claimed Brady violations discussed in section IV.B, supra.

superseded on other grounds by Albrecht, 485 F.3d 103). Thus there must be a colorable claim of constitutional error in order for the Court to accumulate the resulting prejudice. See, e.g., Hannibal v. Gilmore, No. 13-619, 2021 WL 4597084, at *20 (E.D. Pa. Feb. 23, 2021); Richardson v. Capozza, No. 19-1188, 2020 WL 12957619, at *20 n.25 (E.D. Pa. May 27, 2020); see also Gee v. Kerestes, No. 09-825, 2009 WL 6598378, at *10 (E.D. Pa. Nov. 17, 2009), report and recommendation adopted as modified, 722 F. Supp. 2d 617 (E.D. Pa. 2010) ("The court, therefore, examines only the cumulative effect of errors, not the cumulative effect of petitioner's claims."). The cumulative error doctrine thus does not allow a petitioner to aggregate all of his claims, including those a court finds meritless, to argue that the trial was unfair; a petitioner may only argue that the cumulative effect of meritorious trial errors that were individually harmless violated their right to a fair trial. In other words, zero plus zero is zero and does not add up to one.

A habeas petitioner has the burden of establishing "actual prejudice" on the basis of cumulative error, in order to be afforded relief. Albrecht, 485 F.3d at 139. But, "in cases of grave doubt as to harmlessness the petitioner must win." O'Neal v. McAninch, 513 U.S. 432, 437 (1995).

Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the

jury's verdict." Id. "In other words, '[t]here must be more than a "reasonable probability" that the error was harmful.'" Charleston v. Gilmore, 305 F. Supp. 3d 612, 630 (E.D. Pa. 2018) (quoting Johnson v. Lamas, 850 F.3d 119, 133 (3d Cir. 2017)).

By that logic, "the stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair." Marshall v. Hendricks, 307 F.3d at 69. For instance, in Albrecht, the court found that the petitioner could not demonstrate cumulative prejudice resulting from the petitioner's complaints of the jury instructions, actual innocence, ineffectiveness of counsel, and the prosecution's failure to timely disclose witness statements, because the petitioner had a motive to commit the crime, there was physical evidence about him, and he had previously told people he would commit a crime. 485 F.3d at 139.

Other courts have found cumulative prejudice to warrant granting a habeas petition where "[t]he jury did not have the opportunity to consider highly damning impeachment evidence and did not consider and rely on critical witness testimony that has since been found to be false." Roberts v. Broomfield, --- F. Supp. 3d ---, 2022 WL 16532819, at *119 (E.D. Cal. Oct. 28, 2022). More specifically, in Roberts, the court found cumulative prejudice resulting from the prosecution's failure to disclose potential biases of the eyewitnesses who testified against the

petitioner at trial critically undermined the fairness of the petitioner's trial because the prosecution's case rested solely on the testimony of eyewitnesses. Id. at *117. In another case from the Ninth Circuit, the court found that "the collective presence of" "the failure to disclose impeachment evidence, [the prosecution's main witness's] perjury, and the prosecution's comments on privileged conduct . . . . [was] devastating to one's confidence in the reliability of th[e] verdict and therefore requires, at the very least, a new trial." Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002). Similarly, in Cargle v. Mullin, the Eleventh Circuit focused on the "inherent synergistic effect" of the prosecution's improper bolstering of two critical witnesses and defense counsel's failure to challenge the vulnerable witnesses in an already weak case, finding that "habeas relief [was] warranted on the basis of cumulative error". 317 F.3d 1196, 1220-21 (10th Cir. 2003).

    2.   Discussion[29]

Having previously concluded that it was error for (1) the prosecution to fail to timely disclose the arrest photo;

---

[29] In 2014, the Third Circuit held that a standalone claim of cumulative error, like its component independent claims of error, is subject to exhaustion. Collins v. Sec'y Pa. Dep't of Corr., 742 F.3d 528, 543 (3d Cir. 2014). This federal habeas petition was docketed on June 7, 2013. Petitioner first presented a standalone claim of cumulative error in his first counseled amended petition, docketed on November 8, 2013. See Am. Pet., ECF No. 17. The Court previously granted Petitioner's

(2) trial counsel to fail to secure the arrest photo; and

(3) trial counsel to fail to interview Angelo Smith, the Court

now considers whether these errors, taken together and in light

of the trial evidence, would "undermine[] the fundamental

fairness" of Petitioner's trial. Fahy, 516 F.3d at 205.

The prejudice resulting from each of these errors--

individually and cumulatively--was minor. First, the arrest

photograph at issue was only weakly favorable to Petitioner as

his mustache was thin and the shooting occurred in the dark.

Second, trial counsel's failure to obtain the arrest photo was

not material because the arrest photo was not strongly

exculpatory. Third, trial counsel's failure to interview or

present Angelo Smith as a witness did not strongly prejudice him

in light of the unequivocal identification testimony by three

eyewitnesses who knew him from around the neighborhood.[30]

---

motion for a stay and abeyance in order to exhaust claims based
on newly discovered evidence. See May 4, 2015 Order, ECF No. 47.
However, Petitioner did not raise a standalone claim of
cumulative error in the amended PCRA petition filed on his
behalf by the Pennsylvania Innocence Project on January 21,
2016. See 2016 Amended PCRA Petition, ECF No. 96-2. This claim
is thus not exhausted. However, as noted previously, the Court
will review this claim on the merits as doing so at this time is
in the interests of justice.

[30]    Although all four eyewitnesses have since averred that they
were threatened by police in some capacity to identify
Petitioner as the man with the pistol, neither Petitioner nor
Respondents articulate how this police misconduct constituted a
constitutional error that may be aggregated as part of the
cumulative prejudice analysis. Furthermore, aside from James

The state courts in this matter have acknowledged that
trial counsel was deficient (though not constitutionally
ineffective) for failing to consult more extensively with
Petitioner before trial. See, e.g., Pet'r's Reply to Amicus at
27 n.10, ECF No. 92-1 (summarizing the state courts' holdings
regarding Petitioner's ineffective assistance of counsel
claims). Petitioner's PCRA petition was denied by the PCRA
court, appealed by Petitioner, remanded by the Superior Court
for an evidentiary hearing, granted by the PCRA court following
the evidentiary hearing, appealed by Respondents, granted by the
Superior Court, and then subsequently denied by the Superior
Court after rehearing en banc. The record thus indicates that
whether or not Petitioner's trial counsel was a constitutionally
effective advocate was not a clear call.

Yet, three eyewitnesses testified that Petitioner was the
man with the pistol. Although the eyewitnesses did not see

─────────────────────

Smith's 2001 affidavit, the allegations of police misconduct
derive from 2014 statements of the eyewitnesses, in which they
explain that they were coerced by police. However, when
interviewed by police investigators again in 2016, neither Opal
Nickson nor Angelo Smith described coercion by police.
Accordingly, the parties have not described a sufficient factual
basis for the claim of police misconduct, either.
    Nor do the parties sufficiently describe how the
prosecutor's conduct violated any of Petitioner's constitutional
rights, especially in light of the trial judge's recognition
that, while the prosecutor's comments were frequently
inappropriate, many of the inappropriate comments were made
outside the presence of the jury, and the jury was given a
number of limiting instructions regarding statements of counsel.

Cowboy being shot by anyone, another shooter was never found, no weapons were ever recovered, and Petitioner presented an alibi defense, the jury believed the testimony of the eyewitnesses that Petitioner was the man with the pistol. Thus, in light of Petitioner's claims that counsel was ineffective for failing to discover and use the arrest photos before and at trial--and counsel's ineffectiveness for failing to investigate an exculpatory eyewitness--there was not a reasonable probability of a different result had trial counsel's performance not been deficient and had <u>Brady</u> material been disclosed. Defense counsel attempted to impeach the eyewitnesses at trial, and had Angelo Smith been presented as a defense witness, the prosecution similarly would have undermined his credibility.

Accordingly, any cumulative prejudice flowing from the constitutional errors at trial is insufficient to warrant relief.

> **F.** **Actual Innocence**
>
> 1. <u>Legal Standard</u>

A petitioner's claim of actual innocence may serve as an equitable exception to compliance with AEDPA's one-year statute of limitations. <u>McQuiggin v. Perkins</u>, 569 U.S. 383 (2013). Where the showing of evidence of innocence is credible, a prisoner may be permitted to maintain constitutional claims "on the merits notwithstanding the existence of a procedural bar to relief."

Id. at 392. This "miscarriage of justice exception . . . applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" Id. at 394-95 (quoting Schlup, 513 U.S. at 329) (alteration in original). The Court reviews de novo whether a petitioner's evidence, new and existing, is sufficient to show that the Schlup standard is satisfied. Munchinski v. Wilson, 694 F.3d 308, 337 (3d Cir. 2012). This does not mean that the Court "make[s] an independent factual determination of what actually happened. Rather, [the Court] assess[es] the likely impact that the new evidence would have had on reasonable jurors." Wallace v. Mahanoy, 2 F.4th 133, 151 (3d Cir. 2021). Although a showing of diligence is not required for an "actual innocence" claim, untimeliness "does bear on the credibility of evidence proffered to show actual innocence." McQuiggin, 569 U.S. at 401.

In reviewing all the evidence, the Court considers "both newly discovered evidence as well as exculpatory evidence that counsel failed to discover or present at trial." Wallace, 2 F.4th at 152 (citing Reeves v. Fayette SCI, 897 F.3d 154, 163-64 (3d Cir. 2018)).

Per Wallace, the Court considers (1) the "newness" of the evidence; (2) the reliability of the "new" evidence; (3) whether the evidence tends to show actual innocence as a matter of law;

66

and (4) the general relevance of the "new" evidence, in determining whether no reasonable juror would have reasonable doubt about a petitioner's guilt in light of the new, reliable evidence. Id. at 152-53.

2.  Discussion

Petitioner has not demonstrated that he meets the high bar for actual innocence. The "new" evidence that he sets forth include the 2014 statements of the eyewitnesses as well as the arrest photographs. Although this evidence is relevant and tends to exculpate him, it is not sufficiently reliable.

First, the statements are not "new," but the photographs can be considered "new." The 2014 statements of the eyewitnesses--alleging that they were coerced to identify Petitioner and did not actually think he was the man with the pistol--were created nearly thirty years after the shooting. One witness, James Smith, stated in a 2001 affidavit that he wrongly identified Petitioner. That affidavit is fresher, as it was created only approximately fifteen years after the shooting. Petitioner does not explain why it took so long to re-interview the other eyewitnesses, especially where each of those witnesses stated that they would have come forward sooner had anyone asked them about their testimony. On the other hand, the arrest photographs are "new." These were discovered in 2019, and there

is no indication that the photographs are not the authentic photographs taken in 1986.

Second, while the arrest photographs are genuine, the statements of the eyewitnesses are not particularly reliable. James Smith's statements are relatively consistent from 2001 to 2014. But the other three statements are problematic. First, Elijah Bennett attested in his 2014 statement that he has significant memory problems because of a head injury and did not remember testifying at trial--although he recalled wrongfully identifying Petitioner. His statement therefore creates some doubt about his ability to recall the initial statement in the first place--and also indicates that his statement could not be subjected to adversarial testing. Next, Opal Nickson has given three statements--in 2014, 2016, and 2019--and said something slightly different each time. In 2014, she stated that she testified falsely at trial, in 2016, she stated that she testified truthfully at trial, and in 2019, she stated in a deposition that she was told to testify truthfully and thus told the truth when she testified that Petitioner looked like the man who had the pistol. In 2019 she also said she had no recollection of what was in the 2014 affidavit but described Petitioner's investigator as "harassing" her. She has since passed away, so her testimony cannot be subject to further adversarial testing. Finally, Angelo Smith's 2014 and 2016

statements, while generally consistent, are not particularly
reliable. In both statements, Angelo Smith said that he appeared
at trial, told someone affiliated with the prosecution that he
did not recognize Petitioner, and then was told his presence was
no longer required at trial. In the 2016 statement to police
investigators, however, Angelo Smith stated that he did not read
his 2014 statements. Thus there is some doubt as to the
integrity of the 2014 affidavits, with respect to Angelo Smith
and, more generally, with respect to the three other
eyewitnesses. And, this is not even considering that the
recantation statement has not been subject to adversarial cross-
examination.[31]

     Third, the arrest photograph does not tend to show
innocence as a matter of law. As discussed at length above, the
arrest photographs are not particularly exculpatory; the trial
testimony regarding Petitioner's appearance is somewhat
consistent with the photograph, and three eyewitnesses
positively identified him at trial. For this reason, the

---

[31] None of the eyewitnesses were ever cross examined as to their
recantations in open court. In 2016, as part of PCRA proceedings
(when Respondents had still taken an adversarial position)
Angelo Smith and Opal Nickson were asked about their 2014
recantations. In 2019, Opal Nickson was deposed and subjected to
informal cross examination. There is no record of James Smith or
Elijah Bennett ever being questioned by Respondents regarding
their recantations.

photographs are also not particularly relevant to the claim of innocence.

Fourth, the affidavits, if believed, are relevant and could be probative of innocence--all four eyewitnesses have stated that they did not actually recognize Petitioner as the man with the pistol and instead were coerced into choosing his picture. However, as discussed above, these recantations are not reliable in that they were not made until long after the threat of charges for perjury had passed, and they were made in the face of conceded memory problems, thus impacting the parties' ability to subject the statements to adversarial testing. Furthermore, the allegations of coercion by the prosecution or police detectives are one-sided and made without the benefit of so much as interviews with those actually involved.[32] Thus, the Court cannot determine the full extent of any alleged coercion or misconduct.

---

[32] Although Petitioner points to a number of cases in which Pennsylvania courts found the prosecutor or one of the detectives involved in Petitioner's case liable for misconduct, see Settlement Agreement at 13 n.15, ECF No. 77 (collecting cases discussing the prosecutor's misconduct); Mem. of Law in Support of Pet. for Writ of Habeas Corpus at 94 n.23, ECF No. 19 (collecting cases highlighting Detective Bittenbender's past misconduct), no such claim has been adjudicated on the facts of this case. The Court cannot take instances of prior misconduct, without more, as conclusive evidence that the prosecutor or detectives in Petitioner's criminal case engaged in misconduct.

Accordingly, Petitioner has not presented sufficiently reliable "new" evidence to support a meritorious claim of actual innocence.

**V.   CONCLUSION**

For the foregoing reasons, habeas relief is not warranted on Petitioner's claims. The settlement agreement will not be approved.

An appropriate Order follows.